

**RECEIVED**

NOV 2 8 2007

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

MICHAEL W. DOBBINS
CLERK, U. S. DISTRICT COURT

RODICA WAIVIO, )
Plaintiff, )
       v. )
ADVOCATE HEALTH CARE NETWORK, )
ADVOCATE HEALTH AND )
HOSPILAT CORPORATION, )
ADVOCATE LUTHERAN GENERAL HOSPITAL,)
ADVOCATE MEDICAL GROUP non-profit corp) )
IAN JASENOF, individual and employee, )
JENNIFER TORRES, individual and employee, )
DANIEL PESCH, individual and employee )
THOMAS IANNUCCI, individual and employee )
BRUCE PIELATE, individual and employee, )
Rapisarda John, individual and employee )
Defendants.

07CV6690
JUDGE GUZMAN
MAGISTRATE JUDGE VALDEZ

## COMPLAINT AND DEMAND FOR JURY TRIAL

**NOW COMES** Plaintiff, RODICA WAIVIO, in Pro Se representation, and complaining against Defendants, states as follows:

1.     This is an action alleging defendants' violation of plaintiff's freedom from discrimination in medical services starting year 2006 till present as secured by US Constitution and federal laws 42USC1981, 42USC1981(a), ADA, Title V ADA 42USC12203, Title VII, Title VI, Fourteenth Amendment to US Constitution. Complaint claims defendants violated plaintiff's constitutional/federal rights to life, happiness, property, enjoyment of life, and prosperity as well as violation of plaintiff's baby right to life, as protected by US Constitution and federal laws.

2.     This is an action against defendants for conspiracy to violate plaintiff's legal right to prosperity, health, property and plaintiff's baby right to life and enjoinment of life pursuant to 42USC 1985.

3.     This is an action for violation of plaintiff's legal rights pursuant to 42 USC 300, medical services received from medical entity as described in this complaint, in regards to defendants' violation of the plaintiff's and plaintiff's baby right to basic medical services and supplemental medical services. Defendants refused to provide medical service and to inform plaintiff about medical condition; they refused adequate basic medical services such as obstetrics

1

and gynecology as well as prenatal and parietal services; defendants refused to make adequate diagnostics, and inform plaintiff about diagnosis and the results of the lab, such as the ultrasound findings, and their refusal of medical services resulted in death of plaintiff's baby in September 17,2006 and in injury and health damages, Asherman's syndrome.

4.     All state claims based on federal questions are under Tort of Medical Malpractice, Professional Malpractice, Tort of Deceit Tort of Intent Tort of Deceit Misrepresentation Tort of Gross Negligent, Tort of Failure to Warn.

5.     Pursuant to Illinois Constitution and laws: as a matter of law, physician who has a doctor-patient relationship with a pregnant woman who intends to carry her fetus to term has a doctor-patient relationship with the fetus. As a matter of law, Plaintiff as pregnant woman was entitled to be informed if medical test results reveal that she had a disease that could affect her baby or her. The life of each human being begins at conception. Unborn children have protectable interests in life, health, and well-being. Law requires that the attending physician inform his patient of the status of plaintiff's pregnancy, the development of her fetus, the date of possible viability.

6.     "In performing professional services for a patient, physician, [defendants] has a duty to use that degree of learning and skill ordinarily possessed and used by members of that profession and of that school of medicine in the community in which the [physician] practices, or in similar communities, and under like circumstances. In the application of this skill and learning the [physician] should also use ordinary care and diligence.". An intentional violation of duty is violation of federal laws and constitutional rights.

7.     Plaintiff proves the following elements: (1) The defendants owed plaintiff a duty of care and was required to meet or exceed a certain standard of care to protect plaintiff from injury; (2) the defendant breached this duty or deviated from the applicable standard of care; and (3) plaintiff was injured and that injury proximately resulted from the defendant's breach of the standard of care.

8. Plaintiff claims injuries, health injury addressed to reproductive system, death of baby, infection intentional inflicted, child loss and damages resulted from defendants' intentional practices willful misconduct or gross negligence or intentional acts.

2

9. **Jurisdiction:** Jurisdiction is invoked pursuant to 42USCF1981 42 U.S.C. § 2000e-5(f), 28 U.S.C. § 1331, 28U.S.C.§1331,28U.S.C.§1343, 28U.S.C.§1441,42U.S.C.§2000e-5(f),42U.S.C.§2000d,42U.S.C.§1983, 42U.S.C.§1988 to recover damages or to secure equitable relief under civil rights federal laws ( 28U.S.C.§2202), under laws upon which plaintiff claims were brought. Pursuant to 28 USC 1367 this court has jurisdiction over all state claims based on federal questions alleged in this complaint.

10. **Parties:** RODICA WAIVIO ("Waivio") resides in Illinois. At the time the subject events occurred, she was an accepted member of the defendants' network organization; the records identify plaintiff as member in AMG. Medical record and identifications satisfy are contractual arrangements.

### Defendants

11. Advocate Health Care Network[1], Advocate Health Centers, INS, Advocate Health and Hospitals Corporation, Advocate Lutheran General Hospital are non profit corporations in Illinois. Defendants are individuals and non-profit corporations in network organization and relationships; Advocate Health Care Network is non-profit corp, Advovate Health And Hospital Corporation, is a non-profit corp;

12.Ian Jasenof, MD is an employee of previous mentioned defendants and Jennifer Torres, is officially the nurse of Jasenof employed by Advocate Health Care. Advocate Lutheran General Hospital is part of Advocate Network and is an employer of Jasenof. Jasenof has an office in the Lutheran General Hospital in Department of Obstetrics and Gynecology at address 1875 Dempster Suite 340 Park Ridge IL 60068 and an office in 1255 N Milwakee Glenview IL 60025, where he has practice by himself and his nurse Jennifer. Bruce PILATE, is an individual and employee of above entities.

13. Charles Miller is employee of Lutheran General Hospital and employee ofUniversity of Illinois at Chicago employee as teacher, and this shows a relation between present matters and previous matters from case 04-C-3545 Waivio v. UIC. Pursuant to Rule 8(e)(2) the federal questions raised in complaint are independent of federal questions in case 04-C-3545.

---

[1] Agent Gail Haseroucke 2025 Windsor Dr Oak Brook IL 60523

14. Defendant Ian Jasenof is graduate from UIC and has strong relations with UIC which motivates a link of retaliation against plaintiff for her protected actions and oppositions.

15. Defendants entities are "health center" pursuant to 42 USC 254b(a)(1); the defendants satisfy the conditions from 42 USC 254(b)(1) as related to providing to plaintiff required primary health services by basic health services such as 42USC 254(b)(1)A(i)I obstetrics and gynecology, and 42USC 254(b)(1)A(i)II "diagnostic laboratory and radiological services" and 42USC 254(b)(1)A(i)III preventive health services, including— 42USC 254(b)(1) (aa) prenatal and perinatal services; 42USC 254(b)(1) (ee) screenings for elevated blood lead levels, communicable diseases, and cholesterol; and 42USC 254(b)(1)A (ii) referrals to providers of medical services; 42USC 254(b)(1)A 42USC 254(b)(1)A (iv) services that enable individuals to use the services of the health center (including outreach and transportation services and, 42USC 254(b)(1)A (v) education of patients and the general population served by the health center regarding the availability and proper use of health services.

16. Defendants are "medical group" pursuant to 42USC 300e(4); defendants are "heath maintenance organization" pursuant to 42 USC 300e(a).

17 Plaintiff was/is a "member" of the above defendants entities pursuant to 42 USC 300e(1)(3) member. Plaintiff has a contract of "health services" including inpatient and outpatient services, medical treatment and referral services; diagnostic laboratory and diagnostic and therapeutically radiological service, and preventive health service

18. 42USC3000e establishes the "Requirements of heath maintenance organization" pursuant to 42 USC 300e(b) manner of supplying basic and supplemental heath services to members "health maintenance organization shall provide, without limitations as to time or cost, basic and supplemental health services to its members".

19.    Historically Plaintiff filed 3 charges with EEOC, see case 04-C-3545 Waivio v. UIC in Court of Hon Judge Norgle. At the time the events occurred there were pending EEOC charges against UIC and legal actions in district court see case 04-C-3545 Waivio v. UIC. Defendants were aware of legal actions in district court, as plaintiff informed defendants.

**Facts**

4

20.    Between May 2006-Sept 17, 2006 Plaintiff was pregnant. Plaintiff's baby died on Sept 17, 2006 as result of placenta rupture which exploded under the pressure of huge blood clots existent in the uterus [condition known as antiphospholipid syndrome treatable with baby aspirin [81mg], lovenox 41 mg, heparin].

21. In May of 2006 Plaintiff was recommended by Rapisarda, MD (AMG) [employee of AMG and Luteran Hospital], to Jasenof, MD, for further medical care as related to pregnancy. Dr Jasenof received a letter and complete information as related to previous treatment made by DR Rapisarda.

22.. On June 23, 2006 in the ninth week of pregnancy, Plaintiff meat Dr Jasenof in his office from 1255 N. Milwaukee GlenView IL 60025. Dr Jasenof made an examination of the pregnancy and an ultrasound picture [this picture was immediately presented to federal court in case 04-C-3545 where it was used as evidence of pregnancy]. At that time plaintiff meet Jannifer Torres the only nurse of Jasenof in obstetrics. At that time Jasenof made blood analysis and requested urine sample as well as weighted plaintiff [she did not monitor the blood pressure or any fundal height].

23. On July 11 Plaintiff called Jasenof's office and reported vaginal blooding. Plaintiff was scheduled immediately in that day at 1:00 pm to see Dr Jasenof.

24. At about 1:00pm Plaintiff met DR Jasenof, and plaintiff described vaginal bleeding. Dr Jasenof inquired about color of bleedings if it was brown or red. Plaintiff responded that it was both red and brown. Following Dr Jasenof performed an ultrasound exam of the pregnancy, including fetus, uterus, and he verified the cervix. While he was performing ultrasound at one moment he become panic and he showed signs of extreme concerns expressed through upset voice and questions related how plaintiff was scheduled for that day appointment. Plaintiff than looked on the ultrasound and plaintiff saw a black oval of the dimension of a big nut, which was in the uterus and was visible on the ultrasound machine. This is identified by plaintiff as a blood clot seen in the uterus [however at that time plaintiff had no knowledge of any medical condition as plaintiff was not informed by Jasenof], clear visible on ultrasound machine of Dr Jasenof on July 11,2006. Dr Jasenof requested to plaintiff bed, complete rest. However DR Jasenof refused or omitted to inform plaintiff about diagnosis and the medical condition of plaintiff at that time

5

or about the baby; he did not inform plaintiff about the nature of the black oval seen in the uterus on his ultrasound machine [later on Sept 17,2006 when placenta rupture plaintiff saw blood clots]. He requested plaintiff to come again in one week. At this time Jeniffer, his nurse, did not make any medical measure of plaintiff's pressure, weight or any other matter. She limited at welcome Dr Jasenof.

25. On July 18, 2006 plaintiff has another appointment with Dr Jasenof. At this time Jeniffer requested urine sample and weighted plaintiff [she did not monitor the blood pressure or any fundal height]. Dr Jasenof inquired again about the bleeding color, and plaintiff responded that they are brown and red. Plaintiff asked the doctor about Prometrium; plaintiff requested to DR Jasenof to continue Prometrium. He told plaintiff to stop prometrium, and his voice was very upset, refusing to inform or provide any explanation. He performed an ultrasound exam. Plaintiff saw from the ultrasound bed the baby, the hart beat, and again the black oval of the nut dimension in the uterus. The baby was normal. Dr Jasenof recommended the First Trimester scan analysis at Lutheran General Hospital, with Genetics at Parkside Center 1875 W Dempster St Ste 310, Park Ridge IL 60068. Ultrasound was performed solely by Jasenof and there was no qualified personal as radiologist or stay trained for ultrasound.

26. On July 20, 2006 plaintiff preformed the First Trimester Scan with Dr Bruce Piclate, high risk doctor. The ultrasound was performed by Debbie Fuldman. In the time of ultrasound the fetus showed very agitated, and very much mobility, been a little difficult for technician to make picture. The technician had to adjust the bed in a position which was favorable to ultrasound. Plaintiff had a very good look at the ultrasound monitor which was exactly in front of the plaintiff. Plaintiff was the baby movements and main parts of body. Plaintiff furthermore see again the black oval with dimension of a nut in the uterus. At the end of the ultrasound exam Dr Bruce Pilate came and informed plaintiff that everything was good and was nothing abnormal. Plaintiff was informed about the baby length of 7.03 cm. It is the plaintiff's belief that DR Pilate refused or intentionally omitted to inform plaintiff about the nature of the black oval seen in the uterus. Plaintiff trusted DR Pielet's words that everything was normal. Later facts proved that he lied to plaintiff, misinforming plaintiff about child

6

27. On Aug 17, 2006 Plaintiff had an appointment at about 11:30 am withy Dr Jasenof. However in the morning of Aug 17, 2006, Plaintiff received a phone call from Jennifer requesting plaintiff to come at 10:00 am, as there was early availability; plaintiff responded that plaintiff could came earlier as plaintiff and the plaintiff's husband are interested to see an ultrasound of the plaintiff's baby.

28. Early in the morning plaintiff and the plaintiff's husband met Dr Jasenof. This time Dr Jasenof refused to perform an ultrasound [while plaintiff requested an ultrasound] and he limited himself only listening at the fatal hart beat with a small pocket Doppler. Plaintiff requested him to schedule the ultrasound for 20 weeks, but he refused, and he also refused to recommend amniocentesis under false reasoning such as previous results from Genetics were excellent. At that time he refused to listen to plaintiff's concerns. Plaintiff claimed that there were pain in the uterus but Dr Jasenof stated that this was because of the growing of the baby. He requested plaintiff to come in one month.

29. On Sept 15, 2006 Plaintiff called Jennifer and reported vaginal bleeding. Jennifer told plaintiff that this is normal in pregnancy, and recommended plaintiff to see DR Jasenof on next day on Sept 16, 2006, in the morning at 9:00 am. Plaintiff agreed and plaintiff mentioned that she will came next day withy her husband, for the pregnancy and the plaintiff's baby.

30. ON Sept 16, 2006 at 9:00 am plaintiff and her husband met DR Jasenof. DR Jasenof performed an ultrasound. Plaintiff's baby was developed comparative to last ultrasound. The ultrasound was quite long. Plaintiff observed black in uterus (this was blood clots) clearly seen on ultrasound.

31. Plaintiff inquired Dr Jasenof about the well being of baby and he responded that everything was normal and there was no concern. Plaintiff showed to him blood and some mucus which from Sept 15, 2006 but Jasenof said that it was normal. Plaintiff in good faith believes that Jasenof was aware of the critical medical condition as cervix was open and as blood was showing some mucus which was sign evident of cervix being open. However Jasenof lied to plaintiff and he stated that everything was normal while plaintiff was in critical condition and cervix was open. Jasenof performed also a verification of cervix and he lied to plaintiff stating that cervix was closed but the cervix on Sept 16,2006 was open because mucus was getting out.

7

31. On Sept 17, 2006 Plaintiff's baby died at 21 weeks. The placenta rupture under pressure of blood.

32.    Defendants refused to inform plaintiff about "phospholipids syndrome" medical condition identified by defendants in week 10-13 of plaintiff's pregnancy; they refused to treat in any way plaintiff's medical condition; They refused to hospitalize plaintiff; on Sept 16, 2006, in week 21 of plaintiff's pregnancy, after making ultrasound which fully showed plaintiff's uterus full with big blood clots [a critical condition Requiring hospitalization], Defendant Jasenof sent plaintiff at home refusing any medical services and refusing to inform plaintiff about the real critical medical condition[he let plaintiff to understand that plaintiff was all right]; plaintiff's baby died on Sept 17, 2006 and plaintiff was in critical condition of life on Sept 17, 2006, loosing huge amount of blood which threatened plaintiff's life. "Phospholipids syndrome" is a medical condition treatable [with baby aspirin 81mg] and plaintiff's baby life could have been saved with minimal expenses and effort.

33. At the time of plaintiff's pregnancy at Lutheran General Hospital there were only 4 doctors in Obstetrics and Gynecology; the four obstetrics doctors refuse to treat Plaintiff's pregnancy. Following a few month to Dept 17, 2006 Obstetrics and Gynecology department Lutheran Hospital

WHEREFORE, plaintiff, in her complaint, prays that this Honorable Court grant the following relief:

(a)    Order Defendants provide full adequate medical services to Plaintiff for all her life.

(b)    Order Defendants to give a child to plaintiff and her husband as remedy to the lost of her baby; defendants have means to provide medical achievement of pregnancy and life child.

(b)    Permanently enjoin the Defendants and its agents, employees, successors, and all persons in active concert or participation as appropriate, from all illegal practice;

(c)    Provide sufficient remedial relief to make Waivio whole for the loss she has suffered as a result of the actions against her as alleged in this complaint;

(d)    Provide all remedy available under law and all damages compensations any type.

(e)    Award compensatory damages to Waivio for future pecuniary loses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and injuries incurred (direct, indirect) as a result of the discrimination against  as alleged in this complaint.

(f)    Award punitive damages to Waivio as a result of malice, wrongdoing or reckless indifference to Plaintiff's rights as alleged in this complaint.

The plaintiff prays for such additional relief as this Honorable Court deems just and proper.

### JURY DEMAND

The plaintiff hereby demands a trial by jury of all triable issues pursuant to Rule 38 of FRCP and Sect 102 of the Civil Rights Act of 1991, 42 U.S.C. Sec 1981a. Plaintiff hereby demands a jury determination of damages, and damages about $10000000.

1325 Baldwin Court, Apt 2A,
Palatine, IL, 60074 Phone: 847-963-0231        Respectfully, Submitted by Dr. Rodica Waivio

Defendants
Ian Jasenof and Jennifer Torres
1255 N Milwakee
Glenview IL 60025
Or
1875 Dempster Suite 340
ParkRidge IL 60068

9