IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| RODICA WAIVIO,<br>Plaintiff,<br>       v.<br>ADVOCATE HEALTH CARE NETWORK,<br>ADVOCATE MEDICAL GROUP,<br>ADVOCATE HEALTH AND<br>HOSPILAT CORPORATION,<br>ADVOCATE LUTHERAN GENERAL HOSPITAL,)<br>IAN JASENOF, individual and employee,<br>JENNIFER TORRES, individual and employee,<br>DANIEL PESCH, individual and employee<br>THOMAS IANNUCCI, individual and employee<br>BRUCE PIELTE, individual and employee,<br>VISHVANATH KARANDE, individual and employee)<br>RAPISARDA JOHN, individual and employee<br>FERTILITY CENTER OF ILLINOIS,<br>KARANDE& ASSOCIATES | Case No: 07-C-6690<br><br>HONORABLE JUDGE<br>  Ronald A. Guzman |

Defendants.

**FILED**

JAN 1 6 2008
Jan 16 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## COMPLAINT AND DEMAND FOR JURY TRIAL *(Amended)*

**NOW COMES** Plaintiff, RODICA WAIVIO, in Pro Se representation, and complaining against Defendants, states as follows:

1.    This is an action alleging defendants' violation of plaintiff's freedom from discrimination in medical services based on plaintiff's national origin, protected membership in protected classes starting year 2006 till present as secured by US Constitution and federal laws, 42USC1981, 42USC1981(a), Title VII, Title VI[1], Title IX, Rehabilitation Act, ADA, Civil Rights of 1871, Fourteenth Amendment to US Constitution. Complaint claims defendants violated plaintiff's constitutional/federal rights to life, happiness, property, enjoyment of life, and prosperity as well as violation of plaintiff's baby right to life, as protected by US Constitution and federal laws.

---

[1] 42USC300w-7(a)Defendants satisfy the requirement from 42USC300w-7, defendants' activities are funded in part with founds made available under 42USC300, federal funds
42USC708 Maternal and Child Heath activities under federal funds satisfies 42USC708

2.  This is an action against defendants for Violation of Civil Rights Act of 1871, for violation of 42U.S.C.A.1985, 42USCA.1985(2), 42USCA.1985(3),defendants injured plaintiff in "person or property" in retaliation for participating in federal proceeding. Starting to May 2004 plaintiff had participated at federal legal action 04-C-3545 Judge Norgle Northern District Illinois, which continue till present. Defendants made Retaliatory harm to plaintiff, retaliatory discharge from medical services, constructive discharge, and their actions constitute sufficient injury to entitle plaintiff to relief see Haddle v. Garrison 525 US 121 142 L. Ed 2d 502 119 S CT 489(1998).

3.  This is an action pursuant to 42USC300, 42USC300(e)(b)[2], defendants refused to provide medical services and completely denied medical services to plaintiff as to specific necessities. Defendants' actions were intentionally against plaintiff' federal and constitutional rights. Defendants' actions were intentionally designated to escape liability or to further refuse medical services to plaintiff.

4.  All state claims based on federal questions are under Tort of Retaliation, Tort of Retaliation discharge [as for discharge from medical services], Tort of Medical Professional Malpractice, Tort of Deceit, Tort of Intent, Tort of Misrepresentation Tort of Gross Negligent, Tort of Failure to Warn, Tort of Battery.

5   This action is filed pursuant to the Equal Protection Clause of the Fourteenth Amendment to the Constitution to enforce the provisions of 42USC300(e)(b), Public Health Service Act of 1944 as amended 42USC300w-7, 42USC708 Maternal and Child Heath activities under federal funds pursuant to 42USC708, Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, et seq. ("Title VI"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e—2000e-5, et seq. ("Title VII"), , 42 U.S.C § 12101—12514; Americans with Disabilities Act of 1990, Title III Private Entities ("ADA"), (42 U.S.C § 12181—12189); Section 504 of the Rehabilitation Act of 1973 ("Rehab"), 29 U.S.C. § 794-794a, reg 34CFR Part 104; Americans with Disabilities Act of 1990, Title V of Section 503, and 42U.S.C. § 12203; Section 1981 of the Civil Rights Act of 1866 (42 U.S.C. § 1981), Civil Rights Act of 1991 et seq. ("Sec 1981"); 42

---

[2] 42USC300e(b) health organization shall provide, without limitations as to time or cost other than those prescribed by or under this subchapter, basic and supplemental health services to its members

U.S.C. § 1983("Sec 1983"); 735ILCS Civil Procedure;  Code of Fed Reg Dep. of, Dep. of

Justice, Department of Public Health, Department Civil rights of 1871 "protects people

participating in federal procedure", 42USC1895.

      6.    **Parties:** RODICA WAIVIO ("Waivio") resides in Illinois.  At the time the

subject events occurred, she was resident of Cook County and member in defendants' medical

groups, and each doctor had plaintiff as member of their medical services.

      7. Plaintiff claims injuries, health injury addressed to reproductive system, death of baby,

infection intentional inflicted, child loss and damages resulted from defendants' intentional

practices willful misconduct or gross negligence or intentional acts.

      8.    **Jurisdiction:** Jurisdiction is invoked pursuant to 28 USC1343(a)(1), 28

USC1343(a)(2), 42USC1981 42 U.S.C. § 2000e-5(f),  28 U.S.C. § 1331, 28U.S.C.§1343,

28U.S.C.§1441,42U.S.C.§2000e-5(f),42U.S.C.§2000d,42U.S.C.§1983,42USC1985

42U.S.C.§1988 to recover damages or to secure equitable relief under civil rights federal laws (

28U.S.C.§2202), under laws upon which plaintiff claims were brought. Pursuant to 28 USC 1367

this court has jurisdiction over all state claims based on federal questions alleged in this

complaint.

**Defendants**

      9. Advocate medical Group, Advocate Health Care Network, Advocate Health Centers,

INS, Advocate Health  and Hospitals Corporation, Advocate Lutheran General Hospital are non

profit corporations in Illinois.  Defendants are individuals and non-profit corporations in network

organization and relationships;

      10.Ian Jasenof, MD is an employee of Advocate Lutheran Hospital previous mentioned

defendants and  Jennifer Torres, is officially nurse of Jasenof employed by Advocate Health

Care. Advocate Lutheran General Hospital is part of Advocate Network, Advocate medical

Group and is an employer of Jasenof. Bruce PILATE, is an individual and employee of above

entities.

      11. Defendant Karande is employee of Advocate medical Group, Lutheran Hospital and

he has his own business "Karande and associates" private corporation; previously he was teacher

at UIC. Charles Miller,  is employee of Lutheran General Hospital  and employee of University

3

of Illinois at Chicago employee as teacher. This shows relation between present matters and previous matters from case 04-C-3545 Waivio v. UIC.         Defendant Ian Jasenof is graduate from UIC and has strong relations with UIC which motivates relation of retaliation against plaintiff for her protected actions and oppositions.

12. Jon Rapisarda is employee of Advocate Medical Group, Lutheran Hospital and he has his own business with Fertility Center of Illinois, private corporation. Jon Rapisarda is very good friend with Jan Jasenof, and in May 2006 Rapisarda sent letter of recommendation and verbally recommended Plaintiff to Jasenof.

13. Defendants are "medical group" pursuant to 42USC 300e(4); defendants are "heath maintenance organization" pursuant to 42 USC 300e(a).

14. Plaintiff was/is a "member" of the above defendants entities pursuant to 42 USC 300e(1)(3) member. Plaintiff has contract of "health services" including inpatient and outpatient services, medical treatment and referral services, all matters under law; diagnostic laboratory and diagnostic and therapeutically radiological service, and preventive health service

**A prime facie Allegation**

15. Plaintiff was born in Romania; defendants were aware of plaintiff's national origin; complete and in deep information was provided particularly on 07/20/06 at first trimester scan Lutheran Hospital; patients Romanians are rare in defendants' medical services; Lutheran Hospital Jasenof patients were mainly Hispanic, Mexicans.

16. Historically Plaintiff filed 3 charges with EEOC, see case 04-C-3545 Waivio v. UIC in Court of Hon Judge Norgle. At the time the events occurred there were pending EEOC charges against UIC and legal actions in district court and state court starting May 2004 see case 04-C-3545 Waivio v. UIC and 06-7189 Waivio v. UIC. Ultrasound Picture made by Ian Jasenof of plaintiff's pregnancy were submitted to court in case 04-C-3545 and in state courts.

17. Defendants were aware of legal actions in district court, as plaintiff informed defendants. Plaintiff showed legal papers of case 04-C-3545 to Rapisarda John in May 2006, and some of legal papers were left in Fertility Center of Illinois in May 2006. Legal papers of case 04-C-3545 were also showed to Ian Jasenof and his nurse in summer 2006 and legal papers were

4

left about his office. Plaintiff shared all the legal information with Daniel Pesch, while he claimed to have directorial position in Lutheran Hospital, or decisional/influential position.

18. Before receiving services from defendants plaintiff had no history of infertility, and there was no any medical problem with plaintiff's reproductive system. Plaintiff was previously pregnancy in 2005 [fact about this appears in case 04-C-3545].

19. After plaintiff received medical services from defendants plaintiff was diagnosed with Ashermans' Syndrome result of hysteroscopy performed by Daniel Pesch on 01/05/07 at Lutheran Hopital and with lupus anticoagulant positive on 09/28/2006 [Rapisarda detected], while plaintiff never before had something like this; on 09/28/06 MTHFR, ANA Screen was detected positive as induced by treatments of Rapisarda.

20. Defendants had knowledge completely of the plaintiff's medical conditions; starting week 10-21 of pregnancy Lutheran Hospital and Jasenof were fully aware of existent medical condition but he dishonestly misinformed plaintiff that "plaintiff's medical condition was normal" this is what he said to plaintiff; In conversations with Daniel Pesch after Sept 17,2006 he acknowledged they were fully aware of medical condition as early as week 10-11 of pregnancy and that they were aware that plaintiff has in critical medical condition in Sept 16,2006. Daniel Pesch acknowledged that they were fully aware of matters. Plaintiff asked Daniel Pesch what was the diagnostic of plaintiff's pregnancy and he said it was "Thrombophilia". Later discussions with hematology specialist confirmed "phospholipids syndrome" Furthermore medical hematology acknowledged that defendants usually solves this matters with baby aspirin and that it is typical procedure very well aware by doctors and hospitals, shortly there was nothing new for defendants.

21. In Oct 2006 plaintiff discussed with Thomas Iannucci, high risk doctor; he acknowledged that he was aware of all plaintiff's medical matters and he acknowledged that Jasenof refused intentionally to make medical analyses of blood and ultrasounds; Iannucci confirmed that some blood work was done after death of plaintiff's baby when diverse medication was given to induce labor in Sept 17-18,2006, and this medication was used as cover up of real medical condition about which defendants were fully aware. Shortly there was intentional procedure to hide evidence of real medical matter.

5

22. Medical record at Lutheran Hospital or Advocate Medical Group does not present this medical condition or any medical condition; However in Sept 17,2006 plaintiff went to Northwestern Community Hospital where medical records are describing blood clots of 400cc, and critical medical condition see record.

23. Usually the clients receiving medical services by Jasenof were Hispanic, or national origin Mexicans. Jasenof and Jennifer Torres are Hispanic related as they speak Spanish. Daniel Pesch, Iannucci Bruce Piclate, Rapisarda are American origin

### Nature and Statement of Facts

24.     Starting March 2006 plaintiff requested medical services in infertility. from Fertility Center of Illinois, Dr Rapisarda Jon. Plaintiff was recommended FCI by "Women Heath First". Rapisarda made some summary analysis and saline ultrasound in March 2006; plaintiff acknowledged her national origin and her bipolar disability. All results were very good and plaintiff's uterus at that time was normal without any medical condition. Plaintiff's medical expanses were covered by Lumenos insurance at that time see billing from insurance.

25. Beginning April 06, Rapisarda established plan for plaintiff and prescribed medications. Recommended method of treatment for plaintiff was aggressive [comparative to others], and there was less drastic way for plaintiff that was Clomid Pills [or Menopure, Repronex]. Rapisarda never explained plaintiff the difference between Clomid and Gonal-F therefore at that time Clomid would have been a less drastic and available method for plaintiff, however Rapisarda treated plaintiff with injectable while refused clomid. Rapisarda did treat other patients, similar situated to plaintiff, with clomid and those were not Romanians or not involved in similar protected activities as plaintiff.

26. However medication Gonal-F for plaintiff was not directly ordered from pharmacy [they complained there was not sufficient time to order] but the nurse of Rapisarda, Jeannine gave plaintiff medication, 3 boxes of Gonal-F 450, on free. Shortly plaintiff's received medication from the doctor itself, from FCI, and not direct from pharmacy. no pharmacy provided any Gonal-F medication to plaintiff in April–May 2006, but FCI gave medication to plaintiff from its own affairs. Plaintiff believes this practice was not with other people non Romanians or not involved in protected actions.

6

27. Starting 04/25/06 Plaintiff received fertility treatment from FCI, injectable GONAL – F 04/28/06-05/03/06 with 112.5 for 6 days, followed by IUI. Plaintiff got pregnant and by 05/20/06 plaintiff's pregnancy was confirmed.

28. At beginning of June, 2006 plaintiff had appointment with Rapisarda and plaintiff acknowledges problems with pregnancy as there was pain, cramps; plaintiff requested to him to provide further medical services till at week 12 as other persons were permitted. Repisarda refused further medical services and by 06/05/06 informed plaintiff that no further medical services will be provided by FCI after week 7 of pregnancy, after 06/12/06. Rapisarda recommended plaintiff to go to Ian Jasenof and he sent a letter of recommendation to Ian Jasenof while demanded that no further services will be provided by FCI, despite of plaintiff's requests of medical care and plaintiff opposition. It is plaintiff's believe that Rapisarda had other options of recommendations for plaintiff but he choose Jasenof because he had anticipated the matters which were to come. Plaintiff believes Rapisarda refused to treat plaintiff while he intentionally sent plaintiff to Jasenof as to escape liability. Other patients, similar situated but not Romanians or participating in protected actions were recommended to better places and to better medical care [or they were allowed till week 12 to be under care of FCI], while Rapisarda recommended plaintiff to Jasenof.

29. From the time of confirmation till at plaintiff's discharge from FCI there was no any blood work [only HCG and progesterone] while FCI and Rapisarda were fully aware that complications existed and plaintiff complained of pain and plaintiff requested to Rapisarda medical services as to specific pain/situation; plaintiff requested Rapisarda to provide medical services till at 12 weeks. However Dr Rapisarda refused further services after 06/12/06.

30. Plaintiff believes other patients, not Romanians or not involved in protected actions did received treatments as to specific similar conductions to plaintiff and they waited till 12weeks at FCI before transferring somewhere else.

31. Plaintiff was hand in a booklet from FCI which acknowledges at pag 8 "serious complications of these medications [Gonal-F], with exception of multiple birth, are rare. The manufacturers advise that serious pulmonary conditions and thromboemblic (blood clot) events" see exhibit. However the medication Gonal-F manufacturer on box and its content does not

acknowledges such matter [see exhibit Gonal-F leaflet]. Comparing recommendations of manufacturer and FCI statements, it can be seen FCI people identified and established "thromboemblic events" as side effects most common in their practice. Shortly Jon Rapisarda was fully aware of existent side effects as its practice has fully acknowledged however he refused any medical treatment, any medical analysis in May-June 2006 when plaintiff got pregnant and when plaintiff complained of pain and requested medical assistance. Plaintiff believes other people [no Romanians or no participating in protected activities] received full care while plaintiff was refused medical care.

32. Between May 2006-Sept 17, 2006 Plaintiff was pregnant. Plaintiff's baby died on Sept 17, 2006 as result of thrombophila untreated by defendants, which induced placenta rupture [placent exploded under the pressure of huge blood clots existent in the uterus] [condition known as antiphospholipid syndrome treatable with baby aspirin [81mg], lovenox 41 mg, heparin].

33. In May of 2006 Plaintiff was recommended by Rapisarda, MD (american)(AMG) [employee of AMG and Luteran Hospital], to Jasenof, MD, for further medical care as related to pregnancy. Dr Jasenof received a letter and complete information as related to previous treatment made by DR Rapisarda. From further discussions Jasenof confessed that he had many patients coming from DR Rapisarda with similar treatment, and he acknowledged to be aware of fertility treatments acknowledged by Rapisarda see record his writing states gonatropin and IUI. defendants in present case proved to be very well aware of side effects of medication and fertility treatments; Jasenof had knowledge of matters under discussion and he had treated successfully before patients with same conditions, who were not Romanians or unrelated to opposition of unlawful discrimination. Romanians were minority or very rear in defendants' institutions.

34.. On June 23, 2006 in the ninth week of pregnancy, Plaintiff meat Dr Jasenof (American Hispanic, speaking Spanish, white) in his office from 1255 N. Milwaukee GlenView IL 60025. Dr Jasenof filled in the registration with his office see record; plaintiff acknowledged her Romanian origin which appeared mentioned in record, and her bipolar disability; Jasenof made an examination of pregnancy and an ultrasound[3] picture [this picture was immediately

---

[3] Dr JAsenof had ultrasound machines in each room of treatment; ultrasound was performed by himself without help of a qualified professions technician or any other doctor; On July 11,2006 plaintiff requested Jennifer to perform an ultrasound but Jennifer acknowledged that she had no knowledge how to use ultrasound or how to use Doppler

presented to federal court in case 04-C-3545 where it was used as evidence of pregnancy]. At that time plaintiff meet Jannifer Torres (Hispanic) the only nurse of Jasenof in obstetrics. At that time Jasenof made blood analysis and requested urine sample as well as weighted plaintiff [she did not monitor the blood pressure or any fundal height]. Plaintiff requested him to make all analysis and scheduled first trimester analysis.

35. On July 11 Plaintiff called Jasenof's office and reported vaginal blooding. Plaintiff was scheduled immediately in that day at 1:00 pm to see Dr Jasenof.

36. At about 1:00pm Plaintiff met DR Jasenof, and plaintiff described vaginal bleeding. Dr Jasenof inquired about color of bleedings if it was brown or red. Plaintiff responded that it was both red and brown. Following Dr Jasenof performed an ultrasound exam of the pregnancy, including fetus, uterus, and he verified the cervix. Dr Jasenof requested to plaintiff complete bed rest; He requested plaintiff to come again in one week.; plaintiff inquired about medical situation while Jasenof refused to respond to plaintiff's requests of information and treatment; JAsenof appeared quite upset in that day; Plaintiff requested treatment while Jasenof refused any treatment; plaintiff did inquire about prometrium, and Jasenof told plaintiff to stop prometrium.

37. Plaintiff believes ultrasound performed in July 11,2006 day provide evidence of presence of blood clots in uterus and provide sufficient information to Jasenof to diagnostic plaintiff's condition and necessity of treatment;

38. plaintiff believes that facts from Sept 16,2006 were consequence of complete refusal of Jasenof to treat plaintiff's medical condition which was identified by Jasenof starting with July 11,2006.

39. At this time Jeniffer, his nurse, did not make any medical measure of plaintiff's pressure, weight or any other matter. She limited at welcome Dr Jasenof.

40. On July 18, 2006 plaintiff has another appointment with Dr Jasenof. At this time Jeniffer requested urine sample and weighted plaintiff [she did not monitor the blood pressure or

---

Monitor: shortly she was quite limited in her practice; her recommendations appeared based on her own experience of pregnancy of her two children rather than on medical scientific matters.

Shortly at the pace where Jasenof was seen about 20 patients on day, there was no any ultrasound technician who could perform an ultrasound and the only person managing ultrasound appeared to be Ian Jasenof. In October 2006 Jasenof complained and refused to see plaintiff based on reason that he had 20 patients on day, in a place where there was no ultrasound technician: there was no another OB Doctor at AMG from Gland View.

9

any fundal height]. Dr Jasenof inquired again about the bleeding color, and plaintiff responded that they are brown and red. Plaintiff asked the doctor about Prometrium; plaintiff requested to DR Jasenof to continue Prometrium. He told plaintiff to stop prometrium, and his voice was very upset, refusing to inform or provide any explanation. He performed an ultrasound exam.  The baby was normal. Dr Jasenof recommended the First Trimester scan analysis at Lutheran General Hospital, with Genetics at Parkside Center 1875 W Dempster St Ste 310, Park Ridge IL 60068. Ultrasound was performed solely by Jasenof and there was no qualified personal as radiologist or stay trained for ultrasound. Plaintiff requested to Jasenof to make blood analysis but Jasenof refused under pretexts that he was interested in first trimester scan.

41. Plaintiff believes that other persons with similar conditions as plaintiff [no Romanians or no participating in protected actions] did received medical care and they were prescribed  medicines as baby aspirin or levanox for treatment of condition while plaintiff was refused treatments and medication. Plaintiff believes other pregnant women had bood work made in similar conditions however Jasenof refused to perform any blood analyses after July 11,2006.

42. On July 20, 2006 plaintiff preformed the First Trimester Scan with Dr Bruce Pielate, high risk doctor. The ultrasound was performed by Debbie Fuldman.  In the time of ultrasound the fetus showed very agitated, and very much mobility, been a little difficult for technician to make picture. The technician had to adjust the bed in a position which was favorable to ultrasound. Plaintiff had a very good look at the ultrasound monitor which was exactly in front of the plaintiff. Plaintiff inquired about the medical findings and requested explanations. At the end of the ultrasound exam Dr Bruce Pilate came and informed plaintiff that everything was good and was nothing abnormal. Plaintiff was informed about the baby length of 7.03 cm. Plaintiff believes testing performed in July 20,2006  provide evidence of presence of blood clots in uterus and provide sufficient information to defendants as to diagnostic plaintiff's condition and necessity of treatment; plaintiff believes DR Pilate identified the plaintiff's medical condition of thrombophilia  [as Daniel Pesch acknowledged in September 2006], and the test made all information available to defendants; however defendants refused to inform plaintiff they refused to make record of adequate diagnostic and misinformed plaintiff that everything was normal, when the reality was that plaintiff's medical condition was treatable. Plaintiff believes other

similar situated persons, not Romanians or not involved in protected actions, had received complete information about real medical condition while plaintiff was misinformed and lied to.

Plaintiff trusted DR Pilet's words that everything was normal. Later facts proved that he lied to plaintiff, misinforming plaintiff about child, about medical condition which was not acknowledged on July 20,2006 while ultrasound provide all information to them.

Plaintiff does acknowledges that the procedure required plaintiff to acknowledge all her history and protected characteristics such as her Romanian origin and her disability as they ask all information.

43. On Aug 17, 2006 Plaintiff had an appointment at about 11:30 am withy Dr Jasenof. However in the morning of Aug 17, 2006, Plaintiff received a phone call from Jennifer requesting plaintiff to come at 10:00 am, as there was early availability and Dr Jasenof was on harry as he had other matter to do;  plaintiff responded that plaintiff could came earlier as plaintiff and the plaintiff's husband are interested to see an ultrasound of the plaintiff's baby.

44. Early in the morning plaintiff and the plaintiff's husband met Dr Jasenof. This time Dr Jasenof refused to perform an ultrasound [while plaintiff requested an ultrasound] and he limited himself only listening at the fatal hart beat with a small pocket Doppler. Plaintiff requested him to schedule the ultrasound for 20 weeks, but he refused; plaintiff requested blood work and all necessary testing and amniocentesis, but he also refused under false reasoning such as previous results from Genetics were excellent or that he had no time. At that time he refused to listen to plaintiff's concerns as he claimed being very stressed out in that day. Plaintiff claimed that there were pain in the uterus but Dr Jasenof stated that this was because of the growing of the baby. He requested plaintiff to come in one month.

45. Plaintiff believes that other pregnant people received better care and better attention from Jasenoff while plaintiff did not receive any minimal care from Jasenof. plaintiff received no guidance or no necessary treatment or care.

46. Plaintiff discussed with Jennifer that plaintiff had pain in uterus but Jennifer said that this was normal because she had a normal pregnancy and because she had pain too while she was pregnant; shortly she was not providing care to plaintiff but he was just telling her stories.

11

47. On Sept 15, 2006 (Friday morning) Plaintiff called Jennifer and reported vaginal bleeding. Jennifer told plaintiff that this is normal in pregnancy, and recommended plaintiff to see DR Jasenof on next day on Sept 16, 2006, in the morning at 9:00 am. Plaintiff agreed and plaintiff mentioned that she will came next day withy her husband, for the pregnancy and the plaintiff's baby.

48. Plaintiff believed Jennifer discriminated against plaintiff because usually with other patients Jennifer was arranging them to be seen in AMG office from Lutheran Hospital which had doctors on call Jennifer did not arrange for plaintiff to e seen immediately or arrange a phone call to doctor on call; she misinformed plaintiff that there was no doctor available while she scheduled plaintiff to see Jasenof next day. Plaintiff believes with other patients no Romanians nor no participating in protected activates, she was directing them to office from Lutheran Hospital or provided them with phone call doctor.

49. ON Sept 16, 2006 at 9:00 am plaintiff and her husband met DR Jasenof. Plintiff showed to doctor in a plastic bad the blood and the mucus which got out one day before; Jasenof said that "this is shameful" DR Jasenof performed an ultrasound. Plaintiff's baby was developed comparative to last ultrasound. The ultrasound was quite long. The ultrasound provide information to Jsenoff that plaintiff's situation was critical and plaintiff was necessary to be hospitalized; plaintiff attaches as exhibit a study and similar pictures which proves that at that time Jasenof was fully aware of plaintiff's medical condition as blood clots were visible on his ultrasound machine; However Jasenoff discriminated against plaintiff based on national origin or her protected activities and lied to plaintiff that everything "was normal".

50. Plaintiff inquired Dr Jasenof about the well being of baby and he responded that everything was normal and there was no concern. Plaintiff showed to him blood and some mucus which from Sept 15, 2006 but Jasenof said that it was normal. Plaintiff in good faith believes that Jasenof was aware of the critical medical condition as cervix was open and as blood was showing some mucus which was sign of cervix being open. However Jasenof dishonestly misinformed plaintiff and he stated that everything was normal while plaintiff was in critical condition and cervix was open. Jasenof performed also a verification of cervix and he

12

dishonestly misinformed plaintiff stating that cervix was closed but the cervix on Sept 16,2006 was open because mucus was getting out.

51. On Sept 17, 2006 about 3:00pm placenta had rupture under pressure of blood clots and pain. Plaintiff was transported immediately to Northwestern Community Hospital were plaintiff received blood transfusion and IV. The medical personnel established that there were blood clots in uterus about 400CC, while plaintiff's situation was threatened by lost of blood see medical record Plaintiff's baby died at 21 weeks.

52. Plaintiff believes that facts from Sept 17,2006 were fully preventable with simile baby aspirin and simple care; plaintiff believes defendants willfully refused medical diagnostic and treatment discriminating plaintiff based on her national origin or participation in protected activities. Plaintiff believes defendants completely denied medical services to plaintiff and the resulted was the lost of life of baby and critical condition for plaintiff.

53. Plaintiff believes that other patients, not Romanians or not participating in protected activities were treated better or were placed in hospital and care about while plaintiff was refused complete medical care.

54.    Defendants refused to inform plaintiff about "phospholipids syndrome" medical condition identified by defendants in week 10-13 of plaintiff's pregnancy; they refused to treat in any way plaintiff's medical condition; They refused to hospitalize plaintiff; on Sept 16, 2006, in week 21 of plaintiff's pregnancy, after making ultrasound which fully showed plaintiff's uterus with big blood clots [a critical condition Requiring hospitalization], Defendant Jasenof sent plaintiff at home refusing any medical services and refusing to inform plaintiff about the real critical medical condition[he let plaintiff to understand that plaintiff was all right]; plaintiff's baby died on Sept 17, 2006 and plaintiff was in critical condition of life on Sept 17, 2006, loosing huge amount of blood which threatened plaintiff's life. "Phospholipids syndrome" is a medical condition treatable [with baby aspirin 81mg] and plaintiff's baby life could have been saved with minimal expenses and effort.

55. At the time of plaintiff's pregnancy at Lutheran General Hospital there were only 4 doctors in Obstetrics and Gynecology in Park Ridge office, Jasenof, Daniel Pesch, Gomez, Galvez; the four obstetrics doctors completely refuse to treat Plaintiff's pregnancy or provide

13

further medical services. However only Lutheran Hospital had about 19 specialists in infertility at time of plintiff's pregnancy; each one was making about 200[4] women pregnant on year, therefore it was expected that about 3800 women were soliciting Lutheran Hospital for medical care following fertility treatments; Jasenof was complaining that he had about 20 women on day. It appears that there existed shortage of medical specialists in obstetrics at Lutheran General Hospital; the same situation is for gynecology. At time of plintiff's pregnancy there were just 4-5 specialist in high risk at Luthcran Hospital and considering that fertility treatments are in essence high risk it can be implied that Defendants has shortage of specialists in high risk pregnancy and this induced discrimination based on national origin. There is extreme low numbers of high risk pregnancy medical specialists comparative to fertility doctors, therefore defendants have bias with respect to fertility. Considering this comparative to case 04-C-3545 defendants might have seen in 04-C-3545 as mirror of their own practice, therefore motivating retaliation against plaintiff based on plaintiff's participating in federal procedure and opposition of unlawful discrimination.

56. Defendants have bias and preference for specific race, national origin. Jasenof prefers Hispanic patient. Defendants granted preferential treatment based on national origin, race, non-disability based on overwhelming imbalance between patients in defendants' practice and community.

57. medical record made by AMG did not report any blood clot, while ultrasound performed showed clear evidence; NCH record identified on Sept 17,2006 big blood clots with 400cc, which provide evidence of Jasenof's complete refusal to provide medical services to

---

[4] In one appointment with Rapisarda he declared that he is making about 200 women pregnant on year;
Reproductive endocrinology appears main specialization of Lutheran General Hospital as the number of specialists in fertility [there were 19 specialist in fertility at Lutheran Hospital] was exceeding the number of specialists in obstetrics and gynecology about time of plaintiff's pregnancy; this suggest that defendants might have been afraid of a federal investigation of their affairs as there is excessive disproportion between the specialists in obstetrics and those in infertility. Defendants appear to have bias to fertility matters, as number of fertility treatments exceed the ability of defendants to serve these pregnancies. This implies that defendants bias results in scarifications of some pregnancies and associates this with minorities and lack of culture of those it can be inferred that national origin discrimination against Romanians was induced by defendants' bias to fertility, shortly plaintiff's pregnancy was scarified as plaintiff was minority based on her national origin. Plaintiff was differently treated in medical services based on her national origin. Because Hispanic appeared to be the primary race of patients of Jasenof. due to Hispanic patients preference for Jasenof's national origin/race, implies plaintiff was discriminated based on her national origin by Jasenof against Hispanic who were major class of patients of Jasenof.

14

plaintiff. Defendants had acknowledged many times they were fully aware of plaintiff's condition but they refused medical services.

58. On Sept 17,2006 after NCH stabilized plaintiff's medical condition they transferred plaintiff to Lutheran General Hospital. At all time when plaintiff was at Lutheran Hospital Jasenof refused to discuss or meet plaintiff. Plaintiff was treated by Daniel Pesch and Isabel Gomez, and residents.

59. On Sept 18,2006 defendants refused to perform a complete D&C to plaintiff and they let a small part of placenta "product of conception" in plaintiff's uterus as to prevent further pregnancy. Afterwards they dishonestly misinformed plaintiff about her medical condition. They refused to clean the uterus under various pretexts.  Following Dec 17-18,2006 defendants refused to give antibiotic to plaintiff as medical standards procedure required plaintiff to have antibiotic following pregnancy lost and labor; all other women with about same conditions received antibiotic and medical care; plaintiff requested antibiotic to Jasenof and Daniel Pesch and they refused to provide antibiotic. In night of Sept 18,2006 plaintiff called Pesch on emergency as plaintiff had high temperature, and plaintiff's heath was very bad, but Pesch refused to provide any antibiotic to plaintiff. Plaintiff discussed with other people and they confirmed that all other patients in labor situation received antibiotic and medical care staing for 4-5 days in hospital after delivery while plaintiff was sent to home on Sept 19,2007, in same day with delivery.

60. Following defendants' refusal to provide medication and medical care plaintiff uterus got infected and on Sept 22,2006 plaintiff was taken to Lutheran Hospital based on excessive temperature about 102degree and very bad medical conditions. Defendants gave plaintiff diagnostic of endometritis but in essence this was willfully induced by defendants in retaliation and based on plaintiff's national origin.

61. In December 2006 plaintiff had a hysteroscopy for diagnosis and biopsy report stated that there was placenta left over in uterus from pregnancy, as defendants refused to clean plaintiff's uterus.

62. Iannucci and Pesch had conspired to have plaintiff make hysteroscopy for removal of left placenta from uterus in fall 2006, see letter in Dec 2006  from Iannucci and record statements

of Pesch; Pesch continually solicited plaintiff to have surgery with him in an effort to agrees and harm plaintiff.

63. In January 5, 2007 plaintiff accepted to have hysteroscopy of removal of placenta from uterus. While Pesch declared that procedure is a hysteroscopy and there can not be harm, plaintiff believes that Pesch performed actually two different surgeries in same time without consent of plaintiff and without given knowledge to plaintiff; on 01/05/07 Pesch performed both a D&C and a hysteroscopy as two separate procedures and he aggressed plaintiff's uterus. His actions are battery. Pesch and defendents have liable in trespass (battery) because they did not obtain consent for procedure, while they claimed to be a simile and without risk procedure.

64. In February 2007 plaintiff requested services from Charless Miller medical Group where plaintiff received medical treatment from Michel Zinger. Zinger performed an 3-D ultrasound and established that 70% of plaintiff uterus was scarred following the surgery performed by Pesch at Lutheran Hospital on 01/05/07; Zinger identified Asherman's Syndrome as induced by defendants. Plaintiff requested Zinger to make hysteroscopy for removal of scaring. Before making testing with Zinger plaintiff performed a saline ultrasound with Pesch, and Pecsh declared that uterus was normal. Comparing the two testing plaintiff realized that Pesch was dishonestly misinforming plaintiff about the real medical condition of plaintiff while he aggressed plaintiff on 01/05/07.

65. Plaintiff discussed with Pesch the testing of Zinger in Feb 2007. Pesch declared that he will discuss with Zinger about plaintiff. After a few days from Pesch discussion with Zinger, Zinger refused to perform surgery. He requested plaintiff to go to a mental heath doctor [he gave plaintiff a name] and have medical care and for that doctor to give a letter of recommendation to Michel Zinger that plaintiff was able to have surgery. Plaintiff did not satisfy the requests of Zinger therefore plaintiff left Charless Miller office without treatment. Zinger completely refused medical care to plaintiff's situation while previous to discussion to Pesch he promised plaintiff total medical care to solve the Ashermsn's syndrome induced by Pesch surgery.

66. There is a relation between Pecsh induction of Asherman's syndrome to plaintiff and Zinger. In February 2007 Zinger was not an employee of Lutheran Hospital. Today Michel Zinger is an employee of Lutheran Hospital. It appears that Michael Zinger was compensated for

his refusal to treat plaintiff by being made employee of Lutheran General Hospital [plaintiff declares under oath Michel Zinger appears today on internet http://www.advocatehealth.com/system/about/overview.html as employee of Lutheran Hospital while he was not en employee in Feb 2007].

67. In February and March 2007 plaintiff received medical services from Karande (Indian), employee of Lutheran Hospital. Plaintiff requested him to make hysteroscopy for removal of scaring and plaintiff requested him to use scissors. On March 20,2007 he performed hysteroscopy for removal of scaring; however he burned plintiff's uterus with electricity while he did not use scissors; after surgery plaintiff had about one month bleedings which indicated that Karande let scaring intentionally in the uterus; on 04/17/07 plaintiff made HSG which identified that right side of uterus was left with scar see exhibits. On 05/09/07 Karande sent a letter to plaintiff asserting that no further medical services will be provided by him or his office, complete denial of medical services. In May 2007 his associate Sigal Klipstein was not an employee of Lutheran General Hospital. Today Sigal Klipstein is an employee of Lutheran General Hospital. In fall 2006 Daniel Pesch recommended to plaintiff to receive treatment for infertility from Sigal Klipstein. Today she is employee of Lutheran General Hospital and this is related to plaintiff's harm by Daniel Pesch.

68. In Summer 2007 plaintiff requested medical services from Randy Morris, in his practice office from Naperville. After a short appointment Rendy Morrison refused to provide medical services on pretexts to discrimination, but he did not refused others no Romanians or no participating in protected activities. While in summer 2007 Randy Morrison was not an employee of Lutheran Hospital, today Randy Morrison is employee of Lutheran Hospital.

69. It appears that Lutheran General Hospital hire medical specialists in Ashermen's syndrome while plaintiff received a complete refusal of medical doctors to be treated from Ashermans' syndrome. Lutheran Hospital shows tactical legal strategy of hostile environment and complete denial to plaintiff of medical services not only by completely refusal medical services, by intentionally inducing harm but also by hiring people who refused to treat plaintiff or people who were needed to treat plaintiff in local area. This motivates an inference of retaliation as it appears that plaintiff was aggressed intentionally and Pesch induced intentional

harm to plaintiff. Furthermore there is significant movement regarding the number of infertility specialists employed by Lutheran General Hospital. At the time of plaintiff's pregnancy there were 19 specialists in reproductive endocrinology (RE), today there are 13 specialist RE from which 3 were new hiring as they are doctors specialists in Asherman's syndrome who refused services to plaintiff.

## Count I – Discrimination Based on National Origin or Race in medical services in Violation of Title VII, Title VI ; Unlawful Discrimination Section 1981 or 42 U.S.C. § 1983;

1-69 Plaintiff repeats and realleges paragraphs 1 through 69 as paragraphs 1-69 of this Count I.

70.    Defendants refused to retain the plaintiff based on her national origin, eliminating or discriminating her.

71.    Defendants had a practice of elimination, discrimination against, minorities or Romanians; patients with same national origin to plaintiff, or minorities, were not retained by Defendants; they suffered adverse actions, depravation of rights, benefits, ended in elimination.

72.    The national origin was a motivating factor of the discriminatory practice, in medical services; Hispanic people were preferred by Jasenof instead of the plaintiff or patients with national origin or minorities, even thou the plaintiff's satisfied all requirements and was qualified to receive medical services.

73.    Defendants granted preferential treatment to groups based on race, national origin of the groups on account of the imbalance which existed with respect to the total number of persons of race, color, or national origin treated by defendants in comparison with the total number or percentage of persons of such race, color, or national origin in existent communities (in violation of Title VII, 42 USC 2000e-2(j)). This motivated the discrimination, the disfavor treatment, in medical services, against underrepresented protected national, ethic groups based solely on the race, national origin conforming to 29 CFR 1607.11.

74.    Defendants had lack of race, national origin diversity among patients. There was a racial, national origin imbalance, motivated by defendants' preferential treatment, in education and employment, based on race, national origin; the Romanians were underrepresented and

disfavored based on their national origin, when other national, racial groups [Hispanic] overwhelmingly overrepresented were favorably preferred based on their race or national origin.

75.    Defendants had national origin or racial preference and people of specific nationalities, or racial groups were favored based on their national origin, but other national groups were disliked and disfavored based on their national origin.

76.    plaintiff was denied the benefits of medical services, solely because of her Romanian origin. Other patient, Romanians were denied benefits of medical services, or suffered other adverse actions, while patients (non Romanians) were allowed to enjoy the benefits of medical services that were denied to Plaintiff and other similar situated. The Hispanic was preferred to the Romanians.

77.    Defendants refused or failed to even attempt to understand the Plaintiff's cultural differences and completely refused to accept the plaintiff's culture. Defendants' made fun of the plaintiff.

78.    The plaintiff's lack of American experience was an additional motivating factor of the defendants' abuse, exploitation and humiliation against plaintiff.

79.    The Romanian culture has tradition in respect to equal rights. Defendants disliked her ethnicity because it was opposite to their false interests [unrelated to issues at question] and discriminatory practice.

80.    Defendants refused or failed to make positive efforts in reaching at a level of trust, or friendship, beyond the language or cultural differences. The relation between the plaintiff and the defendants was cold, distant, and formal, therefore subject to national origin factors.

81. defendants' violation of federal or state laws as described was an actual cause to plaintiff's losses, injury.

82.    The relationship between the plaintiff and defendants was a contractual relationship..

83.    Plaintiff belongs to "Romanian ethnicity", an ethnicity traditionally subject to discrimination; the disparate treatment against the plaintiff had racial character on the grounds of the plaintiff's ethnicity. defendants had traditional discrimination against minorities, Romanians.

19

84.     The plaintiff was subject to a constructive discharge based on her ethnicity. The defendants acted with either actual knowledge of or reckless disregards for the violation of the plaintiff's federal right under Section 1981.

85.     Therefore, the plaintiff's ethnicity was a motivating factor of unlawful discrimination against plaintiff.

86.     defendants' discriminatory practice against the plaintiff's ethnicity violated her federal right under Sect 1981, as protected under Section 1983; the violation was the cause to her damages injuries.

WHEREFORE RODICA WAIVIO, respectfully requests that this court grant judgment in her favor and against Defendants, and grant Plaintiff all relief deemed appropriate under the law.

## Count II US Constitution, Legal Malpractice, Tort of Retaliation, Tort of Misrepresentation, Deceit (Varga, ETS) Section 1985; Tort of Battery, Trespass

1-86 Plaintiff repeats and realleges paragraphs 1 through 86 as paragraphs 1-86 of this Count II.

87. Defendants' adverse actions followed the plaintiff's opposition and plaintiff's protected actions, federal court activity within such a period of time to raise an inference of retaliation.

88. The plaintiff claims the following in the present count

A. Plaintiff opposed unlawful discrimination and participated in protected activities, and plaintiff had federal and state court procedure;.

B. Defendants acted adversely against plaintiff as described in this count;

C. There is a relationship between the plaintiff's involvement in protected activities, opposition and federal or state court participation and defendants' adverse actions against the plaintiff; this is proved by the short period of time between the plaintiff's protected activities and the adverse actions, or by defendants' complete refusal of medical services refusal to plaintiff's requests and specific necessities.

D. Plaintiff suffered substantial damages as a result of the actions described;

Defendants'practice was the legal and proximate cause of injury, losses, and damages to the plaintiff.

89. The plaintiff claims the following in the present count:

a. Defendants used false, deceptive statements material to the facts and actions against plaintiff; these were done intentionally with purpose to personal gain or to hide information;

b. Plaintiff trusted all these, she relayed on Defendants' dishonest matters, or misrepresentation, or she was affected by Defendants' misrepresentation because others relied on Defendants' misrepresentation.

c. Defendants' deceive practice or misrepresentation was the legal and proximate cause of injury, losses, and damages to the plaintiff.

d. Plaintiff suffered substantial damages as a result of the Defendants' misrepresentation was the legal and proximate cause of injury, losses, and damages to the plaintiff.

90.　　The plaintiff proves the following in the present count:

a. Defendants' agents were required to obey the state and federal laws; they owed a duty of lawful and proper conduct, trustful actions;

b.　Defendants' violated the state laws as described in this count

c.　Defendants' violation was legal or proximate cause of injury losses to plaintiff,

d.　Plaintiff suffered substantial damages as a result of the Defendants 'actions

91. Defendants' intended to deprive the plaintiff of her rights, among other ways, by retaliation, discrimination based on national origin inappropriate conduct, activates of deceit, inappropriate actions designated to deprive the plaintiff of her rights.

92. The facts described in this count proved the violation of state or federal laws actionable under 45USC1985, Tort of Intent, Tort of Misrepresentation and Fraud, Tort of Deceit, Malpractice, Tort of Retaliation; these violations were the legal and proximate cause of injury to the plaintiff, and the plaintiff suffered damages as a result of the Defendants' actions; the plaintiff's depravation of legal rights or the adverse damages were therefore caused.

WHEREFORE RODICA WAIVIO, respectfully requests that this court grant judgment in her favor and against Defendants, and grant Plaintiff all relief deemed appropriate under the law.

　　　　WHEREFORE, plaintiff, in her complaint, prays that this Honorable Court grant the following relief:

(a)     Declare that defendants had unlawful practice against plaintiff in violation of federal and state laws and US Constitution;

(a)     Order Defendants provide full adequate medical services to Plaintiff for all her life.

(c)     Order Defendants to give two children to plaintiff and her husband as remedy to the lost of her baby and harm made to her health; defendants have means to provide medical achievement of pregnancy and life child.

(d)     Permanently enjoin the Defendants and its agents, employees, successors, and all persons in active concert or participation as appropriate, from all illegal practice;

(e)     Provide sufficient remedial relief to make Waivio whole for the loss she has suffered as a result of the actions against her as alleged in this complaint;

(f)     Provide solution to defendants practice as to secure that practice is not repeated.

(g)     Provide all remedy available under law and all damages compensations any type.

(h)     Award compensatory damages to Waivio for future pecuniary loses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and injuries incurred (direct, indirect) as a result of the discrimination against as alleged in this complaint.

(k)     Award punitive damages to Waivio as a result of malice, wrongdoing or reckless indifference to Plaintiff's rights as alleged in this complaint.

(l)     Plaintiff requests the suspension of the right of medical practice to Daniel Pesch and Ian Jasenof; or injunctive order to enjoin them from unlawful and illegal activity against plaintiff including misinformation of others, perjury, false statements, activity of deceit, conspiracy etc.

(m)     Provide sanctions and punishment for defendants' agents as appropriate to Laws.

(n)     Enforce defendants pursuant to 42USC300, 42USC300(e)(b) to provide full and adequate medical services and correct past matters.

Plaintiff prays for such additional relief as this Honorable Court deems just and proper.


The plaintiff prays for such additional relief as this Honorable Court deems just and proper.

## JURY DEMAND

The plaintiff hereby demands a trial by jury of all triable issues pursuant to Rule 38 of FRCP and Sect 102 of the Civil Rights Act of 1991, 42 U.S.C. Sec 1981a. Plaintiff hereby demands a jury determination of damages, and damages about $15000000.

Date of submission
Jan 16, 2008

*Rodica Waivio*

1325 Baldwin Court, Apt 2A,
Palatine, IL, 60074 Phone: 847-963-0231        Respectfully, Submitted by Dr. Rodica Waivio


Defendants
Ian Jasenof and Jennifer Torres
1255 N Milwakee
Glenview IL 60025
Or
1875 Dempster Suite 340
ParkRidge IL 60068

Acknowledgement

Present complaint includes pursuant to Rule 10(c) exhibits which are submitted separately

Today employees of Lutheran
Hopital

# Advocate
# Doctor Directory

We have **13 doctors** for you to
meet!

To get detailed information on
the doctors at the right, click on
their name. Or **modify** your
search criteria to get different
results.

You may also display, side-by-
side, as many as 5 physicians
from your results listing. Create
your list by clicking on the
physician photographs. Click
here for help.

For more information about
Advocate doctors, please call
**1.800.3.ADVOCATE**
(1.800.323.8622)/TDD
630.990.4700 or send us an e-
mail.



indicates that a physician has written or been
mentioned in publications and or articles


**Angeline N Beltsos , M.D.**
Reproductive Endocrinology
Advocate Good Samaritan
Hospital
Advocate Good Shepherd
Hospital
Advocate Illinois Masonic
Medical Center
Advocate Lutheran General
Hospital
Offices in Buffalo Grove
and Chicago and Lindenhurst


**Laurence Jacobs , M.D.**
Reproductive Endocrinology
Advocate Illinois Masonic
Medical Center
Advocate Lutheran General
Hospital
Offices in Buffalo Grove
and Glenview


**Sigal Klipstein , M.D.**
Reproductive Endocrinology
Advocate Lutheran General
Hospital
Offices in Arlington Heights
and Hoffman Estates and St
Charles


**Charles Miller , M.D.**
Reproductive Endocrinology
Advocate Lutheran General
Hospital
Offices in Naperville
and Schaumburg


**Jane Nani , M.D.**
Reproductive Endocrinology
Advocate Good Shepherd
Hospital
Advocate Illinois Masonic
Medical Center
Advocate Lutheran General


Photo not
available
**Eve C Feinberg , M.D.**
Reproductive Endocrinology
Advocate Lutheran General
Hospital
Offices in Highland Park
and Hoffman Estates

Photo not
available
**Vishvanth Karande , M.D.**
Reproductive Endocrinology
Advocate Lutheran General
Hospital
Offices in Hoffman Estates
and St Charles


**Aaron S Lifchez , M.D.**
Reproductive Endocrinology
Advocate Good Shepherd
Hospital
Advocate Illinois Masonic
Medical Center
Advocate Lutheran General
Hospital
Offices in Chicago and Oak
Brook Terrace


**Randy Morris , M.D.**
Reproductive Endocrinology
Advocate Lutheran General
Hospital
Offices in Chicago
and Naperville


**John Rapisarda , M.D.**
Reproductive Endocrinology
Advocate Lutheran General
Hospital
Offices in Buffalo Grove
and Glenview and Highland
Park

Hospital
Offices in Chicago
and Hoffman Estates

**Christopher S Sipe , M.D.**
Reproductive Endocrinology
Advocate Good Samaritan
Hospital
Advocate Lutheran General
Hospital
Offices in Chicago and Oak
Brook Terrace

Photo not available



**Meike L Uhler , M.D.**
Reproductive Endocrinology
Advocate Good Samaritan
Hospital
Advocate Illinois Masonic
Medical Center
Advocate Lutheran General
Hospital
Offices in Chicago
and Naperville and Oak Brook
Terrace



**Michael Zinger , M.D.**
Reproductive Endocrinology
Advocate Lutheran General
Hospital
Offices in Naperville
and Schaumburg

# Doctor Directory

We have **5 doctors** for you to meet!

To get detailed information on the doctors at the right, click on their name. Or modify your search criteria to get different results.

You may also display, side-by-side, as many as 5 physicians from your results listing. Create your list by clicking on the physician photographs. Click here for help.

For more information about



**Thomas Iannucci , M.D.**
Maternal Fetal Medicine
Advocate Good Samaritan
Hospital
Advocate Lutheran General
Hospital
Advocate Medical Group
Offices in Aurora and Park
Ridge and Winfield



**James Keller , M.D.**
Maternal Fetal Medicine
Advocate Good Samaritan
Hospital
Advocate Lutheran General
Hospital
Advocate Medical Group
Offices in Aurora and Downers
Grove and Park Ridge



**Brian McCulloch , M.D.**
Maternal Fetal Medicine
Advocate Good Samaritan
Hospital
Advocate Lutheran General
Hospital
Advocate Medical Group
Offices in Aurora and Downers
Grove and Park Ridge



**Barbara V Parilla , M.D.**
Maternal Fetal Medicine
Advocate Christ Medical
Center
Advocate Good Samaritan
Hospital
Advocate Lutheran General
Hospital
Advocate Medical Group
Offices in Aurora and Downers
Grove and Park Ridge
and Winfield

Advocate doctors, please call
**1.800.3.ADVOCATE**
(1.800.323.8622)/TDD
630.990.4700 or send us an e-mail.



**Bruce Pielet , M.D.**
Maternal Fetal Medicine
Advocate Good Samaritan
Hospital
Advocate Lutheran General
Hospital
Advocate Medical Group
Offices in Aurora and Park
Ridge

# *Emergency Ultrasound*

Bedside ultrasound is a clinical skill that every emergency physician should master. There are four acutely life-threatening emergencies for which delay in definitive care is unjustified:

- abdominal aortic aneurysm
- traumatic hemoperitoneum
- ectopic pregnancy
- pericardial tamponade

With the use of bedside ultrasound by the emergency physician a diagnosis can be rapidly made and definitive care arranged in a timely fashion. Other indications for emergency ultrasound include gallbladder disease and obstructive uropathy.

Dr. Dietrich Jehle is the Clinical Director of Emergency Services at Erie County Medical Center and the Vice-Chair of our department. He is one of the pioneers of ED bedside ultrasound and author of Ultrasound in Emergency Medicine. Dr. Jehle is directly involved with training emergency medicine residents in ultrasound use in the ED.

Residents who graduate from the program will be credentialed to use the ultrasound in the ED to evaluate for the conditions listed above.

Here are some ultrasound images obtained by Dr. Jehle depicting various pelvic pathology (Dietrich Jehle).



Complex mass. This mass (plus signs mark orders) has multiple hypoechoic and hyperechoic regions. This could represent a tubo-ovarian abscess, ectopic pregnancy, hemorrhagic ovarian cyst, or ovarian tumor.



Hematometra. A large amount of hypoechoic blood (clot) is seen within the uterus. This can be seen with an imperforate lymen or as a postoperative complication of gynecologic surgery.



Ovarian hyperstimulation syndrome. Multiple large anechoic cysts are visualized in both ovaries in this image. Ovarian hyperstimulation syndrome or polycystic ovary disease may have this appearance.



Placental abruption. This retroplacental hemorrhage is visualized in a patient during the third trimester of her pregnancy. Retroplacental abruptions carry a poorer prognosis than marginal abruptions.



Placenta previa. The cervix is seen on the right side of the image and is covered by the edge of the placenta. The placenta is the homogeneous structure on the anterior wall of the uterus

### *To Contact Us:*

Department of Emergency Medicine
100 High Street
Buffalo, New York 14203
716-859-1993 (v)
716-859-1555 (f)
dmcarthy@kaleidahealth.org

## HOME

**Fertility Centers of Illinois**

Page 8

## Section 6

## Potential Complications and/or Side Effects of the Use of Ovulation Induction Medications

**Multiple Pregnancy**

The risk of multiple pregnancy is increased with the use of clomiphene. There is an approximately 8% risk of twins and less than 1% risk of triplets or more. The most frequent adverse reaction to clomiphene include ovarian enlargement, transient hot flushes (which may be unpleasant but are not dangerous) and abdominal discomfort. Women who do not ovulate normally on their own may notice symptoms usually associated with ovulation, *e.g.* midcycle ovulation pain, premenstrual symptoms (abdominal discomfort, breast tenderness, *etc.*) and menstrual cramps. If you experience pelvic pain, you should report it to your physician. Other side effects, occurring in a very small percentage of women, include nausea, vomiting, nervousness, insomnia, visual symptoms, headache, dizziness and light-headedness.

Gonadotropin use often results in release of several eggs from the ovaries that may result in multiple pregnancy *(e.g.* twins, triplets, *etc)*. If a woman conceives after gonadotropin use, the risk of multiple pregnancy is significantly increased. Multiple pregnancy may occur in up to 20% of pregnancies resulting from gonadotropin use. The risk of multiple pregnancy may be minimized by careful monitoring and adjustment of gonadotropin dosage, or cancellation of a cycle if too many mature follicles develop. Multiple pregnancies are associated with higher risks of birth defects and premature births. The couple's attitude regarding fetal reduction, a procedure that may be employed in early pregnancy to reduce a pregnancy from quadruplets or triplets to twins, must be considered. If a couple has serious emotional, ethical or religious reservations regarding the procedure, they should carefully evaluate the use of gonadotropins, because their use is associated with a high risk of multiple pregnancy.

Most of the side effects of these drugs are minor, involving discomfort, but not usually requiring continuing or unusual medical intervention.

Serious complications of these medications, with the exception of multiple births [See Pregnancy and OHSS Birth Following Infertility Treatments] are rare. The manufacturers advise that serious pulmonary conditions and thromboembolic (blood clot) events have been reported in conjunction with the use of ovarian stimulation medication and some patients might have a hypersensitivity to such drugs. Symptoms of generalized rash, swelling or difficulty breathing should be reported to your doctor. These drugs may occasionally cause the development of ovarian cysts (non-cancerous, fluid-filled structures in the ovaries); in rare instances these may need to be removed surgically, in which case hospitalization may be required. The removal of an ovarian cyst can result in the loss of an ovary, though such a loss is extremely rare. It is also possible for an ovarian cyst to rupture, causing a brief episode of pain. Under rare circumstances, the rupture of an ovarian cyst may be associated with sudden bleeding and require surgery and/or blood transfusion(s). Such acute bleeding is very unusual. It is inappropriate for any of these medications to be used during pregnancy. It is sometimes difficult to rule out the possibility of a pregnancy even when it seems that normal menstruation has occurred. For this reason, women may be asked to have a pregnancy test prior to commencing a cycle. Additionally, couples may be asked to refrain from intercourse, or use barrier protection at certain times of the woman's cycle.

A published study in the past addressed a potential risk of ovarian cancer associated with the use of certain medications for ovarian stimulation. Since that time, the consensus of medical opinion on the issue, as voiced by the Society of Assisted Reproductive Technology (SART) and the American Society for Reproductive Medicine (formerly the American Fertility Society), is that there is no conclusive evidence of risk. As part of your patient counseling, you should discuss this issue with your physician.



& Associates, S.C.

Dated: 05/09/2007
Hoffman Estates, IL

**Reproductive
Endocrinology and
Infertility**
Vishvanath C. Karande,
M.D., F.A.C.O.G.

Sigal Klipstein, M.D.


**Male Infertility**
Robert Brannigan, M.D.


**Embryology**
David Hazlett Ph.D.,
H.C.L.D.


**Administration**
Victoria Mostov


880 W. Central Road
Suite 3400
Arlington Heights, IL 60005

1585 N. Barrington Road
Doctors Building II
Suite 406
Hoffman Estates, IL 60194

1875 Dempster Street
Suite 340
Park Ridge, IL 60068

2320 Dean Street
Suite 102
St. Charles, IL 60175

Telephone: 847-884-8884
Facsimile: 847-884-8093

www.karandeivf.com

Dear Mrs. Rodica Waivio...

I am writing to advise you that I will no longer be able to serve you as your physician after 05/09/2007. I find it necessary to terminate our physician-patient relationship at this time.

However, if there is any acute emergency in the next thirty days, which requires my immediate attention, you may contact my office at (847) 884 – 8884.

If you need assistance finding another physician, I suggest you contact your insurance company or primary care physician for a referral.

My office has already provided a copy of your medical records free of charge to you directly.


Sincerely,

Vishvanath C. Karande, M.D., F.A.C.O.G

*Vishvanath C. Karande*

President and Medical Director

# STATEMENT

057337   368641

FCI
3703 WEST LAKE AVENUE
GLENVIEW IL 60025

RETURN SERVICE REQUESTED

v11120
B5392M
SA13
BNS 011
1169 L

| Please Include Security Code From Back Of Card | |
|---|---|
| CHECK CARD USING FOR PAYMENT | |
| ☐ MASTERCARD | ☐ VISA |
| CARD NUMBER | EXP. DATE |
| CARDHOLDER NAME | SECURITY CODE |
| SIGNATURE | AMOUNT |

REMIT TO:

RODICA WAIVIO
1325 BALDWIN CT APT 2A
PALATINE, IL 60074-8783

FCI
3703 WEST LAKE AVENUE
GLENVIEW, IL 60025-5823

PLEASE RETURN THIS PORTION WITH PAYMENT

| Office Phone Number | Statement Date | Your Account Number | Page No. | Patient Balance | SHOW AMOUNT PAID HERE $ |
|---|---|---|---|---|---|
| (847) 729-2188 | 05/12/06 | 368641 | 01 | 75.60 | |

CHARGES APPEARING ON THIS STATEMENT ARE **NOT** INCLUDED ON ANY HOSPITAL BILL OR STATEMENT

| DATE | PROVIDER NAME | EXPLANATION OF ACTIVITY | PATIENT NAME | CHARGES AND DEBITS | PAYMENTS AND CREDITS | BALANCE |
|---|---|---|---|---|---|---|
| 040306 | RAPISARDA, | 36415 COLLECTION OF VENEOUS BLO | 628.9 ROD I WAIVI | 16.00 | | 16.00 |
| 040306 | RAPISARDA, | 82670 ESTRADIOL | 628.9 ROD I WAIVI | 31.00 | | 31.00 |
| 040306 | RAPISARDA, | 83001 GONADOTROPIN; FOLLICLE | 628.9 ROD I WAIVI | 50.00 | | 50.00 |
| 040306 | RAPISARDA, | 83002 GONADOTROPIN; LUTEINIZING | 628.9 ROD I WAIVI | 50.00 | | 50.00 |
| 040306 | RAPISARDA, | 86900 BLOOD TYPING ABO | 628.9 ROD I WAIVI | 8.00 | | 8.00 |
| 040306 | RAPISARDA, | 86901 BLOOD TYPING;RH(D) | 628.9 ROD I WAIVI | 12.00 | | 12.00 |
| 040306 | RAPISARDA, | 86762 ANTIBODY;RUBELLA | 628.9 ROD I WAIVI | 37.00 | | 37.00 |
| 040306 | RAPISARDA, | 84146 PROLACTIN | 628.9 ROD I WAIVI | 52.00 | | 52.00 |
| 040306 | RAPISARDA, | 84443 THYROID STIMULATING HORMO | 628.9 ROD I WAIVI | 45.00 | | 45.00 |
| 040306 | RAPISARDA, | 86704 HEPATITIS B CORE ANTIBODY | 628.9 ROD I WAIVI | 32.00 | | 32.00 |
| 040306 | RAPISARDA, | 87340 INFECTIOUS AGENT ANTIGEN | 628.9 ROD I WAIVI | 28.00 | | 28.00 |
| 040306 | RAPISARDA, | 86803 HEPATITIS C ANTIBODY | 628.9 ROD I WAIVI | 38.00 | | 38.00 |
| 040306 | RAPISARDA, | 86703 ANTIBODY;HIV 1 AND HIV 2 | 628.9 ROD I WAIVI | 37.00 | | 37.00 |
| 040306 | RAPISARDA, | 86592 SYPHILIS TEST;QUALITATIVE | 628.9 ROD I WAIVI | 12.00 | | 12.00 |
| 040606 | RAPISARDA, | 76831 HYSTERSONOGRAPHY W WO COL | V26.2 ROD I WAIVI | 205.00 | | 205.00 |
| 040606 | RAPISARDA, | 58340 CATHETERIZATION AND INTRO | V26.2 ROD I WAIVI | 319.00 | | 319.00 |
| 040606 | RAPISARDA, | 84146 PROLACTIN | V26.2 ROD I WAIVI | 52.00 | | 52.00 |
| 040606 | RAPISARDA, | 36415 COLLECTION OF VENEOUS BLO | V26.2 ROD I WAIVI | 16.00 | | 16.00 |

FCI ACCEPTS VISA, MASTERCARD AND
AMERICAN EXPRESS-SEE STMT BACK.

| Statement Date: | 05/12/06 | PLEASE INDICATE YOUR ACCOUNT NUMBER WHEN CALLING OUR OFFICE | | | | 368641 | |
|---|---|---|---|---|---|---|---|
| CURRENT | 30-60 DAYS | 60-90 DAYS | > 90 DAYS | TOTAL | INS PENDING | PATIENT BALANCE PAY THIS AMOUNT |
| 75.60 | 964.40 | | | 1040.00 | 964.40 | 75.60 |

SEND INQUIRIES / PAYMENTS TO:

FCI
3703 WEST LAKE AVENUE
GLENVIEW IL 60025

(847) 729-2188

**057336**    **368765**    **STATEMENT**

FCI
3703 WEST LAKE AVENUE
GLENVIEW IL 60025

v11120
B5392M
SA13
BNS 011
1169 R

RETURN SERVICE REQUESTED

| Please Include Security Code From Back Of Card | |
| --- | --- |
| CHECK CARD USING FOR PAYMENT | |
| ☐ MASTERCARD | VISA ☐ VISA |
| CARD NUMBER | EXP. DATE |
| CARDHOLDER NAME | SECURITY CODE |
| SIGNATURE | AMOUNT |

REMIT TO:

NATHAN WAIVIO
1325 BALDWIN CT APT 2A
PALATINE, IL 60074-8783

FCI
3703 WEST LAKE AVENUE
GLENVIEW, IL 60025-5823

PLEASE RETURN THIS PORTION WITH PAYMENT

| Office Phone Number | Statement Date | Your Account Number | Page No. | Patient Balance | SHOW AMOUNT PAID HERE $. |
| --- | --- | --- | --- | --- | --- |
| (847) 729-2188 | 05/12/06 | 368765 | 01 | 10.80 | |

CHARGES APPEARING ON THIS STATEMENT ARE **NOT** INCLUDED ON ANY HOSPITAL BILL OR STATEMENT

| DATE | PROVIDER NAME | EXPLANATION OF ACTIVITY | PATIENT NAME | CHARGES AND DEBITS | PAYMENTS AND CREDITS | BALANCE |
| --- | --- | --- | --- | --- | --- | --- |
| 040406 | RAPISARDA, | 36415 COLLECTION OF VENEOUS BLO V26.2 | NAT A WAIVI | 16.00 | | 16.0 |
| 040406 | RAPISARDA, | 86704 HEPATITIS B CORE ANTIBODY V26.2 | NAT A WAIVI | 32.00 | | 32.0 |
| 040406 | RAPISARDA, | 87340 INFECTIOUS AGENT ANTIGEN V26.2 | NAT A WAIVI | 28.00 | | 28.0 |
| 040406 | RAPISARDA, | 86803 HEPATITIS C ANTIBODY V26.2 | NAT A WAIVI | 38.00 | | 38.0 |
| 040406 | RAPISARDA, | 86703 ANTIBODY;HIV 1 AND HIV 2 V26.2 | NAT A WAIVI | 37.00 | | 37.0 |
| 040406 | RAPISARDA, | 86592 SYPHILIS TEST;QUALITATIVE V26.2 | NAT A WAIVI | 12.00 | | 12.0 |

FCI ACCEPTS VISA, MASTERCARD AND
AMERICAN EXPRESS-SEE STMT BACK.

| Statement Date: | 05/12/06 | PLEASE INDICATE YOUR ACCOUNT NUMBER WHEN CALLING OUR OFFICE: | | | 368765 | |
| --- | --- | --- | --- | --- | --- | --- |
| CURRENT | 30-60 DAYS | 60-90 DAYS | > 90 DAYS | TOTAL | INS PENDING | PATIENT BALANCE PAY THIS AMOUNT |
| 10.80 | 152.20 | | | 163.00 | 152.20 | 10.8 |

SEND INQUIRIES, PAYMENTS TO:
FCI
3703 WEST LAKE AVENUE
GLENVIEW IL 60025

(847) 729-2188



# Obstetrical Ultrasound Report

**Patient** : Rodica I Waivio
**MPI** : 368641
**DOB** : 08/04/1969

**Treatment No** :   128194
**Treatment Type** : IUI
**1st Day of Stim:** 4/25/2006
**Insem. Date** :   5/6/2006
**EDC** :           01/27/2007

---

## US # : 1

**Number of Sacs** : 1     **Date Performed** : 06/05/2006  **Perf. By** : Lisa Crocco
**Impressions** : F/U Recommended
**Comments** :     Single viable IUP; 6w3d crl w/+ Fht's; Size approp for dates
YS measures 2mm and does not have expected amount of fluid seen w/in; F/U
recommended

| Sac | Fet | CRL | CRL Calculated Gest Age | Yolk sac | AVG GS Ø | Gest. SAC Calculated Gest Age | FCA | FHR | Location |
|-----|-----|-----|-------------------------|----------|----------|-------------------------------|-----|-----|----------|
| 1 | A | 6.2 | 6.3 | 2 | 16 | 6.4 | Y | 150 | Intrauterine |

### Adnexa Views

| Left Ovary | Corpus luteum | Right Ovary | Corpus luteum |
|------------|---------------|-------------|---------------|
| 43 x 28 x 26 mm. | 20 mm. | 44 x 26 x 32 mm. | 18 mm. |

---

## US # : 2

**Number of Sacs** : 1     **Date Performed** : 06/12/2006  **Perf. By** : Lisa Crocco
**Impressions** : F/U Recommended
**Comments** :     Pt experiencing pelvic pain;
Single viable IUP; Good growth since previous ultrasound
YS still has less fluid w/in than expected as well as a slightly elongated
appearance; clinical significance unknown?
F/U

| Sac | Fet | CRL | CRL Calculated Gest Age | Yolk sac | AVG GS Ø | Gest. SAC Calculated Gest Age | FCA | FHR | Location |
|-----|-----|-----|-------------------------|----------|----------|-------------------------------|-----|-----|----------|



*Fertility Centers' Illinois*

# Obstetrical Ultrasound Report

| 1 | A | 13 | 7.3 | 3.5 | 23 | 7.2 | Y | 160 | Intrauterine |
|---|---|----|-----|-----|----|-----|---|-----|-------------|

## Adnexa Views

| Left Ovary | Corpus luteum | | Right Ovary | Corpus luteum |
|------------|---------------|---|-------------|---------------|
| 39 x 35 x 30 mm. | 18 mm. | | 35 x 27 x 30 mm. | 15 mm. |



*Fertility Centers of Illinois*

A Reproductive Science Center

# Obstetrical Ultrasound Report

Patient : Rodica I Waivic

MPI : 368641

DOB : 08/04/1969

Treatment No :   128194

Treatment Type : IUI

1st Day of Stim: 4/25/2006

Insem. Date :    5/6/2006

EDC :            01/27/2007

— **US #: 1** —

Number of Sacs : 1     Date Performed : 06/05/2006   Perf. By : Lisa Crocco

Impressions : F/U Recommended

Comments :    Single viable IUP; 6w3d crl w/+ Fht's; Size approp for dates
              YS measures 2mm and does not have expected amount of fluid seen w/in; F/U
              recommended

| Sac | Fet | CRL | CRL Calculated Gest Age | Yolk sac | AVG GS Ø | Gest. SAC Calculated Gest Age | FCA | FHR | Location |
|-----|-----|-----|-------------------------|----------|----------|-------------------------------|-----|-----|----------|
| 1 | A | 6.2 | 6.4 | 2 | 16 | 6.4 | Y | 150 | Intrauterine |

**Adnexa Views**

| Left Ovary | Corpus luteum | Right Ovary | Corpus luteum |
|------------|---------------|-------------|---------------|
| 43 x 28 x 26 mm. | 20 mm. | 44 x 26 x 32 mm. | 18 mm. |



*Fertility Centers of Illinois*

A Reproductive Science Center

# Obstetrical Ultrasound Report

**Patient :** Rodica I Waivio

**MPI :** 368641

**DOB :** 08/04/1969

**Treatment No :** 128194

**Treatment Type :** IUI

**1st Day of Stim:** 4/25/2006

**Insem. Date :**     5/6/2006

**EDC :**     01/27/2007

---

### US # : 1

**Number of Sacs :** 1     **Date Performed :** 06/05/2006     **Perf. By :** Lisa Crocco

**Impressions :** F/U Recommended

**Comments :**     Single viable IUP; 6w3d crl w/+ Fht's; Size approp for dates
YS measures 2mm and does not have expected amount of fluid seen w/in; F/U
recommended

| Sac | Fet | CRL | CRL Calculated Gest Age | Yolk sac | AVG GS Ø | Gest. SAC Calculated Gest Age | FCA | FHR | Location |
|-----|-----|-----|-------------------------|----------|----------|-------------------------------|-----|-----|----------|
| 1 | A | 6.2 | 6.3 | 2 | 16 | 6.4 | Y | 150 | Intrauterine |

### Adnexa Views

| Left Ovary | Corpus luteum | | Right Ovary | Corpus luteum |
|------------|---------------|--|-------------|---------------|
| 43 x 28 x 26 mm. | 20 mm. | | 44 x 26 x 32 mm. | 18 mm. |

 *Advocate HealthCare*

# Lutheran General Hospital
## Department of Pathology

## Surgical Pathology Report

Location: AMBULATORY
Med. Rec. #: 001217205
Billing #: 322581158
Birth Date/Age/Sex: 8/4/1969 (Age: 37) F

**Specimen #: LS07-192**
**Patient: WAIVIO, RODICA I**
Physician: Daniel E. Pesch, M.D.

Date Specimen Collected: 1/5/2007
Date Specimen Received: 1/5/2007
Date & Time Reported: 1/8/2007 14:01

Clinical Information:
Retained products of conception

Specimen(s) Submitted:
Endometrial curettings

---

### Final Pathologic Diagnosis:

A: Endometrial curettings: Fragments of hyalinized tissue with chronic inflammation and old hemorrhage consistent with implantation site nodule (placental site nodule), and fragments of disordered proliferative endometrium showing changes consistent with shedding.

Note: This case was subjected to intradepartmental quality assurance review.

hsm

Ronald L. Sirota, M.D.
** Electronic Signature (RS) **

---

Gross Description:
A: The container is labeled "endometrial curettings." The specimen is received in formalin and consists of multiple fragments of pink-tan tissue admixed with blood clots measuring in aggregate 2.5 x 1 x 0.3 cm. and weighing 1.5 gm. The specimen is submitted in toto for microscopic examination.

mek/MM

Microscopic Description:
Microscopic examination performed.

End of Report

1775 Dempster Street, Park Ridge IL 60068
Office: (847) 723-8180  Fax. (847) 723-7540

Print Date    : Mon Sep 25 10:42:09 2006
WAIVIO, RODICA I    MRN:0000000001217205        321763260
Gender        : Female
Age          : 37
Birth Date   : 08/04/1969
Disposition  : Home, Self Care (1)
Admit Date   : 09/17/2006
LOS          : 1
Disch Date   : 09/18/2006



## Medicare DRG

381    ABORTION W D&C, ASPIRATION CURETTAGE OR HYSTEROTOMY

CMS  wt  0.6034  A/LOS  2.2    G/LOS  1.6

## MDC

014    PREGNANCY, CHILDBIRTH & THE PUERPERIUM

## Admit Diagnosis

65813    PREMATURE RUPTURE OF MEMBRANES, ANTEPARTUM

## Principal Diagnosis

*632    MISSED ABORTION

## Secondary Diagnoses

65813    PREMATURE RUPTURE OF MEMBRANES, ANTEPARTUM
65223    BREECH PRESENTATION WITHOUT VERSION, ANTEPARTUM
65963    ELDERLY MULTIGRAVIDA, ANTEPARTUM
V230     SUPERVISION OF HIGH-RISK PREGNANCY WITH HISTORY OF
         INFERTILITY

## Principal Procedure

*6902    DILATION AND CURETTAGE FOLLOWING DELIVERY/ABORTION

## Other Procedures

9649    GENITOURINARY INSTILLATION

I CERTIFY THAT THE ICD-9-CM CODING OF PRINCIPAL AND SECONDARY DIAGNOSES
AND THE MAJOR PROCEDURES PERFORMED ARE ACCURATE AND COMPLETE, BASED ON
THE CONTENT OF THE MEDICAL RECORD, TO THE BEST OF MY KNOWLEDGE.

NAME          SIGNATURE          DATE

## Preconception Counseling

Referring Physician: _Prev Hosp Pt_    Phone #: _____    Attending Physician: _PMIKP_

Name: _Waivio, Rodica_    Age: _31_ _(8-10-75)_ Date: _12-4-06_

Address: _1325 Baldwin Ct Apt 2A Palatine 60074_ Phone #: _(847)963-0231_
Occupation: _Engineer_    Work Phone: _____
Husband's Name: _Nathan_    Years Married _7yrs_ Occupation: _Engineer_
Ethnic Group – Patient: _Romanian_    Husband _Finland/Netherla  /+?_

MENSTRUAL HISTORY  Menarche: _11?_  Interval: _7, 21 days_ Duration_Long_    LNMP: _11-13-06_
Present Contraception: _Ø_    Last Pap Smear: _3/06_

### OBSTETRICAL HISTORY                                          Para _0  1  1  0_

|   | Year | Antepartum Complications | GA | WT | Sex | Type of Delivery | Comments | Hospital |
|---|------|--------------------------|-----|------|-----|------------------|----------|----------|
| 1 | 2005 | Spont AB | ~9 wk | 5 day | | complete → D&C | | HF? |
| 2 | 9/8/06 | PROM | 21+ | 450Gm 15.8oz | ♂ | SVD | Retained Placenta → D&C IUFD | LGH |
| 3 | | | | | | | | |
| 4 | | | | | | | | |
| 5 | | | | | | | | |
| 6 | | | | | | | | |

### MEDICAL HISTORY (Patient)
Surgeries _D&C x2_

| | | |
|---|---|---|
| Anemia: _Ø_ | Thyroid Disease: _Ø ?_ | DES exposure _NKA_ |
| Asthma: _Ø_ | Hepatitis: _Ø_ | Allergies: _NKA_ |
| Cancer: _Ø_ | Hypertension: _⊕ p dilation_ | Psychological Disorders _Bildex_ |
| Diabetes: _Ø_ | Seizure Disorders: _Ø_ | Blood Transfusions: _Ø_ |
| Rubella: _Immune?_ | Veneral Disease _Ø_ | Other_____ |

_(as child w valve prob?)_

Current Medications: _Started progesterone 11/27 → 11/30  Dr Kapusida   Saw Dr Rssl   Limited 25-52 mg   hypertension med_

SOCIAL HISTORY:  Smoking _Ø_ /day   Alcohol _occ_   Drugs _Ø_
_Quit 2001_

### FAMILY HISTORY:
Diabetes: _Ø_
Hypertension: _Ø_    Genetic Disorders _None_
Cancer: _F - esophageal_    Tay Sachs: _Ø_
Heart Disease: _Ø_    Cystic Fibrosis: _Ø_
Blood Disorders: _Ø_
Seizure Disorders: _Ø_
Reason for Consultation:_____

_Dyslexia - ♂_

_338 7?_

Physical Exam:    Height:____5-1____    Weight:___175___    B/P __130/80__

Neuro: _____Normal: Oriented to time, place and person_____Abnormal_____
General: _____Normal: Well-developed, well-nourished, no deformities_____Abnormal_____
Skin: _____Normal: No abnormal lesions, rashes, or moles_____Abnormal:_____
Neck: _____Normal: No thyroid enlargement or neck masses_____Abnormal:_____
Lungs: _____Normal: Lungs clear to auscultation_____Abnormal:_____
Heart: _____Normal rate and rhythm, no murmurs_____Abnormal:_____
Breasts: _____Normal: No skin changes, masses, nipple discharge/inversion, or axillary LAN
_____SBE technique reviewed with patient
_____Fibrocystic changes. No dominant mass palpable
_____Abnormal: (see diagram)_____
Abdomen:_____Normal: Soft non-tender, no masses, no hepatosplenomegaly, no hernias
Lymph: _____Normal: No neck, supraclavicular or inguinal LAN_____Abnormal_____

Genitourinary:

External genitalia: ____Normal: No lesions_____Atrophy present_____Abnormal:_____
Urethral Meatus: ____Normal: No lesions, tenderness or prolapse_____Abnormal:_____
Urethra: ____Normal: No prolapse, masses, tenderness, scarring_____Abnormal_____
Bladder: ____Normal: No masses or tenderness_____Abnormal:_____
Vagina: ____Normal: No lesions_____Atrophy present_____Abnormal:_____
Discharge: _____None    _____Clear    _____White    _____Yellow    _____Green
Amount: _____Small    _____Moderate    _____Large
Consistency: _____Thin    _____Med    _____Thick    _____c/w Yeast
If indicated pH_____Whiff test: Pos Neg    Micro: Candida: Yes No    Clue cells: Yes No    Trich: Yes No

Cervix: _____Normal: No lesions or cervical motion tenderness
Absent_____    _____Abnormal:_____
Uterus: _____Normal: Non-tender, mobile, normal size, shape and consistency
Absent_____    Position: ___AV ___RV ___Mid
_____Abnormal:_____
Adnexae/parametria: _____Normal: No masses, tenderness or nodularity bilaterally
Absent_____    _____Abnormal:_____
Anus/perineum: _____Normal: No lesions    _____Abnormal_____
Rectum: _____Normal: No masses, normal sphincter tone_____Ext. hemorrhoids
Not examined____    Stool guiac: _____Negative    _____Positive    _____Not indicated
_____Abnormal:_____
Pelvic support: _____Normal: No uterine prolapse, cystocele, rectocele or enterocele
_____Prolapse present: _____Uterine    _____Cystocele    _____Rectocele

Diagnoses:_____
_____
_____
_____
_____

Management Plan:_____
_____
_____
_____
_____
_____

Parkside
Maternal Fetal
1875 Dempster
Park Ridge, IL 60068
(847) 723-8610

 **Advocate Medical Group**

## CONSULTATION

**NAME:** WAIVIO, RODICA
**DOB:** 08/04/1969
**DATE:** 12/04/2006
**MRN:** G1000211513

Dear Drs. Pesch and Jasenof:

I saw Rodica Waivio for preconceptional consultation. As you know, Rodica is a 31-year-old gravida 2, para 0110 who had an unfortunate loss of a 21 week pregnancy in late September. She presented with ruptured membranes and was found to have a fetal demise. She had a D & C, however, did spike a temperature one time and was on antibiotics several days later. At that point, I saw her in the hospital.

Rodica is doing her best to educate herself as best as possible using internet sources, which is in some ways beneficial, but also I feel may be giving her some expectations and answers that are not always the best given her situation. She has a reasonable understanding of the issues; however, does need to be told of some inconsistencies that are present in circumstances such as hers and I did try my best to avail her of the situation in a logical sense.

Since the time of her pregnancy loss, the patient has had antiphospholipid studies and she was found to have positive ANA and also positive for lupus anticoagulant. Her coagulation studies had been normal in the hospital with the exception of a low Protein S, however, she states that these were redone and she had a normal thrombophilic studies at that time. She had been previously told that in all likelihood she would need to be on low dose aspirin and Lovenox during the pregnancy and I would concur with this given her history and the findings of these tests.

Also, of note, although I have no records, Rodica does state that she had some bleeding in the uterus that was noted in the late first trimester/early second trimester scan and that may have indicated some subchorionic hemorrhages. These also may be related to Antiphospholipid Syndrome, although again since no records are present as to the accuracy of her remembering this, I could not state for certain.

Rodica also has a fibroid in the fundus of her uterus that is approximately 2.3 cm in diameter. It has been there during the past three ultrasounds over the past few months and the question that, of course, is present is this submucosal or intramural. She states that she is scheduled for a saline hysterogram in the coming weeks and I advised her that I thought that was a good idea. She is also aware that if that cannot give a definitive answer, she may need a hysteroscopy, although I would take this step by step given the risks of a hysteroscopy.

Page 1

**NAME:** WAIVIO, RODICA
**MRN:** G1000211513
**DOS:** 12/04/2006

Rodica is aware that because of this question of the fibroid, I would recommend that it is dealt with or at least diagnosed in the most complete way possible in order to have that not be a secondary issue with regards to future pregnancies. Rodica is trying to get pregnant at this time and has seen Dr. Rapisarda for further evaluation.

At this point, I would continue with her Rodica's work up, specifically for the fibroid and subsequently for any other antiphospholipid tests. She was advised that during the early part of the pregnancy, she will likely be followed by Dr. Rapisarda and the Advocate OB department and subsequently she may also be co-managed by the Advocate OB department and Maternal Fetal Medicine.

If there are any questions regarding Rodica, please feel free to contact me and thank you for allowing me to participate in her care.

P.S. Rodica does state that she has some hypertension and is on medication for this, although she is not certain of what the medication is. She also is on Lamictal 25-50 mg per day for her bipolar disorder. This would be a preferred drug to keep her on during the pregnancy should that be necessary.

Thomas Iannucci MD

D: 12/04/2006 13:30:25 T: 12/04/2006 19:42:03

CC: Ian Jasenof M.D.
1255 N. Milwaukee Ave.
Glenview, IL 60025

CC: John Rapisarda MD
Fertility Centers of Illinois
3703 West Lake Avenue, Suite 106
Glenview, IL 60025

CC: Daniel Pesch MD
1875 Dempster, Suite 340
Park Ridge, IL 60068

Page 2



**GeneCare**®

**Medical Genetics Center**

Chapel Hill, NC
(919) 942-0021 • 1-800-277-4363 • Fax (919) 967-9519
CLIA #34D0706890  CAP #25892-01
Lab#: 374696MP Practice Code: PP-IL
Fax: 1-847-723-8675; 1-847-723-2290

PARKSIDE PERINATAL CENTER
LUTHERAN GENERAL HOSPITAL-MFM
1875 DEMPSTER, SUITE 325
PARK RIDGE, IL 60068
Sonographer(s): FELDMAN,
DEBORAH/PIELET, BRUCE

# 1st TRIMESTER PRENATAL SCREENING REPORT

Genetics

Patient: **RODICA WAIVIO**

| | | | |
|---|---|---|---|
| Patient DOB | : 08/04/1969 | Mult. Preg. | : N |
| Age at EDD | : 37 | Family History | : N (AP1) |
| EDD | : 01/25/2007 | Maternal Weight | : 175 |
| GA By CRL | : 13w0d | Ethnicity | : Caucasian |
| Date Drawn | : 07/20/2006 | CRL | : 70.3mm |
| Date Received | : 07/22/2006 | U/S Date | : 07/20/2006 |
| Report Date | : 07/25/2006 | NT | : 1.8mm |

## Within Normative Range

Free Beta %: 50 Free Beta MOM: 0.94 • PAPP-A %: 40 PAPP-A MOM: 0.76

| DOWN SYNDROME RISK | 1 in 2,278 • Please See Comment(s) • |
|---|---|

The prior risk for DS only based on maternal age alone is 1 in 178. The patient's specific risk based on freeBeta, PAPP-A, nuchal translucency and maternal age is 1 in 2,278, which is LESS than a 35 year old gravida's risk (at patient's gestational age) of 1 in 311.

| TRISOMY 18/13 RISK | 1 in 6,621 • Please See Comment(s) • |
|---|---|

The prior risk for trisomy 18/13 only based on maternal age alone is 1 in 332. The patient's specific risk based on freeBeta, PAPP-A, nuchal translucency and maternal age is 1 in 6,621, which is LESS than the trisomy 18/13 cutoff risk of 1 in 150.

| Plan/Consult |
|---|

* Patient referred for pregnancy evaluation.
* Offer genetic counselling and amniocentesis or CVS due to age risk.
* Schedule **AFP only** between 13w4d - 22w3d or second trimester ultrasound for open neural tube defects (ONTD) screening if patient has CVS or declines amniocentesis/AChE.

■ **COMMENT:** Because Early Screen will have detected 91-97% of Down syndrome and 97% of trisomy 18/13 pregnancies, any follow-up second trimester chromosomal screening will have much lower detection and accuracy, and will increase the false positive rate. However, if this patient elects an additional chromosomal screen, she may be offered a follow-up AFP/freeBeta screening which increases the false positive rate less than other screening tests. A follow-up AFP/freeBeta will only increase the false positive rate by ~1-2% because most patients having a normal freeBeta at 11-13 weeks will continue to have a normal freeBeta at 13-22 weeks.

■ **COMMENT:** ACOG and ACMG's chromosomal screening protocols are to offer amniocentesis or CVS for women 35 years or older at EDD or with a family history of chromosomal abnormality regardless of screening test results.

NTD Laboratories reports these test results.

CAUTION: FreeBeta/PAPP-A without nuchal translucency between 9 weeks 0 days – 13 weeks 6 days detects 58% of Down syndrome, about 90% of Trisomy 18/13, some other chromosome abnormalities and some multiple pregnancies. Between 11 weeks 0 days – 13 weeks 6 days, dried blood FreeBeta/PAPP-A with FMF nuchal translucency measurement increases detection to over 91% for Down syndrome and 97% for Trisomy 18/13. Adding FMF Nasal Bone assessment increased DS detection to 95% and Trisomy 18/13 to 98%. These reports do not eliminate the possibly the fetus may have birth defects, mental retardation, Down syndrome, Trisomy 18/13, other chromosome abnormalities, or other disorders not detectable by these screening test. FreeBeta/PAPP-A screening will not detect neural tube defects, ventral wall defects (VWD) and some pregnancies with perinatal complications. Multiple gestation screening is not as sensitive as singleton. All reports rely on the patient's clinical information. Down syndrome, Trisomy 18/13, and other chromosome abnormality screening results are reported pursuant to our investigation (clinical research). Patient specific risks are determined by very sophisticated statistical distributions (not simply MOMs) and can be accurately recalculated as needed for a dating change, twins, etc. by our lab (only). **Call our Center for interpretations and revisions.** Patient risk cannot be accurately revised by other labs using different tests and databases.

Phil Buchanan, Ph.D.
Director

Karen K. Phillips, Ph.D.
Director

© Copyright 2005 GeneCare All Rights Reserved

**NAME:**    WAIVIO RODICA        **Date of Service:**  7/20/2006
**MRN NO.:**    1000211513          **Scan Location:**  PERINATAL
**Patient's DOB:** 8/4/1969
**Patient's Age:** 36 years           **Referring MD:**   JASENOF/BOOTH

## Lutheran General –Perinatal Center
## Level I Ultrasound Obstetrical Examination

**Study Type:**    1ST TRI
**Reason for Exam:**   AMA
**Type of Gestation:**   Singleton

**Dating:**
LMP: 4/22/2006
The assigned gestational age is 12w 5d , based on LMP . The assigned EDC is 1/27/2007

**OB History:**
Gravida 2   Para 0 /0 /1 /0

**Amniotic Fluid Volume and Placenta for Sac**

| | | | |
|---|---|---|---|
| Amniotic Fluid Volume: | normal | Placenta Location: | posterior |
| | | Placenta Grade: | 0 |

**Fetal Biometry (  ):**
CRL: 7.03  (cm)

MA by US: 13w 2d
EDC by US: 1/23/2007

Nuchal Lucency: 1.80  (mm)

**Fetal Anatomy (  ):**
**Normal:**
- **Abdominal Wall, Urinary Bladder, Fetal Cord Insertion, and Viable IUP**

**Maternal Anatomy:**  A posterior fibroid was noted measuring 2.13x1.45x2.54cms.

**Comments::**
 Fetal biometry is consistent with the patient's dates.  A Nuchal Translucency examination was performed. The NT measurement is 1.8 mm. This data as well as a maternal blood sample was sent to the lab for further assessment of risk factor for aneuploidy.

**Recommendation:**
     Please note normal growth and visualized standard anatomic views within limitations of early scan. Due to early gestational age, a comprehensive exam should be considered at approximately 20 – 22 wks to complete an anatomic survey of the fetus.

**BRUCE PIELET, MD**          Sonographer:DEBBIE FELDMAN, RDMS

WAIVIO RODICA          1000211513          7/20/2006

# Advocate Lutheran General Hospital

cc:   Seetal Adhikari, M.D.   R
      Ian Jasenof, M.D.

The patient was admit to Lutheran General labor and delivery on
September 18, 2006 at around midnight.

**CHIEF COMPLAINT:**
Preterm rupture of membranes at 21 weeks.

**HISTORY:**
This is a 37-year-old G2, P0-0-1-0 at 21 and 2/7 weeks with an IU I singleton
with an estimated date of delivery of 1/27/2007 who presents to Lutheran
General labor and delivery as a self transport from Northwest Community.   The
patient stated that she experienced a leakage of fluid and vaginal bleeding
this evening and went to the nearest hospital.   A speculum exam there showed
large amounts of blood in the vault.   An OB ultrasound was performed and AFI
was noted to be 0.   Positive fetal heart tones were noted.   The patient
transported herself to Lutheran General because her doctor was at this
hospital.

**PRENATAL CARE:**
IUI pregnancy, otherwise unremarkable.

**PRENATAL LABS:**
O+, rubella immune, hepatitis B surface antigen nonreactive, RPR nonreactive,
HIV negative.   Ultrasound on 9/17/2006 showed an AFI of 0 with an estimated
fetal weight of 389 g and positive fetal heart tones. Placenta was noted to
be posterior and fundal

**OBSTETRICAL HISTORY:**
The patient had a spontaneous abortion times one in 2005.

**PAST MEDICAL HISTORY:**
Bipolar disorder.

**PAST SURGICAL HISTORY:**
Unknown.

**MEDICATIONS:**
Prenatal vitamins and Benadryl.

FILE COPY

WAIVIO, RODICA I
**MRN#:**  001217205
**ACCT#:**  321763260
**ADMIT DATE:**  09/17/2006
**DISCH DATE:**  09/18/2006

Ian Jasenof, M.D.
**DICTATED BY:** Seetal Adhikari, M.D.   R
DD: 10/31/2006 DT: 10/31/2006 TD: 14:04 TT: 16:38 K#: 149529/MEDQ

**DISCHARGE SUMMARY**

# Advocate Lutheran General Hospital

**PAGE 2**

**ALLERGIES:**
No known drug allergies.

**SOCIAL HISTORY:**
Not listed.

**PHYSICAL EXAM:**
On admission vital signs 118/64, heart rate 96, respiratory rate 20 and temperature of 98.5. Sterile vaginal exam showed 50 cc of clot from the cervix and approximately 1 cm dilation and long with no pressure. Bedside ultrasound showed transverse presentation with no fetal heart tones and no amniotic fluid noted. The negative fetal cardiac activity was confirmed by Dr. Sum.

**ASSESSMENT/PLAN:**
This is a 37-year-old G2, P0-0-1-0 at 21 and 2/7 weeks with PROM and IUFD. The patient was informed of the fetal demise. Plan was to proceed with Cytotec induction of labor and check IUFD labs with a thromboasthenia work up and _____ titers. Plan is discussed with Dr. Jasenof.

At 1:10 a.m. Cytotec 200 mcg was placed without difficulty by Dr. Bush. Labs that were back at that time showed a white count of 13, hemoglobin 9.9 and platelets of 258. Coags showed a PT of 9.9, INR of 0.9 and a PTT of 29. Fibrinogen was 479 and D-dimer 0.9.

At 7:20 a.m. on 9/18/2006 Cytotec #2 200 mcg was placed in posterior cul-de-sac without difficulty. Cervical exam was difficult secondary to the patient's intolerance. Cervical exam did appear unchanged. At 12:30 on 9/18/2006, the patient called out and stated that she passed a clot, when she went to the bathroom unassisted. The patient flushed the toilet. On cervical exam approximately 1 cm and long, no blood on the resident's after exam. The patient was not feeling much as far as contractions. Plan was to start high-dose Pitocin per protocol. Also the patient requested a progesterone level to be drawn and that done by the RN and sent to the lab. At 1550 the patient called out in pain. Cervical exam was 2, 100 with positive pressure. A soft part was presenting, but noting not to be a small part. The patient was given Dilaudid 2 mg IV and Zofran 4 mg IV times one. The patient was refusing an epidural. At 1625 a male infant was delivered with no cardiac activity in shoulder to frank breech presentation. Weight was 15.8 oz or 450 g. Other findings of the fetus were a left back hematoma, cerebral hematoma and mouth was noted to open, otherwise no gross

Ian Jasenof, M.D.
**DICTATED BY:** Seetal Adhikari, M.D.  R
**DD:** 10/31/2006 **DT:** 10/31/2006 **TD:** 14:04 **TT:** 16:38 **X#:** 149529/MEDQ

**WAIVIO, RODICA I**
**MRN#:** 001217205
**ACCT#:** 321763260
**ADMIT DATE:** 09/17/2006
**DISCH DATE:** 09/18/2006

**DISCHARGE SUMMARY**

*Advocate Lutheran General Hospital*
1775 Dempster Street
Park Ridge, IL. 60068

Attending Dr : JASENOF, IAN
Admitting Dr : JASENOF, IAN
Consulting Dr :

## D I A G N O S T I C   I M A G I N G

| Procedure: | Procedure Date/Time: | Accession #: |
|---|---|---|
| US PELVIS COMPLETE | 9/25/06 4:39:14 PM | US-06-0092607 |

**CPT 4**

76856,  76856

Clinical History: Rule out products of conception. Status post D\T\C.

Findings: The uterus measures 12.6 x 6.3 x 8.1 cm. The endometrial stripe measures 5 mm, within normal limits. There is a 2.3 x 1.9 x 2.7 cm posterior intramural uterine fibroid. The left ovary measures 3.3 x 3.5 x 1.4 cm and appears normal. The right ovary is not clearly seen. No adnexal mass.

Impression:

1. Uterine fibroid
2. Normal appearance of the endometrial stripe

**** F I N A L ****

Transcribed by: TP
09/25/06 4:43 pm

Dictated By:      KUMAR, ADA JAIN

Approved By:      KUMAR, ADA JAIN  09/25/06 4:44 pm

| Send To:<br>IANNUCCI, THOMAS A<br>1875 DEMPSTER SUITE 325<br><br>PARK RIDGE, IL. 60068 | Pt Name  : **WAIVIO, RODICA I**<br>Pt Phone : **8479630231**<br>Ord Dr   : **IANNUCCI, THOMAS A**<br>MR #     : **LGH-001217205**<br>DOB      : 8/4/69<br>Billing # : 321803876 | Sex    : FEMALE<br>Age    : 37 years<br>Svc    : GYN<br>Req Loc : LGH 11MN<br>Pt Loc  : 1166 06 |
|---|---|---|

Print D/T: 9/25/06 5:05 PM

Patient Addressograph

DATE __6-25-06__

NAME __Waivio,__ __Rodica__ _____
    LAST               FIRST               MIDDLE

ID # _____ HOSPITAL OF DELIVERY __LGH__

NEWBORN'S PHYSICIAN _____ REFERRED BY __Rapisarda__ **AMG OB/GYNE**

FINAL EDD _____      PRIMARY PROVIDER/GROUP _____

| BIRTH DATE 8-11-69 MONTH DAY YEAR | AGE 36 | RACE | MARITAL STATUS S M W D SEP | ADDRESS 1325 Baldwin Ct 2A Palatine 60074 |
|---|---|---|---|---|
| OCCUPATION | | | EDUCATION (LAST GRADE COMPLETED) | ZIP   PHONE    (H)    (O) |
| LANGUAGE English / Romanian | | | | INSURANCE CARRIER/MEDICAID # Aetna HMO |
| HUSBAND/DOMESTIC PARTNER   PHONE | | | | POLICY # |
| FATHER OF BABY Brother   PHONE | | | | EMERGENCY CONTACT   PHONE |

| TOTAL PREG 2 | FULL TERM 0 | PREMATURE 0 | AB. INDUCED 0 | AB. SPONTANEOUS 2 | ECTOPICS 0 | MULTIPLE BIRTHS 0 | LIVING 0 |
|---|---|---|---|---|---|---|---|

## MENSTRUAL HISTORY

☐ DEFINITE   ☐ APPROXIMATE (MONTH KNOWN)   MENSES MONTHLY ☐ YES ☐ NO   FREQUENCY: Q _____ DAYS   MENARCHE _____ (AGE ONSET)
☐ UNKNOWN   ☐ NORMAL AMOUNT/DURATION   PRIOR MENSES _____ DATE   ON BCP AT CONCEPT ☐ YES ☐ NO   hCG + ___/___/___
☐ FINAL _____

## PAST PREGNANCIES (LAST SIX)

| DATE MONTH / YEAR | GA WEEKS | LENGTH OF LABOR | BIRTH WEIGHT | SEX M/F | TYPE DELIVERY | ANES. | PLACE OF DELIVERY | PRETERM LABOR YES/NO | COMMENTS/ COMPLICATIONS |
|---|---|---|---|---|---|---|---|---|---|
| 2005 | | | | | Spont | Ab | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

## MEDICAL HISTORY

| | O Neg. + Pos. | DETAIL POSITIVE REMARKS INCLUDE DATE & TREATMENT | | O Neg. + Pos. | DETAIL POSITIVE REMARKS INCLUDE DATE & TREATMENT |
|---|---|---|---|---|---|
| 1. ...ETES | O | | 17. D (Rh) SENSITIZED | O | |
| 2. HYPERTENSION | | | 18. PULMONARY (TB, ASTHMA) | | |
| 3. HEART DISEASE | | | 19. SEASONAL ALLERGICS | | |
| 4. AUTOIMMUNE DISORDER | | | 20. DRUG/LATEX ALLERGIES/ REACTIONS | | |
| 5. KIDNEY DISEASE/UTI | ↓ | | | | |
| 6. NEUROLOGIC/EPILEPSY | | | 21. BREAST | ↓ | |
| 7. PSYCHIATRIC | ① | Bipolar — | 22. GYN SURGERY | + | Dec 2005 |
| 8. DEPRESSION/POSTPARTUM DEPRESSION | O | Tritophan Supplements | 23. OPERATIONS/ HOSPITALIZATIONS (YEAR & REASON) | O | |
| 9. HEPATITIS/LIVER DISEASE | | | | | |
| 10. VARICOSITIES/PHLEBITIS | | | 24. ANESTHETIC COMPLICATIONS | | |
| 11. THYROID DYSFUNCTION | | | 25. HISTORY OF ABNORMAL PAP | | |
| 12. TRAUMA/VIOLENCE | | | 26. UTERINE ANOMALY/DES | ↓ | |
| 13. HISTORY OF BLOOD TRANSFUS. | ↓ | | 27. INFERTILITY | | |

| | AMT/DAY PREPREG | AMT/DAY PREG | # YEARS USE | | | |
|---|---|---|---|---|---|---|
| 14. TOBACCO | O | | | 28. RELEVANT FAMILY HISTORY | O | |
| 15. ALCOHOL | | | | | | |
| 16. ILLICIT/RECREATIONAL DRUGS | ↓ | | | 29. OTHER | | |

COMMENTS _____

ACOG ANTEPARTUM RECORD (FORM A)

Patient Addressograph

NAME _Waivio, Rodica_
LAST      FIRST      MIDDLE

| DRUG ALLERGY | ∅ | LATEX ALLERGY | | |
|---|---|---|---|---|
| IS BLOOD TRANSFUSION ACCEPTABLE IN AN EMERGENCY? | ☐ YES ☐ NO | ANESTHESIA CONSULT PLANNED | ☐ YES ☐ NO | |

**PROBLEMS/PLANS**

1. h/o 2° Infertility
2. Conceived via Gonadotropins / IUI
3. AMA - rel ↑ based Terby
4.
5.
6.

**MEDICATION LIST**    Start date    Stop date

1. Prometrium 200 mg/d — 5/1/06 — _/_/_
2. _/_/_ — _/_/_
3. _/_/_ — _/_/_
4. _/_/_ — _/_/_
5. _/_/_ — _/_/_
6.

**EDD CONFIRMATION**

AL EDD
‹ 4/22/06 - EDD 1/27/07
TIAL EXAM _/_/_ = _WKS = EDD _/_/_
ULTRASOUND 6/12/06 - 7.5 WKS = EDD 1/25/07
INITIAL EDD _/_/_ INITIALED BY _____

**18–20-WEEK EDD UPDATE**

QUICKENING _/_/_ +22 WKS = _/_/_
FUNDAL HT. AT UMBIL. _/_/_ +20 WKS = _/_/_
ULTRASOUND _/_/_ = _WKS = _/_/_
FINAL EDD _/_/_ INITIALED BY _____

PREPREGNANCY WEIGHT _____

| | WEEKS GEST. (BEST EST.) | FUNDAL HEIGHT (CM) | PRESENTATION | FHR | FETAL MOVEMENT | PRETERM LABOR SIGNS/SYMPTOMS: − = PRESENT − = ABSENT | CERVIX EXAM (DIL /EFF /STA.) ULTRASOUND LENGTH | BLOOD PRESSURE | WEIGHT | URINE (ALBUMIN/GLUCOSE) | NEXT APPOINTMENT | PROVIDER (INITIALS) | COMMENTS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6/23 | 9 | ~9 | — | + | — | ∅ | c/c | 140/90 | 175 | N/N | 4 | (✓) | NOB, 14g, GC, C5/ Noted bleeding 7-10-06 |
| 7/11 | 11+ | 42 | — | 2 | — | ∅ | c/c | 128/80 | 175 | / | / | | vaginally. Spec low light spotting c/o Prometrium Vaginal IR spotting terby |
| 7/18 | 12+ | 42 | — | 2 | — | ∅ | c/c | 140/90 | 179 | N/100 | 4 | (✓) | I further bleeding Noted suprapubic pain |
| 8/17 | 16+ | √6 | — | 2 | — | ∅ | c/c | 120/80 | 184 | TR/N | 4 | (✓) | |
| | | | | | | | | | | | | | |
| 9/15 | 21 | 21 | — | 2 | √/− | ∅ | c/c | 140/90 | 186 | TR/100 | 4 | (✓) | Needs Level II. Notes brown O/c; mild LLQ p-m |
| | | | | | | | | | | | | | |

**PROBLEMS** _____

**COMMENTS** _____

ACOG ANTEPARTUM RECORD (FORM C)

Patient Addressograph

| SYMPTOMS SINCE LMP |
|---|
| *Mild nausea* |
| |
| |
| |

## GENETIC SCREENING/TERATOLOGY COUNSELING
### INCLUDES PATIENT, BABY'S FATHER, OR ANYONE IN EITHER FAMILY WITH:

| | YES | NO | | YES | NO |
|---|---|---|---|---|---|
| 1. PATIENT'S AGE ≥ 35 YEARS AS OF ESTIMATED DATE OF DELIVERY | ✓ | | 12. HUNTINGTON'S CHOREA | | ✓ |
| 2. THALASSEMIA (ITALIAN, GREEK, MEDITERRANEAN, OR ASIAN BACKGROUND): MCV <80 | | ✓ | 13. MENTAL RETARDATION/AUTISM | | |
| 3. NEURAL TUBE DEFECT (MENINGOMYELOCELE, SPINA BIFIDA, OR ANENCEPHALY) | | ✓ | IF YES, WAS PERSON TESTED FOR FRAGILE X? | | |
| 4. CONGENITAL HEART DEFECT | | | 14. OTHER INHERITED GENETIC OR CHROMOSOMAL DISORDER | | |
| 5. DOWN SYNDROME | | | 15. MATERNAL METABOLIC DISORDER (EG, TYPE 1 DIABETES, PKU) | | |
| Y-SACHS (EG, JEWISH, CAJUN, FRENCH CANADIAN) | | | 16. PATIENT OR BABY'S FATHER HAD A CHILD WITH BIRTH DEFECTS NOT LISTED ABOVE | | |
| NAVAN DISEASE | | | 17. RECURRENT PREGNANCY LOSS, OR A STILLBIRTH | | |
| 8. SICKLE CELL DISEASE OR TRAIT (AFRICAN) | | | 18. MEDICATIONS (INCLUDING SUPPLEMENTS, VITAMINS, HERBS OR OTC DRUGS)/ILLICIT/RECREATIONAL DRUGS/ALCOHOL SINCE LAST MENSTRUAL PERIOD | | |
| 9. HEMOPHILIA OR OTHER BLOOD DISORDERS | | | IF YES, AGENT(S) AND STRENGTH/DOSAGE | | |
| 10. MUSCULAR DYSTROPHY | | | | | |
| 11. CYSTIC FIBROSIS | | ✓ | 19. ANY OTHER | | ✓ |

**COMMENTS/COUNSELING** _____

| INFECTION HISTORY | YES | NO | | YES | NO |
|---|---|---|---|---|---|
| 1. LIVE WITH SOMEONE WITH TB OR EXPOSED TO TB | | ✓ | 4. HISTORY OF STD, GONORRHEA, CHLAMYDIA, HPV, SYPHILIS | | ✓ |
| 2. PATIENT OR PARTNER HAS HISTORY OF GENITAL HERPES | | ✓ | | | |
| 3. RASH OR VIRAL ILLNESS SINCE LAST MENSTRUAL PERIOD | | ✓ | 5. OTHER (See Comments) | | ✓ |

**COMMENTS** _____

**INTERVIEWER'S SIGNATURE** _____

## INITIAL PHYSICAL EXAMINATION

DATE **6 / 23 / 06**    HEIGHT _____    BP _____

| | | | | | | |
|---|---|---|---|---|---|---|
| 1. HEENT | ☑ NORMAL | ☐ ABNORMAL | 12. VULVA | ☑ NORMAL | ☐ CONDYLOMA | ☐ LESIONS |
| 2. FUNDI | ☐ NORMAL | ☐ ABNORMAL | 13. VAGINA | ☑ NORMAL | ☐ INFLAMMATION | ☐ DISCHARGE |
| 3. TEETH | ☐ NORMAL | ☐ ABNORMAL | 14. CERVIX | ☑ NORMAL | ☐ INFLAMMATION | ☐ LESIONS |
| 4. THYROID | ☑ NORMAL | ☐ ABNORMAL | 15. UTERUS SIZE | ☐ _____ WEEKS | | ☐ FIBROIDS |
| 5. BREASTS | ☑ NORMAL | ☐ ABNORMAL | 16. ADNEXA | ☑ NORMAL | ☐ MASS | |
| 6. LUNGS | ☑ NORMAL | ☐ ABNORMAL | 17. RECTUM | ☐ NORMAL | ☐ ABNORMAL | |
| 7. HEART | ☑ NORMAL | ☐ ABNORMAL | 18. DIAGONAL CONJUGATE | ☑ REACHED | ☐ NO | _____ CM |
| 8. ABDOMEN | ☑ NORMAL | ☐ ABNORMAL | 19. SPINES | ☑ AVERAGE | ☐ PROMINENT | ☐ BLUNT |
| 9. EXTREMITIES | ☑ NORMAL | ☐ ABNORMAL | 20. SACRUM | ☑ CONCAVE | ☐ STRAIGHT | ☐ ANTERIOR |
| 10. SKIN | ☑ NORMAL | ☐ ABNORMAL | 21. SUBPUBIC ARCH | ☑ NORMAL | ☐ WIDE | ☐ NARROW |
| 11. LYMPH NODES | ☑ NORMAL | ☐ ABNORMAL | 22. GYNECOID PELVIC TYPE | ☐ YES | ☐ NO | |

**COMMENTS** (Number and explain abnormals) _____

**EXAM BY** _____

ACOG ANTEPARTUM RECORD (FORM B)

Patient Addressograph

NAME _____
        LAST                    FIRST                    MIDDLE

## PLANS/EDUCATION
(COUNSELED ☐)---BY TRIMESTER. INITIAL AND DATE WHEN DISCUSSED.

| FIRST TRIMESTER | COMPLETED | NEED FOR FURTHER DISCUSSION |
|---|---|---|
| ☐ HIV AND OTHER ROUTINE PRENATAL TESTS | | |
| ☐ RISK FACTORS IDENTIFIED BY PRENATAL HISTORY | | |
| ☐ ANTICIPATED COURSE OF PRENATAL CARE | | |
| ☐ NUTRITION AND WEIGHT GAIN COUNSELING | | |
| ☐ TOXOPLASMOSIS PRECAUTIONS (CATS/RAW MEAT) | | |
| ☐ SEXUAL ACTIVITY | | |
| ☐ EXERCISE | | |
| ☐ ENVIRONMENTAL/WORK HAZARDS | | |
| TRAVEL | | |
| ☐ TOBACCO (ASK, ADVISE, ASSESS, ASSIST, AND ARRANGE) | | |
| ☐ ALCOHOL | | |
| ☐ ILLICIT/RECREATIONAL DRUGS | | |
| ☐ USE OF ANY MEDICATIONS (INCLUDING SUPPLEMENTS, VITAMINS, HERBS, OR OTC DRUGS) | | |
| ☐ INDICATIONS FOR ULTRASOUND | | |
| ☐ DOMESTIC VIOLENCE | | |
| ☐ SEAT BELT USE | | |
| ☐ CHILDBIRTH CLASSES/HOSPITAL FACILITIES | | |
| **SECOND TRIMESTER** | | |
| ☐ SIGNS AND SYMPTOMS OF PRETERM LABOR | | |
| ☐ ABNORMAL LAB VALUES | | |
| ☐ INFLUENZA VACCINE | | |
| ☐ SELECTING A PEDIATRICIAN | | |
| ☐ POSTPARTUM FAMILY PLANNING/TUBAL STERILIZATION | | |
| **THIRD TRIMESTER** | | |
| ☐ ANESTHESIA/ANALGESIA PLANS | | |
| ☐ FETAL MOVEMENT MONITORING | | |
| ☐ LABOR SIGNS | | |
| ☐ VBAC COUNSELING | | |
| ☐ SIGNS AND SYMPTOMS OF PREGNANCY INDUCED HYPERTENSION | | |
| ☐ POSTTERM COUNSELING | | |
| ☐ CIRCUMCISION | | |
| ☐ BREAST OR BOTTLE FEEDING | | |
| ☐ POSTPARTUM DEPRESSION | | |
| ☐ NEWBORN CAR SEAT | | |
| ☐ FAMILY MEDICAL LEAVE OR DISABILITY FORMS | | |
| REQUESTS | | |
| | | |
| | | |

TUBAL STERILIZATION CONSENT SIGNED          DATE          INITIALS
                                          ___/___/___     _____

HISTORY AND PHYSICAL HAS BEEN SENT TO HOSPITAL, IF APPLICABLE    DATE          INITIALS
                                          ___/___/___     _____

ACOG ANTEPARTUM RECORD (FORM E)

*1000211513*

Patient Addressograph

## LABORATORY AND EDUCATION

| INITIAL LABS | DATE | RESULT | REVIEWED |
|---|---|---|---|
| BLOOD TYPE | 6/23/06 | A    B    AB    (O) | |
| D (Rh) TYPE | / / | pos | |
| ANTIBODY SCREEN | / / | neg | |
| HCT/HGB | / / | 12.6 % 36.4 g/dL | |
| PAP TEST | / / | NORMAL/ABNORMAL/____ | |
| RUBELLA | 6/23/06 | immune | |
| VDRL | / / | NR | |
| URINE CULTURE/SCREEN | / / | neg | |
| HBsAg | / / | NR | |
| HIV COUNSELING/TESTING* | / / | POS. (NEG.) DECLINED | |

| COMMENTS/ADDITIONAL LABS |
|---|
| |

| ___TIONAL LABS | DATE | RESULT |
|---|---|---|
| ELECTROPHORESIS | / / | AA  AS  SS  AC  SC  AF  TA$_2$ |
| PPD | / / | |
| CHLAMYDIA | / / | |
| GONORRHEA | / / | |
| GENETIC SCREENING TESTS (SEE FORM B) | / / | |
| OTHER | | |

| 8–18-WEEK LABS (WHEN INDICATED/ELECTED) | DATE | RESULT |
|---|---|---|
| ULTRASOUND | / / | |
| MSAFP/MULTIPLE MARKERS | / / | |
| AMNIO/CVS | / / | |
| KARYOTYPE | / / | 46,XX  OR  46,XY/OTHER____ |
| AMNIOTIC FLUID (AFP) | / / | NORMAL____  ABNORMAL____ |

| ___8-WEEK LABS (WHEN INDICATED) | DATE | RESULT |
|---|---|---|
| HCT/HGB | / / | ____% ____g/dL |
| DIABETES SCREEN | / / | 1 HOUR_____ |
| GTT (IF SCREEN ABNORMAL) | / / | ____FBS ____1 |
| | | ____2 HOUR ____3 |
| D (Rh) ANTIBODY SCREEN | / / | |
| ANTI-D IMMUNE GLOBULIN (RhIG) GIVEN (28 WKS) | / / | SIGNATURE |

| 32–36-WEEK LABS | DATE | RESULT |
|---|---|---|
| HCT/HGB | / / | ____% ____g |
| ULTRASOUND (WHEN INDICATED) | / / | |
| VDRL (WHEN INDICATED) | / / | |
| GONORRHEA (WHEN INDICATED) | / / | |
| CHLAMYDIA (WHEN INDICATED) | / / | |
| GROUP B STREP | / / | |

*Check state requirements before recording results.

PROVIDER SIGNATURE (AS REQUIRED)_____

Patient Name _Koelra Waivri_

Address _1325 Baldwin CT Apt 2A_

Phone Number _Palatin IL 60074_

Date of Birth _07/24/69_

Medical Record Number _1000211513_

**✚** *Advocate Medical Group*
1255 Milwaukee Ave.
Glenview, IL. 60025
Ph # 847-294-5490
Fax # 847-294-5496

# AUTHORIZATION FOR RELEASE OF PATIENT HEALTH INFORMATION

I hereby authorize that the protected health information regarding the above-named person be forwarded:

**FROM:**   Person/Institution   ADVOCATE MEDICAL GROUP

Address   1255  N.  MILWAUKEE AVENUE

City   GLENVIEW   State IL   Zip   60025

**TO:**
**(Recipient)**   Person/Institution   _Koelra Waivri_

Address   _1325 Baldwin CT Apt 2A_

City   _Palatine_   State _IL_   Zip   _60074_

Purpose or need for information: _____

Disclosure will include: *(check all that apply)*

☑ Face Sheet   ☑ History & Physical   ☑ Laboratory Report   ☑ Operative Report   ☐ Other _all_
☑ Discharge Summary   ☑ Progress/Physician Notes   ☑ X-ray/Radiology Report   ☑ Pathology Report
☑ Emergency Report   ☑ Nurses Notes   ☑ EKG/EMG/EEG Report   ☑ Consultation Report

Records for the period (dates) from _this year_ to _____

**I understand that the information to be released may include:** *(initial all that apply)*

_____ Diagnosis, Evaluation and/or treatment for alcohol and/or drug abuse

_____ Records of HTLV-III or HIV testing (AIDS test) result, diagnosis and/or treatment

_____ Psychiatric, psychological records or evaluation and/or treatment or treatment for mental, physical and/or emotional illness including narrative summary, tests, social work assessment, medication, psychiatric examination, progress notes, consultations, treatment plans, and/or evaluation.

I also understand that this Authorization is subject to revocation/withdrawal by me at any time in writing to the medical record contact person at this site of care except to the extent that action has already been taken to release this information. This Authorization shall remain valid unless revoked but <u>will expire in 1 year after signing</u>. I have a right to inspect a copy of the health information to be released and if I do not sign this Authorization, the institution named above will not release my health information. The above named person/institution will not refuse to treat me based on whether I agree to allow my health information to be used and disclosed to others.

_Koelra Waivri_                          _1/30/06_
Signature of Patient                          Date


_____          _____
Signature of Parent/Legal Guardian/Personal Representative          Relationship to Patient


_____
Witness

**REDISCLOSURE:**   Notice is hereby given to the patient or legal representative signing this Authorization and the recipient named above that this health information disclosed under this Authorization may be re-disclosed by the recipient to others. Federal law, rules and regulations prohibit the recipient from further disclosing any health information that may be included regarding treatment for drug/alcohol abuse. * A minimum fee of $15.00 will be charged for the copy of your records.   (1) Original in Medical Record   (2) Copy to the Patient

| | |
|---|---|
| **NAME:** WAIVIO RODICA | **Date of Service:** 7/20/2006 |
| **MRN NO.:** 1000211513 | **Scan Location:** PERINATAL |
| **Patient's DOB:** 8/4/1969 | |
| **Patient's Age:** 36 years | **Referring MD:** JASENOF/BOOTH |

## Lutheran General –Perinatal Center
## Level I Ultrasound Obstetrical Examination

**Study Type:** 1ST TRI
**Reason for Exam:** AMA
**Type of Gestation:** Singleton

**Dating:**
LMP: 4/22/2006
The assigned gestational age is 12w 5d , based on LMP . The assigned EDC is 1/27/2007

**OB History:**
Gravida 2    Para 0 /0 /1 /0

**Amniotic Fluid Volume and Placenta for Sac**
Amniotic Fluid Volume:    normal

Placenta Location:    posterior
Placenta Grade:    0

**Fetal Biometry ( ):**
CRL: 7.03  (cm)

MA by US: 13w 2d
EDC by US: 1/23/2007

Nuchal Lucency: 1.80  (mm)

**Fetal Anatomy ( ):**
**Normal:**
   • **Abdominal Wall, Urinary Bladder, Fetal Cord Insertion, and Viable IUP**

**Maternal Anatomy:**   A posterior fibroid was noted measuring 2.13x1.45x2.54cms.

**Comments::**
 Fetal biometry is consistent with the patient's dates.  A Nuchal Translucency examination was performed. The NT measurement is 1.8 mm. This data as well as a maternal blood sample was sent to the lab for further assessment of risk factor for aneuploidy.

**Recommendation:**
    Please note normal growth and visualized standard anatomic views within limitations of early scan. Due to early gestational age, a comprehensive exam should be considered at approximately 20 – 22 wks to complete an anatomic survey of the fetus.

**BRUCE PIELET, MD**                  Sonographer:DEBBIE FELDMAN, RDMS

WAIVIO RODICA                    1000211513                    7/20/2006

| L LABS* | DATE | RESULT | REVIEWED |
|---|---|---|---|
| YPE | 6/23/06 | A    B    AB    (O) | |
| PE | / / | pos | |
| Y SCREEN | / / | neg | |
| | / ✓ | 12.6 % 36.4 g/dL | |
| | | NORMAL/ABNORMAL/ | |
| | 6/23/06 | immune | |
| | / / | NR | |
| LTURE/SCREEN | / / | neg | |
| | / / | NR | |
| SELING/TESTING* | / ✓ | POS (NEG.) DECLINED | |

| NAL LABS | DATE | RESULT |
|---|---|---|
| TROPHORESIS | / / | AA AS SS AC SC AF TA₂ |
| | / / | |
| IA | / / | |
| EA | / / | |
| CREENING TESTS (SEE FORM B) | / / | |

| EEK LABS (WHEN INDICATED/ELECTED) | DATE | RESULT |
|---|---|---|
| NC | / / | |
| TIPLE MARKERS | / / | |
| | / / | |
| YPE | / / | 46,XX  OR  46,XY/OTHER |
| C FLUID (AFP) | / / | NORMAL ___ ABNORMAL ___ |

| EEK LABS (WHEN INDICATED) | DATE | RESULT |
|---|---|---|
| | / / | ___ % ___ g/dL |
| CREEN | / / | 1 HOUR |
| EN ABNORMAL) | / / | ___ FBS ___ 1 H |
| | | ___ 2 HOUR ___ 3 H |
| ODY SCREEN | / / | |
| NE GLOBULIN (RhIG) (S) | / / | SIGNATURE |

| EK LABS | DATE | RESULT |
|---|---|---|
| | / / | ___ % ___ g/ |
| (WHEN INDICATED) | / / | |
| NDICATED) | / / | |
| WHEN INDICATED) | / / | |
| WHEN INDICATED) | / / | |
| F | / / | |

tinents before recording testing.

TURE (AS REQUIRED) ___

### COMMENTS/ADDITIONAL LABS

GERT 3200 Advantage II (R)
System

GERT 3200 ADVII

CB  3.5 MHz Convex Abdominal

GE RT 3200 Advantage II® System

GE RT 3200 ADV II

CB  3.5 MHz  Convex  Abdominal  convex xlat
RT 3200

TR  7.0 MHz  Transvaginal / Transrectal

This is  TR  7.0MHz



**Advocate Medical Group**
1255 Milwaukee Avenue
Glenview, Illinois 60025
847/294-5490

---

*Brief Interaction*
11/09/2006 10:15AM

**Patient:** RODICA I. WAIVIO
**MRN:** 1000211513
**DOB:** 08/04/1969

**Chaperone**
November 9, 2006

Chaperone : Accepted
**Notes**
Discuss fibroids and infertility issues-Jennifer Torres present for visit.
Pt with continued questions with prior pregnancy loss and lack of clear understanding with causes. Current focus is on the potential side effects of the infertility drugs used and possible cause of Lupus and potential coagulation effects.
Have expressed to Pt in clear terms my desire to transfer Pt to MFM and RepoEndo.
Pt has sought outside opinions but yet desires to continue her care at LGH. Pt expresses to continue her care with Dr. Pesch. Pt's discussion was often rambling and her questions were varied and difficult to answer.
Pt was asked multiple times if there were any current issues and she continued to express her difficulty with understanding the nature of the loss of her pregnancy.

Time spent 20'
**Signature**
Signed By: Jennifer Torres ; 11/09/2006 10:44 AM CST
Signed By: Ian Jasenof ; 11/10/2006 11:18 AM CST

**Advocate Medical Group**
1255 Milwaukee Avenue
Glenview, Illinois  60025
847/294-5490

*Brief Interaction*
11/28/2006 3:30PM

**Patient:**   RODICA I. WAIVIO
**MRN:**        1000211513
**DOB:**        08/04/1969

**Chaperone**
November 28, 2006

Chaperone : Accepted.
**Notes**
Review u/s results.
My nurse Jennifer Torres and Mary Hebden, RN were present for the appt.
Pt had U/S at outside hospital and not with my order. Have told Pt that I can not comment or speculate on the results.
Thickened endometrial lining noted. This maybe due to her cycle. Pt with recent 20+wk loss and she believes it
maybe retained placental tissue. Pt with normal menses.
Have told Pt multiple times that I believe her future care is best served by sub-specialists. She continued to persist in
my speculation of her recent pregnancy loss. Pt continues to not comprehend my simple words of the discussion and
I had to repeat them many times. I believe we have had a break down of the Pt/Physician relationship. She insisted
on me writing down on a piece of paper my desire to dismiss the Pt.
I have only offered the Pt a repeat U/S in 4wks at the Parkside office.
Pt also believes she saw findings on a bedside U/S that suggested blood clots and some how the pregnancy could
have be "saved".
**Signature** ·
Signed By: Jennifer Torres ; 11/28/2006 3:46 PM CST.
Signed By: Ian Jasenof ; 11/28/2006 5:55 PM CST.

**Advocate**
*Lutheran General Hospital*

WAIVIO,RODICA I   ZEM   001217205
037Y F
GOMEZ, ISABEL   08/04/1969 10/21/2006
EMERGENCY DEPT,
322026915 HM

# CONSULTATION REPORT

Requested of ___Ob/gyn___          10/21/06          23⁴⁵
                 Physician or Service              Date          Hour

Reason for Consultation: VB

History and Findings: Pt. is a 37 y/o G2P0110 s/p IUPFD delivery @ 21 wk by cytotec. Pt. then had D&C for retained products and was again hospitalized 2° pp endometritis. She was treated c̄ course of Unasyn 1 Gent → cefindulex 48° → d/c'd home on Augmentin x 2 wks. Pt. c/o uterine pain. Pt. presents today c̄ c/o ↑ bleeding since 10/q/06. ↑ bleeding 10/q-12 - likely menses. Pt. states lower quadrant abd. pain and ↑ pain today.

PE: 98⁵  116/63  81  18        Pt. refused SSE and SVE.
Gen. tearful                    Pad showed ? light pink tinge
o-vd- soft, NT, ND. oversound, guarding.   active bleeding noted

                                uHCG ⊖      11.7
Diagnosis:                      uA ⊖     11 ⟋  319
   Benign exam                           ⟍ 35.6

Recommendation:                          ⊕ left shift

   1) Pt. is very concerned that she has an infxn. & clinical signs of inf at this time. To f/u in Tues. for f/u in office.

   2) Strongly consider counseling to deal c̄ grief (loss

   3) D/W Dr Gomez.

        ___S. Toledi___ M.D.
         Consultant's Signature

10/22/06          0030
Date              Hour

| | | | |
|---|---|---|---|
| **NAME:** | WAIVIO RODICA | **Date of Service:** | 10/24/2006 |
| **MRN NO.:** | 1000211513 | **Scan Location:** | OB/GYNE |
| **Patient's DOB:** | 8/4/1969 | | |
| **Patient's Age:** | 37 years | **Referring Physician:** | JASENOF |

**Advocate Medical Group**
**Obstetrics and Gynecology**
**Department**

### PELVIC ULTRASOUND REPORT

**Reason for Scan:** 5 Day Follow–up

**Technique:**
Multiple longitudinal and transverse sonograms of the pelvis were obtained using the transvaginal approach. The exam was technically adequate.

**Comments:**

On transvaginal sonography, the patient's uterus was found to be retroverted in shape. It contained a single mass most likely to be a fibroid within the fundal portion of the uterus. The endometrium was thickened and measured 3.0 cm. The uterus measures 6.9 cm x 6.0 cm x 5.0 cm. The uterine mass measures 1.9 cm x 1.9 cm x 1.6 cm.

The right ovary was normal and measured 2.7 cm x 2.3 cm x 2.5 cm.

The left ovary was visualzied and measured 4.6 x 3.0 x 2.1 cms. A mostly solid appearing cyst was seen within the left ovary measuring 2.4 x 1.6 x 1.8 cms. It appears to have decreased in size since previous exam.

Dr. Pesch reviewed images and met with patient. Patient to return for follow–up ultrasound in 2 weeks.



***DANIEL PESCH, MD***
Diagnosing Physician

***MICHELE LIC, RDMS***
Sonographer

**Advocate Medical Group**
4920 Central Avenue
Chicago, Illinois  60630
773/286-2870

---

*Brief Interaction*
10/26/2006 10:45AM

**Patient:**  RODICA I. WAIVIO
**MRN:**  1000211513

**Chaperone**
October 26, 2006

Chaperone :  [ Accepted.
**Notes**
F/u vaginal bleeding.
Pt with recent 20+ wk fetal loss with subsequent retained POC and endometritis. Pt with significant psych hx and has been extremely difficult to manage since.
Pt seen by Dr. Pesch for serial U/S for possible additional bleeding. Pt also placed on Prometrium 200mg BiD for several days. Pt declines PE. Notes no further bleeding. Advised to d/c Prometrium, repeat U/S ~1month from last U/S. Will schedule today.
**Signature**
Signed By: Jennifer Torres ; 10/26/2006 11:44 AM CST.
Signed By: Ian  Jasenof ; 10/26/2006 12:40 PM CST.

# REFILL   REQUEST
## AUTO-FAX ELECTRONICALLY TRANSMITTED: 10/31/2006  9:24 PM    EST

**CVS/pharmacy**
Store: 5913
200 W. NORTHWEST HIGHWAY
PALATINE, IL 60067
Phone:  (847) 934-2530

FAX:(847) 934-2537

**Doctor:** DANIEL PESCH

1875 DEMPSTER, SUITE 340
PARK RIDGE, IL 60068
Phone:  (847) 655-8500

FAX:  (847) 655-8501

---

**For Patient :**

WAIVIO, RODICA
1325 BALDWIN
PALATINE, IL 60074
Phone:  (847) 963-0231

DOB:  08/04/1969

**For Prescription :**

Rx#:  155853

Last Filled:  10/24/2006

AMOX TR-K CLV 500-125 MG TATEV
Qty. Prescribed:  21

SIG:  TAKE 1 TABLET BY MOUTH 3 TIMES A DAY

---

Comments from pharmacy:

**Authorization:**

Not Authorized

O  Authorized this time plus _____ additional refills
O  Generic Equivalent Authorized

Prescriber Comments/changes:

| Prescribers Name(Printed):_____ | Prescriber's DEA #: _____ |
| Prescriber's Signature:_____ | Date:_____ |

**Massachusetts Only:**   Interchange is Mandated unless Practitioner writes the words "No Substitution"

The information contained in this electronic message as well as any attachments to this message are intended for the exclusive use of the intended recipient and may contain confidential or privileged information.  If you are not the intended recipient, please destroy all copies of this message as well as its attachments and advise the sender immediately.

| | | | |
|---|---|---|---|
| **NAME:** | WAIVIO RODICA | **Date of Service:** | 11/3/2006 |
| **MRN NO.:** | 1000211513 | **Scan Location:** | OB/GYNE |
| **Patient's DOB:** | 8/4/1969 | | |
| **Patient's Age:** | 37 years | **Referring Physician:** | JASENOF |

## Advocate Medical Group
## Obstetrics and Gynecology
## Department

### PELVIC ULTRASOUND REPORT

**Reason for Scan:** Follow–up

**Technique:**
Multiple longitudinal and transverse sonograms of the pelvis were obtained using the transvaginal approach.
The exam was technically adequate.

**Comments:**

The patient's uterus was found to be retroverted in shape.

The uterus measures 6.9 x 5.3 x 5.0 cms.

Within the fundal portion of the endometrial canal is a rounded mass of irregular echoes measuring 2.3 cms in
AP diameter. The rest of the endometrial canal appears thin. This most likely represents a submucosal fibroid.
An SIS would be helpful to further evaluate this area.

The right ovary was visualzied and appeared unremarkable measuring 3.7 x 2.2 x 3.0 cms.

The left ovary was visualzied and measured 4.2 x 2.4 x 3.2 cms. It contained a cyst with multiple septations
measuring 1.8 x 1.3 x 1.4 cms.

Patient to follow–up with an SIS.

Dr. Pesch reviewed images and met with patient.



**_DANIEL PESCH, MD_**
Diagnosing Physician

**_MICHELE LIC, RDMS_**
Sonographer

**Advocate Medical Group**
4920 Central Avenue
Chicago, Illinois 60630
773/286-2870

---

*Brief Interaction*
11/09/2006 10:15AM

**Patient:** RODICA I. WAIVIO
**MRN:** 1000211513

**Chaperone**
November 9, 2006

Chaperone : Accepted
**Notes**
Discuss fibroids and infertility issues-Jennifer Torres present for visit.
Pt with continued questions with prior pregnancy loss and lack of clear understanding with causes. Current focus is on the potential side effects of the infertility drugs used and possible cause of Lupus and potential coagulation effects.
Have expressed to Pt in clear terms my desire to transfer Pt to MFM and RepoEndo.
Pt has sought outside opinions but yet desires to continue her care at LGH. Pt expresses to continue her care with Dr. Pesch. Pt's discussion was often rambling and her questions were varied and difficult to answer.
Pt was asked multiple times if there were any current issues and she continued to express her difficulty with understanding the nature of the loss of her pregnancy.

Time spent 20'
**Signature**
Signed By: Jennifer Torres ; 11/09/2006 10:44 AM CST
Signed By: Ian Jasenof ; 11/10/2006 11:18 AM CST

---

**. Advocate Medical Group**
4920 Central Avenue
Chicago, Illinois  60630
773/286-2870

---

*Brief Interaction*
11/28/2006 3:30PM

**Patient:** RODICA I. WAIVIO
**MRN:**    1000211513

**Chaperone**
November 28, 2006

Chaperone : Accepted.
**Notes**
Review u/s results.
My nurse Jennifer Torres and Mary Hebden, RN were present for the appt.
Pt had U/S at outside hospital and not with my order. Have told Pt that I can not comment or speculate on the results.
Thickened endometrial lining noted. This maybe due to her cycle. Pt with recent 20+wk loss and she believes it
maybe retained placental tissue. Pt with normal menses.
Have told Pt multiple times that I believe her future care is best served by sub-specialists. She continued to persist in
my speculation of her recent pregnancy loss. Pt continues to not comprehend my simple words of the discussion and
I had to repeat them many times. I believe we have had a break down of the Pt/Physician relationship. She insisted
on me writing down on a piece of paper my desire to dismiss the Pt.
I have only offered the Pt a repeat U/S in 4wks at the Parkside office.
Pt also believes she saw findings on a bedside U/S that suggested blood clots and some how the pregnancy could
have be "saved".
**Signature**
Signed By: Jennifer Torres ; 11/28/2006 3:46 PM CST.
Signed By: Ian  Jasenof ; 11/28/2006 5:55 PM CST.

**Advocate Medical Group**
4920 Central Avenue
Chicago, Illinois  60630
773/286-2870

---

*Brief Interaction*
11/30/2006 12:00AM

**Patient:**  RODICA I. WAIVIO
**MRN:**    1000211513

**Chaperone**
November 30, 2006

Chaperone : Not Applicable.
**Notes**
Pt arrived at office requesting her records.  Patient signed a release, paid her fee and records were copied and given to her.  After receiving the records, patient requested to be permitted to take a photograph of the OB ultrasound machine.  Patient was advised that we could not accomodate that request.  Patient understood and then said she would send a note requesting information about the unit-model # etc.  She was advised that we would wait for the note.  Pt left the office and returned about 20 minutes later.  She had reviewed the records she was given and wanted to make a amendment to the note from the most recent office visit.  I advised her that she could ask for that, but that we could not change anything that was written in the note.  Patient understood.  Patient indicated that she would send a letter stating what she wanted in the record.  She was given another copy of the page from her prenatal record with the ultrasound picture at her request because the quality of the one she received initially was poor.  It had been scanned into the EMR and was not a clear copy.
**Signature**
Signed By: Mary  Hebden ; 11/30/2006 12:52 PM CST.
Signed By: Ian  Jasenof ; 11/30/2006 3:16 PM CST.

**Advocate Medical Group**
4920 Central Avenue
Chicago, Illinois  60630
773/286-2870

---

*Brief Interaction*
12/11/2006 7:13AM

**Patient:**  RODICA I. WAIVIO
**MRN:**     1000211513

**Chaperone**
December 11, 2006

Chaperone : Not Applicable
**Message**
Recorded as Task
Date: 12/08/2006 10:23 AM, Created By: Czerwik,Dagmara
Task Name: Call Back
Assigned To: PESCH,DANIEL
Regarding Patient: WAIVIO, RODICA I, Status: Active
Comment:
Czerwik,Dagmara - 08 Dec 2006 10:23 AM
  TASK CREATED
847-963-0231 like to update the information re a precedure on 12/11,requested to  speak to you thanks
PESCH,DANIEL - 11 Dec 2006 7:13 AM
  TASK EDITED
I spoke with the patient 12/8 after office ended.  The patient informed me that she had consulted another Dr she had
found on the internet.  The physician offered and performed a hysteroscopy wich was reportedly normal but a biopsy
was taken.  I informed her that she will be receiving a letter from our group that terminates her relationship with
AMG after a 30 day period for her to find another physician.  She stated there was a law that prohibits this, I told her
we had consulted our legal staff and were adhering to the law.
As she has an appointment on Monday I informed her we would see her and I would review the findings from her
new doctor.  She stated she would come in today
**Signature**
Signed By: DANIEL  PESCH  M.D.; 12/11/2006 7:15 AM CST

**Advocate Medical Group**
1999 W. Dempster
Park Ridge, Illinois  60068
847/318-2303

---

*Brief Interaction*
12/11/2006 9:45AM

**Patient:**  RODICA I. WAIVIO
**MRN:**      1000211513
**DOB:**      08/04/1969

**Chaperone**
December 11, 2006

Chaperone : Not Applicable.
**Notes**
The patient was here for an ultrasound f/u as previously noted.  The patient notified our ultrasound tech that she has
begun clomid under Dr Rapisarda's care.  Furthermore she had a hysteroscopy with another provider and is awaiting
the results of a biopsy.  I reviewed the ultrasound images and told the patient that the changes at the fundus of the
uterus represented either a myoma or adenomyoma.  The only way to evalute this is surgically.  Given the location
and nature of the change I recommended evalution by a specialist who regularly performs myomectomies such as Dr
Rapisarda.  Michelle our ultrasound technologist and the patient's husband were present for the entire conversation.
At this point the patient was informed again that we had sent a letter to her allowing her 30 days in which to find a
new physician.  During this time AMG will provide emergency care.  She became upset and informed me she was
going to get a court order to require us to care for her.  I told her this was fine if she wanted to pursue this.  She gave
me a hand written statement regarding a US statute.  She also requested pictures from her ultrasound and we told her
we would comply and provide all records with a written request.  I furthermore recommended she follow up with the
physician that performed her HSC and biopsy regarding the results.
**Signature**
Signed By: DANIEL  PESCH  M.D.; 12/11/2006 4:10 PM CST.

| | | | |
|---|---|---|---|
| **NAME:** | WAIVIO RODICA | **Date of Service:** | 12/11/2006 |
| **MRN NO.:** | 1000211513 | **Scan Location:** | OB/GYNE |
| **Patient's DOB:** | 8/4/1969 | | |
| **Patient's Age:** | 37 years | **Referring Physician:** PESCH | |

**Advocate Medical Group**
**Obstetrics and Gynecology**
**Department**

## PELVIC ULTRASOUND REPORT

**Reason for Scan:** Follow-up

**Technique:**
Multiple longitudinal and transverse sonograms of the pelvis were obtained using the transvaginal approach.
The exam was technically adequate.

**Comments:**

**LMP: 12–7–2006**

On transvaginal sonography, the patient's uterus was found to be retroverted in shape. The endometrium was of normal thickness and measured 5.2 mm. The uterus measures 6.5 cm x 6.0 cm x 3.2 cm. Within the fundal portion of the uterus was a diffuse area of hyperechoic echoes. This may represent an adenomyoma vs. a myoma, however other pathology cannot be ruled out. Nabothian cysts are noted.

The right ovary was visualzied and appeared unremarkable measuring 2.8 x 1.9 x 2.2 cms. The left ovary was visualzied and appeared unremarkable measuring 3.6 x 1.9 x 2.4 cms. Multiple follicles were noted bilaterally.

Dr. Pesch was present for exam and met with patient.

*DANIEL PESCH, MD*
Diagnosing Physician



*MICHELE LIC, RDMS*
Sonographer

**Advocate Medical Group**
4920 Central Avenue
Chicago, Illinois  60630
773/286-2870

---

*Brief Interaction*
10/19/2006 11:30AM

**Patient:**  RODICA I. WAIVIO
**MRN:**     1000211513

**Chaperone**
October 19, 2006

Chaperone :  Declined.
**Notes**
Pt. here for vaginal bleeding. Pt reports that it is mild flow, spotting the last few days. She denies fever, chills, nausea, or vomiting.  She is concerned that she has POC still retained. Pt was treated post delivery of an IUFD at 20+ wks for endometritis.  She completed the course of ABX.  Pt presents today insisting on an ultrasound to check for infection.  D/w pt that she needs to be examined re: amt of bleeding and that u/s is not the way to check for infection.  Pt consented to exam.

SSE: No blood in the vault. Cervix normal in apperance. Normal discharge
BME: Uterus 10 wk size, appropriate, nontender.
d/w pt normal exam.  She expressed that she wanted ABX or culture taken.  Patient had already started home dicloxaccillin?, leftover abx, 24-30 hrs ago.  D/W her that culture would unlikely result positive even if done since she started ABX before exam.  Informed patient that she is likely resuming normal menses.  Will send her for u/s to make sure normal stripe with no retained POC.  Recheck Bhcg.
**Signature**
Signed By: Irasema Lopez ; 10/19/2006 11:57 AM CST.
Signed By: PATRICIA HANN-OLEARY M.D.; 11/16/2006 2:07 PM CST.

**Advocate Medical Group**
4920 Central Avenue
Chicago, Illinois  60630
773/286-2870

---

*Brief Interaction*
10/13/2006 9:53AM

**Patient:** RODICA I. WAIVIO
**MRN:** 1000211513

**Chaperone**
October 13, 2006

Chaperone : [ Accepted ][ Declined ][ Not Applicable ].
**Notes**
Called patient today to inform her that Dr Jasenof and Dr Rapisarda spoke and she is to follow up with Dr Rapisarda for further testing. She then tells me that she is still bleeding since her exam on Oct 6 and has a fever of 99.0 to 100.0 and she wants antibiotics. I start to explain to her that Dr Jasenof is away for a week and that I will call Parkside to see if anyone could see her. I spoke with Pat at Parkside and explained the patient history to her. She agreed with me that this could be her period and that the first period after a delivery could be quite heavy. She also said that she could take Tylenol every 4 hours PRN and/or go to LGH ER. I related all this information to the patient and she got upset with me. Stating that if Dr Jasenof does not want to see her anymore that he should tell her. I told her that Dr Jasenof was out of the country and not that he did not want to see her.  It became very difficult to speak with her and have her understand that I was trying to help her. I finally told her just to go to LGH ER and she agreed.

I later called her again and explained to her that I was trying to help her and that I could give her an appointment with Dr Jasenof when he returned, she agreed. Appointment was made for Oct 26 @ 11am.  I then asked her if she was going to LGH ER and she said that she had some antibiotics at home that she would take and go to ER if she thought it was necessary.
**Signature**
Signed By: Jennifer  Torres ; 10/13/2006 10:33 AM CST.
Signed By: Ian  Jasenof ; 10/23/2006 4:23 PM CST.

**Advocate Medical Group**
4920 Central Avenue
Chicago, Illinois 60630
773/286-2870

---

*Post Partum Exam*
10/06/2006 10:45AM

**Patient:** RODICA I. WAIVIO
**MRN:** 1000211513

**Chaperone**
October 6, 2006

Chaperone : Declined
**Vitals 2**
G: 2    P: 0 0 2 0
LMP: 4/22/06
LAST PAP: 2006
METHOD OF BC: None
**Vital Signs**
Recorded by hebdenm on 06 Oct 2006 11:02 AM
BP:110/74, LUE, Sitting,
Weight: 176 lb
**Delivery Information**
DELIVERY DATE 9/17/06
DELIVERY PHYSICIAN: Gomez    GA AT DELIVERY: 20 weeks
INFANT INFO:
    MALEx
    WT:
    NAME:
INFANT HEALTH:
TYPE OF DELIVERY: NSVD x
TYPE OF EPISIOTOMY/LACERATION:
DELIVERY COMPLICATIONS: D&C
POSTPARTUM COMPLICATIONS: endometritis
PRENATAL RUBELLA STATUS: Immune x
    If non-immune: Vaccinated?
CURRENT BREAST FEEDING?   No x
POST PARTUM DEPRESSION?   No x
ANY CHANGES IN YOUR HEALTH SINCE DELIVERY? No x
**Current Meds**
Reviewed and reported
**Contraception Information**
CONTRACEPTION: Prior to pregnancy : [ ] Desired Now: [ ]
**Nursing Notes**
Here for post partum exam. Delivered 9-17-06
**Physician Notes**
S/o 20wk IUFD
Pt extremely anxious regarding outcome. Desires Rheum, Heme-Onc, MFM consult
No gyne complaints
**Physical Exam**
**Vital signs:**
    ° Normal
**Standard Measurements:**

---

*Post Partum Exam*
10/06/2006 10:45AM

**Patient:**  RODICA I. WAIVIO
**MRN:**  1000211513

° Normal
**General appearance:**
° Normal
**Abdomen:**
° Normal
**Urinary system:**
° Normal
° Genital findings were normal
**Genitalia:**
° Normal
**Pelvic exam:**
° Normal
**Perineum:**
° Normal
**Assessment**
1. s/p 20wk loss
**Plan**
NEXT OFFICE VISIT:  Year [ ] Month [ ]
PAP: Done Today [ ]   Next Pap:  Year [ ] Month [ ]

Instructions given to patient recommending:
[ ] - Calcium: 1000-1200 mg/day    [ ] - Exercise/Weight loss   [ ] - Monthly SBE
[ ] - MVI/folate (400 mcg/day or prenatal vitamins daily       [ ] - Patient to quit smoking

Patient to call for combined OCPs: [ ] when weaning

Pt to f/u with Dr. Rapisarda
Will consult heme-onc given outcomes and/or Rheum.
Advise future transfer to MFM with next pregnancy
**Signature**
Signed By: Mary  Hebden ; 10/06/2006 11:05 AM CST
Signed By: Ian  Jasenof ; 10/06/2006 11:33 AM CST

**Quest**
**Diagnostics** ®

Quest on Demand™

PATIENT INFORMATION
**WAIVIO, RODICA**

REPORT STATUS **Final**

QUEST DIAGNOSTICS INCORPORATED

DOB: 08/04/1969  Age: 37
GENDER: F

SPECIMEN INFORMATION
SPECIMEN:    WX705745S
REQUISITION: 0001046
LAB REF NO:

ID: BR5575
PHONE: 8479630231

ORDERING PHYSICIAN
**RAPISARDA, JOHN J.**
CLIENT INFORMATION
22667154
FERTILITY CENTERS
OF IL-LINDENHURST
2592 E GRAND AVE FL 2
LINDENHURST, IL 60046-5915

COLLECTED:  09/28/2006    14:53
RECEIVED:   09/28/2006    23:41
REPORTED:   09/30/2006    21:02

| Test Name | In Range | Out of Range | Reference Range | Lab |
|---|---|---|---|---|
| LUPUS ANTICOAGULANT EVALUATION WITH REFLEX | | | | |
| LUPUS ANTICOAGULANT | | | | EZ |
| LUPUS ANTICOAGULANT | | DETECTED | NOT DETECTED | |

THE RESULTS REPORTED ARE CONSISTENT WITH A LUPUS
ANTICOAGULANT (AN ANTIPHOSPHOLIPID ANTIBODY).

This interpretation is based
on the following test results:

| | | | | |
|---|---|---|---|---|
| PTT-LA | | 41 H | 40 OR LESS sec | |
| HEXAGONAL PHASE NEUTRALIZATION | NOT CONFIRMED | | NOT CONFIRMED | EZ |
| DRVVT SCREEN | | 44 H | 42 OR LESS sec | EZ |
| PHOSPHOLIPID NEUTRALIZATION | | CONFIRMED | NOT CONFIRMED | EZ |

If either neutralization test is confirmed, a lupus
anticoagulant is present. If both neutralization tests are
not confirmed/not indicated, a lupus anticoagulant is not
detected.

Lupus anticoagulants (LA) represent a heterogeneous mix of
antibodies to phospholipid binding proteins. The titer and
avidity of these antibodies are highly variable. No single
test is sensitive enough to detect all LA antibodies.

----

Performing Laboratory Information:

EZ    Quest Diagnostics Nichols Institute-San Juan Capis 33608 Ortega Hwy San Juan Capastrano CA  92675
      Laboratory Director: R E Reitz

**✚ Advocate**
*Lutheran General Hospital*

## Perinatal Loss/Infant Expiration Checklist

WAIVIO,RODICA I    037Y F    O-2    001217205
JASENOF, IAN    08/04/1969 09/17/2006
JASENOF, IAN
321763260 CI

Originating unit **LED**    Infant's name **Elijah Moses Waivio**

Mother's name **Rodica Waivio**    Father's name **Nathan Waivio**

Address **1325 Baldwin Ct., Palatine, IL 60074**

Father's address if different _____

Phone ( **847** ) **963-0231**    Surviving sibling(s) ☐ Yes ☒ No  Ages: _____

1. Delivery information: Type **Vag**  Date **9/18/06**  Time **1625**  Sex **M**  Length **12 in**  Weight **450 gm**
2. Time of expiration (this is the delivery time if stillborn) **1625**    Date of expiration **9/18/06**
3. Did the baby have a heartbeat or breathe one breath?  ☐ Yes  ☒ No
   If yes, this is an infant expiration regardless of age or size
   If no, this is a  ☐ Fetal death < 20 weeks  ☐ Fetal death ≥ 20 weeks
4. Is this a planned pregnancy termination?  ☐ Yes  ☒ No
5. Mother's gestation **21**    Mother and/or baby's admitting diagnosis _____
6. Is this a multiple birth?  ☐ Yes  ☒ No  If yes, sibling information _____
7. Number of mother's previous losses:  **1** Miscarriage  **0** Stillborn  **0** Newborn

8. ☐ Gift of Hope (notify for all live births) (800) 545-4438  reference # _____ spoke to _____
9. Duty Chaplain notified (pager 1920) ☒ upon admission    ☐ at delivery or at time of death
10. Voice message left for  ☐ RN Bereavement Coordinator  or  ☐ OB/Peds Chaplain
    x217911    x217339

11. Religious tradition of family **Christian**
12. Faith Ritual
    - Blessing performed    ☒ Yes  ☐ No
    - Blessing certificate completed    ☒ Yes  ☐ No
    - Baptism performed    ☐ Yes  ☒ No
    - Baptism certificate completed    ☐ Yes  ☒ No
13. Patient's own clergy notified    ☐ Yes  ☐ No  ☒ Declined

    Outcome _____

**✉ FILE COPY**

**Advocate Medical Group**
**Adult Down Syndrome Center**
1999 W. Dempster
Park Ridge, Illinois  60068
847/318-2303

---

*Brief Interaction*
02/23/2007 11:00AM

**Patient:**  RODICA I. WAIVIO
**MRN:**     1000211513
**DOB:**     08/04/1969

**Chaperone**
February 23, 2007

Chaperone : Not Applicable.
**Notes**
The patient presents for discussion of her ultrasound findings. The patient had 3D sonohysterogram. However, the image which teh patient did not have was a static image. I reviewed the patient's care from her loss to the most recent ultrasound/SIS. I reviewed the fact that the timing of her surgery was appropriate and was responding to her concern of retained products. This was diagnosed by another physician with office HSC. At the time of surgery very little was done. The pathology does not reveal evidence of aggressive D&C in that a small amount of material was removed and no myometrium was seen. Additionally, I discussed the case with Dr Rapisarda, he recommends another cyle with Gonal F as the patient did not have a full stimulation last cycle. Additionally, the patient conceived with a thin cycle with her last pregnancy.

At this time I recommended that she follow up with Dr Rapisarda. She states she cannot without knowing definitively that her uterus is OK. We discussed alternatives including HSG. I however reiterated that based on her clinical history, pathologic and sonographic findings I do not suspect asherman's syndrome. The patient left to get the ultrasound pictures from the other office.
**Signature**
Signed By: DANIEL PESCH M.D.; 02/23/2007 11:58 AM CST.

**Advocate Medical Group**
**Adult Down Syndrome Center**
1999 W. Dempster
Park Ridge, Illinois 60068
847/318-2303

---

*Brief Interaction*
02/22/2007 5:08PM

**Patient:** RODICA I. WAIVIO
**MRN:** 1000211513
**DOB:** 08/04/1969

**Chaperone**
February 22, 2007

Chaperone : Not Applicable.
**Notes**
The patient had been seen on Monday with a sonogram and SIS secondary to a thin endometrium during her last stimultion with Dr Rapisarda. The SIS which I performed and read showed that the cavity was filling to the fundus without filling defect. The patient called today with a report via 3D ultrasound SIS performed by another physician that revealed a filling defect the patient reports as a 70% defect. I offered her an appointment tomorrow to review the images from the other center. She would like us to repeat the 3D scan to confirm the diagnosis. She also stated that "you destroyed my uterus on purpose". I responded by telling her that I would certainly not do such a thing. We discussed the fact that Asherman's syndrome is a known complication of D&C HSC especially one that followed her previous D&C for her previous pregnancy loss. The patient was clearly upset, and I spoke with the husband after he had looked at the images. I told him that if the ultrasound indeed did show scarring in the uterus that it can be treated. Finally we agreed that the patient would come to the office tomorrow at 11am for consultation.
**Signature**
Signed By: DANIEL PESCH M.D.; 02/22/2007 5:34 PM CST.

**✚ *Advocate Medical Group***

PARKSIDE CENTER
1875 DEMPSTER #340
PARK RIDGE, IL 60068

## Saline Infusion Sonogram Ultrasound Test Consent

Your doctor wants to perform a test to evaluate the lining of the uterus.

The procedure:
1. The doctor will insert a speculum in the vagina (like during a pap smear test).
2. The cervix will be cleaned with Betadine to decrease the risk of infection.
3. A sterile, thin, catheter will be inserted through the cervix into the uterine cavity.
4. The speculum will be removed.
5. The ultrasound probe will be inserted into the vagina.
6. Sterile water will be injected into the uterus while the doctor and ultrasound technician watch the ultrasound screen. This will cause menstrual-like cramping or pain like a labor contraction.
7. Following evaluation of the uterus, the ultrasound probe and catheter will be removed.
8. Following the procedure, you will probably have a watery, bloody discharge. This may last a few days and is normal.

Risks:
Complications are very uncommon, however, can occur. These include:
1. Infection. Everything possible will be done to prevent this.
2. Bleeding. Mild vaginal bleeding is normal following the procedure.
3. Uterine perforation: The catheter can go too far in and poke through the uterus.

*It was explained there is no risks*
*I Request doxicilin for prevention infection.*

Call the office if you experience these symptoms any time in the next 2 weeks:
1. Fever over 100.3
2. Abdominal pain
3. Vaginal discharge with foul odor
4. Heavy vaginal bleeding

This test has been explained to me.
I agree to proceed with the Saline Infusion Sonogram Ultrasound Test

_Rodica Wasvio_
Patient Signature

_02/19/07_
Date

Witness

 *Advocate Health Care*

# Lutheran General Hospital
## Department of Pathology

## Gynecologic Cytology Consultation Report

Location: 3 WEST-L
Med. Rec. #: 001229568
Billing #: 322771197
Birth Date/Age/Sex: 7/14/1964 (Age: 42) F

Specimen #: LG07-11
Patient: WILDE, ANN B
Physician: Joseph Peabody, M.D.

Date Specimen Collected: 1/31/2007
Date Specimen Received: 1/31/2007
Date & Time Reported: 2/2/2007 15:42

*Susan Sehy, MD*

---

### Cytologic Interpretation

Thin Prep Cervical:

Statement of Adequacy:
　　Specimen processed and examined, but unsatisfactory for evaluation of epithelial abnormalities (see below).

　　Marked hypocellularity or acellularity.

Descriptive Interpretation:
　　Unsatisfactory

Comment: The Pap smear is not a diagnostic test. It is a screening test with an inherent false negative rate in the range of 5-10%. Annual Pap smears are the best means available to lower this false negative rate and to detect early cervical cancer.

Please share this information with your patient.
bdl
Tyler C. Faken, CT(ASCP)

\*\* Electronic Signature (BDL) \*\*

---

Specimen Submitted: Thin Prep Cervical

High Risk History: N



End of Report

1775 Dempster Street, Park Ridge, IL 60068
Office: (847) 723-6180  Fax: (847) 723-7540

**Advocate Medical Group**
**Adult Down Syndrome Center**
1999 W. Dempster
Park Ridge, Illinois 60068
847/318-2303

---

*Brief Interaction*
01/19/2007 12:30PM

**Patient:**  RODICA I. WAIVIO
**MRN:**  1000211513
**DOB:**  08/04/1969

**Chaperone**
January 19, 2007

Chaperone : Declined.
**Vital Signs**
Recorded by Zidek,Patricia on 19 Jan 2007 12:35 PM
BP:118/72,
LMP: 02 Jan 2007.
**Notes**
Pt here for 2 week follow up

**Chief Complaint**
    • No genitourinary symptoms  Pathology and surgical findings discussed.  All questions answered
**PSH**
    Surgical / procedural history  2007 D&C HSC.
**Physical Exam**
Deferred secondary to recent isemination.
**Assessment**
    • Visit for: postsurgical exam   (V67.00)
    • Irregular length of periods  which is resolved  (626.4)
**Plan**
The patient will f/u with Dr rapisarda for her fertility care.  She may call for a midcycle ultrasound next cycle as she prefers our office for this service.

**Signature**
Signed By: Patricia Zidek ; 01/19/2007 12:37 PM CST.
Signed By: DANIEL PESCH M.D.; 01/19/2007 5:25 PM CST.

**Advocate Medical Group**
**Adult Down Syndrome Center**
1999 W. Dempster
Park Ridge, Illinois  60068
847/318-2303

---

*Brief Interaction*
01/08/2007 3:03PM

**Patient:**  RODICA I. WAIVIO
**MRN:**  1000211513
**DOB:**  08/04/1969

**Chaperone**
January 8, 2007

Chaperone : Not Applicable.
**Message**
Recorded as Task
Date: 01/08/2007 11:14 AM, Created By: Burdulinski,Stefanie
Task Name: Call Back
Assigned To: PESCH,DANIEL
Regarding Patient: WAIVIO, RODICA I, Status: Active
Comment:
Burdulinski,Stefanie - 08 Jan 2007 11:14 AM
  TASK CREATED
847-963-0231 re: pt would like a script for antibiotics , she would also like 2 speak w/ dr. pesch pharm# 847-934-2530 thx stef
Zidek,Patricia - 08 Jan 2007 2:10 PM
  TASK REASSIGNED: Previously Assigned To Zidek,Patricia
Spoke with pt and she feels she needs antibiotics because of the procedure done. She is also having some spotting/bleeding and is concerned. Please call.
PESCH,DANIEL - 08 Jan 2007 3:02 PM
  TASK EDITED
I discussed the pathology findings with the patient. All questions answered. She will wait one cycle before she conceives. She was insistent that since the pathology showed inflammation she should take an antibiotic. Doxycycline was prescribed. She was informed that she should not take the antibiotic while pregnant. The patient will f'u in 2 weeks.
**Current Meds**
Prometrium 200 MG Capsule;TAKE TABLET TWICE DAILY; Rx
Doxycycline Hyclate 100 MG Capsule;TAKE 1 CAPSULE TWICE DAILY.; Rx.
**Signature**
Signed By: DANIEL PESCH M.D.; 01/08/2007 3:04 PM CST.

Quest on Demand™

## Quest Diagnostics®

QUEST DIAGNOSTICS INCORPORATED

| PATIENT INFORMATION |
| WAIVIO, RODICA |

DOB: 08/04/1969  Age: 37
GENDER: F

SPECIMEN INFORMATION
SPECIMEN:     WX705745S
REQUISITION: 0001046
LAB REF NO:

ID: BR5575
PHONE: 8479630231

COLLECTED:  09/28/2006    14:53
RECEIVED:   09/28/2006    23:41
REPORTED:   09/30/2006    21:02

| REPORT STATUS  **Final** |

ORDERING PHYSICIAN

CLIENT INFORMATION

RS

2592 E GRAND AVE FL 2
LINDENHURST, IL 60046-5915

---

| Test Name | In Range | Out of Range | Reference Range | Lab |
|---|---|---|---|---|
| LUPUS ANTICOAGULANT EVALUATION WITH REFLEX | | | | |
|   LUPUS ANTICOAGULANT | ✓ | | | EZ |
|     LUPUS ANTICOAGULANT | | DETECTED | NOT DETECTED | |

THE RESULTS REPORTED ARE CONSISTENT WITH A LUPUS
ANTICOAGULANT (AN ANTIPHOSPHOLIPID ANTIBODY).

This interpretation is based
on the following test results:

| | In Range | Out of Range | Reference Range | Lab |
|---|---|---|---|---|
|   PTT-LA | | 41 H | 40 OR LESS sec | |
| HEXAGONAL PHASE NEUTRALIZATION | NOT CONFIRMED | | NOT CONFIRMED | EZ |
| DRVVT SCREEN | | 44 H | 42 OR LESS sec | EZ |
| PHOSPHOLIPID NEUTRALIZATION | | CONFIRMED | NOT CONFIRMED | EZ |

If either neutralization test is confirmed, a lupus
anticoagulant is present. If both neutralization tests are
not confirmed/not indicated, a lupus anticoagulant is not
detected.

Lupus anticoagulants (LA) represent a heterogeneous mix of
antibodies to phospholipid binding proteins. The titer and
avidity of these antibodies are highly variable. No single
test is sensitive enough to detect all LA antibodies.

---

**Performing Laboratory Information:**

EZ    Quest Diagnostics Nichols Institute-San Juan Capis 33608 Ortega Hwy San Juan Capistrano CA  92675
    Laboratory Director: R E Reitz

WAIVIO, RODICA - WX705745S

Page 1 - End of Report