## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

RODICA WAIVIO,                                    )
Plaintiff,                                        )
      v.                                         )    Case No: 07-C-6690
ADVOCATE HEALTH CARE NETWORK,                     )
ADVOCATE MEDICAL GROUP,                           )
ADVOCATE HEALTH AND                               )    HONORABLE JUDGE
HOSPILAT CORPORATION,                             )    Ronald A. Guzman
ADVOCATE LUTHERAN GENERAL HOSPITAL,)
IAN JASENOF, individual and employee,             )
JENNIFER TORRES, individual and employee,         )
DANIEL PESCH, individual and employee             )
THOMAS IANNUCCI, individual employee              )
BRUCE PIELTE, individual and employee,            )
VISHVANATH KARANDE, individual employee)
RAPISARDA JOHN, individual and employee )
FERTILITY CENTER OF ILLINOIS,                     )
KARANDE& ASSOCIATES                               )

Defendants.

**FILED**

JAN 1 6 2008
Jan 16 2008
MICHAEL W. DOBBINS
**CLERK, U.S. DISTRICT COURT**

## <u>COMPLAINT AND DEMAND FOR JURY TRIAL</u> *(Amended)*

**NOW COMES** Plaintiff, RODICA WAIVIO, in Pro Se representation, and complaining against Defendants, states as follows:

1.    This is an action alleging defendants' violation of plaintiff's freedom from discrimination in medical services based on plaintiff's national origin, protected membership in protected classes starting year 2006 till present as secured by US Constitution and federal laws, 42USC1981, 42USC1981(a), Title VII, Title VI[1], Title IX, Rehabilitation Act, ADA, Civil Rights of 1871, Fourteenth Amendment to US Constitution. Complaint claims defendants violated plaintiff's constitutional/federal rights to life, happiness, property, enjoyment of life, and prosperity as well as violation of plaintiff's baby right to life, as protected by US Constitution and federal laws.

---

[1] 42USC300w-7(a)Defendants satisfy the requirement from 42USC300w-7, defendants' activities are funded in part with founds made available under 42USC300, federal funds
42USC708 Maternal and Child Heath activities under federal funds satisfies 42USC708

2.     This is an action against defendants for Violation of Civil Rights Act of 1871, for violation of 42U.S.C.A.1985, 42USCA.1985(2), 42USCA.1985(3),defendants injured plaintiff in "person or property" in retaliation for participating in federal proceeding. Starting to May 2004 plaintiff had participated at federal legal action 04-C-3545 Judge Norgle Northern District Illinois, which continue till present. Defendants made Retaliatory harm to plaintiff, retaliatory discharge from medical services, constructive discharge, and their actions constitute sufficient injury to entitle plaintiff to relief see Haddle v. Garrison 525 US 121 142 L. Ed 2d 502 119 S CT 489(1998).

3.     This is an action pursuant to 42USC300, 42USC300(e)(b)[2], defendants refused to provide medical services and completely denied medical services to plaintiff as to specific necessities. Defendants' actions were intentionally against plaintiff' federal and constitutional rights. Defendants' actions were intentionally designated to escape liability or to further refuse medical services to plaintiff.

4.     All state claims based on federal questions are under Tort of Retaliation, Tort of Retaliation discharge [as for discharge from medical services], Tort of Medical Professional Malpractice, Tort of Deceit, Tort of Intent, Tort of Misrepresentation Tort of Gross Negligent, Tort of Failure to Warn, Tort of Battery.

5     This action is filed pursuant to the Equal Protection Clause of the Fourteenth Amendment to the Constitution to enforce the provisions of 42USC300(e)(b), Public Health Service Act of 1944 as amended 42USC300w-7, 42USC708 Maternal and Child Heath activities under federal funds pursuant to 42USC708, Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, et seq. ("Title VI"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e—2000e-5, et seq. ("Title VII"), , 42 U.S.C § 12101—12514; Americans with Disabilities Act of 1990, Title III Private Entities ("ADA"), (42 U.S.C § 12181—12189); Section 504 of the Rehabilitation Act of 1973 ("Rehab"), 29 U.S.C. § 794-794a, reg 34CFR Part 104; Americans with Disabilities Act of 1990, Title V of Section 503, and 42U.S.C. § 12203; Section 1981 of the Civil Rights Act of 1866 (42 U.S.C. § 1981), Civil Rights Act of 1991 et seq. ("Sec 1981"); 42

---

[2] 42USC300e(b) health organization shall provide, without limitations as to time or cost other than those prescribed by or under this subchapter, basic and supplemental health services to its members

U.S.C. § 1983("Sec 1983"); 735ILCS Civil Procedure; Code of Fed Reg Dep. of, Dep. of Justice, Department of Public Health, Department Civil rights of 1871 "protects people participating in federal procedure", 42USC1895.

6.    **Parties:** RODICA WAIVIO ("Waivio") resides in Illinois.  At the time the subject events occurred, she was resident of Cook County and member in defendants' medical groups, and each doctor had plaintiff as member of their medical services.

7. Plaintiff claims injuries, health injury addressed to reproductive system, death of baby, infection intentional inflicted, child loss and damages resulted from defendants' intentional practices willful misconduct or gross negligence or intentional acts.

8.    **Jurisdiction:** Jurisdiction is invoked pursuant to 28 USC1343(a)(1), 28 USC1343(a)(2), 42USC1981 42 U.S.C. § 2000e-5(f), 28 U.S.C. § 1331, 28U.S.C.§1343, 28U.S.C.§1441,42U.S.C.§2000e-5(f),42U.S.C.§2000d,42U.S.C.§1983,42USC1985 42U.S.C.§1988 to recover damages or to secure equitable relief under civil rights federal laws ( 28U.S.C.§2202), under laws upon which plaintiff claims were brought. Pursuant to 28 USC 1367 this court has jurisdiction over all state claims based on federal questions alleged in this complaint.

### Defendants

9. Advocate medical Group, Advocate Health Care Network, Advocate Health Centers, INS, Advocate Health and Hospitals Corporation, Advocate Lutheran General Hospital are non profit corporations in Illinois. Defendants are individuals and non-profit corporations in network organization and relationships;

10.Ian Jasenof, MD is an employee of Advocate Lutheran Hospital previous mentioned defendants and Jennifer Torres, is officially nurse of Jasenof employed by Advocate Health Care. Advocate Lutheran General Hospital is part of Advocate Network, Advocate medical Group and is an employer of Jasenof. Bruce PILATE, is an individual and employee of above entities.

11. Defendant Karande is employee of Advocate medical Group, Lutheran Hospital and he has his own business "Karande and associates" private corporation; previously he was teacher at UIC. Charles Miller, is employee of Lutheran General Hospital and employee of University

3

of Illinois at Chicago employee as teacher. This shows relation between present matters and previous matters from case 04-C-3545 Waivio v. UIC.        Defendant Ian Jasenof is graduate from UIC and has strong relations with UIC which motivates relation of retaliation against plaintiff for her protected actions and oppositions.

12. Jon Rapisarda is employee of Advocate Medical Group, Lutheran Hospital and he has his own business with Fertility Center of Illinois, private corporation. Jon Rapisarda is very good friend with Jan Jasenof, and in May 2006 Rapisarda sent letter of recommendation and verbally recommended Plaintiff to Jasenof.

13. Defendants are "medical group" pursuant to 42USC 300e(4); defendants are "heath maintenance organization" pursuant to 42 USC 300e(a).

14. Plaintiff was/is a "member" of the above defendants entities pursuant to 42 USC 300e(1)(3) member. Plaintiff has contract of "health services" including inpatient and outpatient services, medical treatment and referral services, all matters under law; diagnostic laboratory and diagnostic and therapeutically radiological service, and preventive health service

### A prime facie Allegation

15. Plaintiff was born in Romania; defendants were aware of plaintiff's national origin; complete and in deep information was provided particularly on 07/20/06 at first trimester scan Lutheran Hospital; patients Romanians are rare in defendants' medical services; Lutheran Hospital Jasenof patients were mainly Hispanic, Mexicans.

16. Historically Plaintiff filed 3 charges with EEOC, see case 04-C-3545 Waivio v. UIC in Court of Hon Judge Norgle. At the time the events occurred there were pending EEOC charges against UIC and legal actions in district court and state court starting May 2004 see case 04-C-3545 Waivio v. UIC and 06-7189 Waivio v. UIC. Ultrasound Picture made by Ian Jasenof of plaintiff's pregnancy were submitted to court in case 04-C-3545 and in state courts.

17. Defendants were aware of legal actions in district court, as plaintiff informed defendants. Plaintiff showed legal papers of case 04-C-3545 to Rapisarda John in May 2006, and some of legal papers were left in Fertility Center of Illinois in May 2006. Legal papers of case 04-C-3545 were also showed to Ian Jasenof and his nurse in summer 2006 and legal papers were

4

left about his office. Plaintiff shared all the legal information with Daniel Pesch, while he claimed to have directorial position in Lutheran Hospital, or decisional/influential position.

18. Before receiving services from defendants plaintiff had no history of infertility, and there was no any medical problem with plaintiff's reproductive system. Plaintiff was previously pregnancy in 2005 [fact about this appears in case 04-C-3545].

19. After plaintiff received medical services from defendants plaintiff was diagnosed with Ashermans' Syndrome result of hysteroscopy performed by Daniel Pesch on 01/05/07 at Lutheran Hopital and with lupus anticoagulant positive on 09/28/2006 [Rapisarda detected], while plaintiff never before had something like this; on 09/28/06 MTHFR, ANA Screen was detected positive as induced by treatments of Rapisarda.

20. Defendants had knowledge completely of the plaintiff's medical conditions; starting week 10-21 of pregnancy Lutheran Hospital and Jasenof were fully aware of existent medical condition but he dishonestly misinformed plaintiff that "plaintiff's medical condition was normal" this is what he said to plaintiff; In conversations with Daniel Pesch after Sept 17,2006 he acknowledged they were fully aware of medical condition as early as week 10-11 of pregnancy and that they were aware that plaintiff has in critical medical condition in Sept 16,2006. Daniel Pesch acknowledged that they were fully aware of matters. Plaintiff asked Daniel Pesch what was the diagnostic of plaintiff's pregnancy and he said it was "Thrombophilia". Later discussions with hematology specialist confirmed "phospholipids syndrome" Furthermore medical hematology acknowledged that defendants usually solves this matters with baby aspirin and that it is typical procedure very well aware by doctors and hospitals, shortly there was nothing new for defendants.

21. In Oct 2006 plaintiff discussed with Thomas Iannucci, high risk doctor; he acknowledged that he was aware of all plaintiff's medical matters and he acknowledged that Jasenof refused intentionally to make medical analyses of blood and ultrasounds; Iannucci confirmed that some blood work was done after death of plaintiff's baby when diverse medication was given to induce labor in Sept 17-18,2006, and this medication was used as cover up of real medical condition about which defendants were fully aware. Shortly there was intentional procedure to hide evidence of real medical matter.

5

22. Medical record at Lutheran Hospital or Advocate Medical Group does not present this medical condition or any medical condition; However in Sept 17,2006 plaintiff went to Northwestern Community Hospital where medical records are describing blood clots of 400cc, and critical medical condition see record.

23. Usually the clients receiving medical services by Jasenof were Hispanic, or national origin Mexicans. Jasenof and Jennifer Torres are Hispanic related as they speak Spanish. Daniel Pesch, Iannucci Bruce Piclate, Rapisarda are American origin

### Nature and Statement of Facts

24.    Starting March 2006 plaintiff requested medical services in infertility. from Fertility Center of Illinois, Dr Rapisarda Jon. Plaintiff was recommended FCI by "Women Heath First". Rapisarda made some summary analysis and saline ultrasound in March 2006; plaintiff acknowledged her national origin and her bipolar disability. All results were very good and plaintiff's uterus at that time was normal without any medical condition. Plaintiff's medical expanses were covered by Lumenos insurance at that time see billing from insurance.

25. Beginning April 06, Rapisarda established plan for plaintiff and prescribed medications. Recommended method of treatment for plaintiff was aggressive [comparative to others], and there was less drastic way for plaintiff that was Clomid Pills [or Menopure, Repronex]. Rapisarda never explained plaintiff the difference between Clomid and Gonal-F therefore at that time Clomid would have been a less drastic and available method for plaintiff, however Rapisarda treated plaintiff with injectable while refused clomid. Rapisarda did treat other patients, similar situated to plaintiff, with clomid and those were not Romanians or not involved in similar protected activities as plaintiff.

26. However medication Gonal-F for plaintiff was not directly ordered from pharmacy [they complained there was not sufficient time to order] but the nurse of Rapisarda, Jeannine gave plaintiff medication, 3 boxes of Gonal-F 450, on free. Shortly plaintiff's received medication from the doctor itself, from FCI, and not direct from pharmacy. no pharmacy provided any Gonal-F medication to plaintiff in April–May 2006, but FCI gave medication to plaintiff from its own affairs. Plaintiff believes this practice was not with other people non Romanians or not involved in protected actions.

27. Starting 04/25/06 Plaintiff received fertility treatment from FCI, injectable GONAL –
F 04/28/06-05/03/06 with 112.5 for 6 days, followed by IUI. Plaintiff got pregnant and by
05/20/06 plaintiff's pregnancy was confirmed.

28. At beginning of June, 2006 plaintiff had appointment with Rapisarda and plaintiff
acknowledges problems with pregnancy as there was pain, cramps; plaintiff requested to him to
provide further medical services till at week 12 as other persons were permitted. Repisarda
refused further medical services and by 06/05/06 informed plaintiff that no further medical
services will be provided by FCI after week 7 of pregnancy, after 06/12/06. Rapisarda
recommended plaintiff to go to Ian Jasenof and he sent a letter of recommendation to Ian Jasenof
while demanded that no further services will be provided by FCI, despite of plaintiff's requests
of medical care and plaintiff opposition. It is plaintiff's believe that Rapisarda had other options
of recommendations for plaintiff but he choose Jasenof because he had anticipated the matters
which were to come. Plaintiff believes Rapisarda refused to treat plaintiff while he intentionally
sent plaintiff to Jasenof as to escape liability. Other patients, similar situated but not Romanians
or participating in protected actions were recommended to better places and to better medical
care [or they were allowed till week 12 to be under care of FCI], while Rapisarda recommended
plaintiff to Jasenof.

29. From the time of confirmation till at plaintiff's discharge from FCI there was no any
blood work [only HCG and progesterone] while FCI and Rapisarda were fully aware that
complications existed and plaintiff complained of pain and plaintiff requested to Rapisarda
medical services as to specific pain/situation; plaintiff requested Rapisarda to provide medical
services till at 12 weeks. However Dr Rapisarda refused further services after 06/12/06.

30. Plaintiff believes other patients, not Romanians or not involved in protected actions
did received treatments as to specific similar conductions to plaintiff and they waited till
12weeks at FCI before transferring somewhere else.

31. Plaintiff was hand in a booklet from FCI which acknowledges at pag 8 "serious
complications of these medications [Gonal-F], with exception of multiple birth, are rare. The
manufacturers advise that serious pulmonary conditions and thromboemblic (blood clot) events"
see exhibit. However the medication Gonal-F manufacturer on box and its content does not

7

acknowledges such matter [see exhibit Gonal-F leaflet]. Comparing recommendations of manufacturer and FCI statements, it can be seen FCI people identified and established "thromboemblic events" as side effects most common in their practice. Shortly Jon Rapisarda was fully aware of existent side effects as its practice has fully acknowledged however he refused any medical treatment, any medical analysis in May-June 2006 when plaintiff got pregnant and when plaintiff complained of pain and requested medical assistance. Plaintiff believes other people [no Romanians or no participating in protected activities] received full care while plaintiff was refused medical care.

32. Between May 2006-Sept 17, 2006 Plaintiff was pregnant. Plaintiff's baby died on Sept 17, 2006 as result of thrombophila untreated by defendants, which induced placenta rupture [placent exploded under the pressure of huge blood clots existent in the uterus] [condition known as antiphospholipid syndrome treatable with baby aspirin [81mg], lovenox 41 mg, heparin].

33. In May of 2006 Plaintiff was recommended by Rapisarda, MD (american)(AMG) [employee of AMG and Luteran Hospital], to Jasenof, MD, for further medical care as related to pregnancy. Dr Jasenof received a letter and complete information as related to previous treatment made by DR Rapisarda. From further discussions Jasenof confessed that he had many patients coming from DR Rapisarda with similar treatment, and he acknowledged to be aware of fertility treatments acknowledged by Rapisarda see record his writing states gonatropin and IUI. defendants in present case proved to be very well aware of side effects of medication and fertility treatments; Jasenof had knowledge of matters under discussion and he had treated successfully before patients with same conditions, who were not Romanians or unrelated to opposition of unlawful discrimination. Romanians were minority or very rear in defendants' institutions.

34.. On June 23, 2006 in the ninth week of pregnancy, Plaintiff meat Dr Jasenof (American Hispanic, speaking Spanish, white) in his office from 1255 N. Milwaukee GlenView IL 60025. Dr Jasenof filled in the registration with his office see record; plaintiff acknowledged her Romanian origin which appeared mentioned in record, and her bipolar disability; Jasenof made an examination of pregnancy and an ultrasound[3] picture [this picture was immediately ·

___

[3] Dr JAsenof had ultrasound machines in each room of treatment; ultrasound was performed by himself without help of a qualified professions technician or any other doctor; On July 11,2006 plaintiff requested Jennifer to perform an ultrasound but Jennifer acknowledged that she had no knowledge how to use ultrasound or how to use Doppler

presented to federal court in case 04-C-3545 where it was used as evidence of pregnancy]. At that time plaintiff meet Jannifer Torres (Hispanic) the only nurse of Jasenof in obstetrics. At that time Jasenof made blood analysis and requested urine sample as well as weighted plaintiff [she did not monitor the blood pressure or any fundal height]. Plaintiff requested him to make all analysis and scheduled first trimester analysis.

35. On July 11 Plaintiff called Jasenof's office and reported vaginal blooding. Plaintiff was scheduled immediately in that day at 1:00 pm to see Dr Jasenof.

36. At about 1:00pm Plaintiff met DR Jasenof, and plaintiff described vaginal bleeding. Dr Jasenof inquired about color of bleedings if it was brown or red. Plaintiff responded that it was both red and brown. Following Dr Jasenof performed an ultrasound exam of the pregnancy, including fetus, uterus, and he verified the cervix. Dr Jasenof requested to plaintiff complete bed rest; He requested plaintiff to come again in one week.; plaintiff inquired about medical situation while Jasenof refused to respond to plaintiff's requests of information and treatment; JAsenof appeared quite upset in that day; Plaintiff requested treatment while Jasenof refused any treatment; plaintiff did inquire about prometrium, and Jasenof told plaintiff to stop prometrium.

37. Plaintiff believes ultrasound performed in July 11,2006  day provide evidence of presence of blood clots in uterus and provide sufficient information to Jasenof to diagnostic plaintiff's condition and necessity of treatment;

38. plaintiff believes that facts from Sept 16,2006 were consequence of complete refusal of Jasenof to treat plaintiff's medical condition which was identified by Jasenof starting  with July 11,2006.

39. At this time Jeniffer, his nurse, did not make any medical measure of plaintiff's pressure, weight or any other matter. She limited at welcome Dr Jasenof.

40. On July 18, 2006 plaintiff has another appointment with Dr Jasenof. At this time Jeniffer requested urine sample and weighted plaintiff [she did not monitor the blood pressure or

---

Monitor: shortly she was quite limited in her practice; her recommendations appeared based on her own experience of pregnancy of her two children rather than on medical scientific matters.
Shortly at the pace where Jasenof was seen about 20 patients on day, there was no any ultrasound technician who could perform an ultrasound and the only person managing ultrasound appeared to be Ian Jasenof. In October 2006 Jasenof complained and refused to see plaintiff based on reason that he had 20 patients on day, in a place where there was no ultrasound technician: there was no another OB Doctor at AMG from Gland View.

any fundal height]. Dr Jasenof inquired again about the bleeding color, and plaintiff responded that they are brown and red. Plaintiff asked the doctor about Prometrium; plaintiff requested to DR Jasenof to continue Prometrium. He told plaintiff to stop prometrium, and his voice was very upset, refusing to inform or provide any explanation. He performed an ultrasound exam. The baby was normal. Dr Jasenof recommended the First Trimester scan analysis at Lutheran General Hospital, with Genetics at Parkside Center 1875 W Dempster St Ste 310, Park Ridge IL 60068. Ultrasound was performed solely by Jasenof and there was no qualified personal as radiologist or stay trained for ultrasound. Plaintiff requested to Jasenof to make blood analysis but Jasenof refused under pretexts that he was interested in first trimester scan.

41. Plaintiff believes that other persons with similar conditions as plaintiff [no Romanians or no participating in protected actions] did received medical care and they were prescribed medicines as baby aspirin or levanox for treatment of condition while plaintiff was refused treatments and medication. Plaintiff believes other pregnant women had bood work made in similar conditions however Jasenof refused to perform any blood analyses after July 11,2006.

42. On July 20, 2006 plaintiff preformed the First Trimester Scan with Dr Bruce Pielate, high risk doctor. The ultrasound was performed by Debbie Fuldman. In the time of ultrasound the fetus showed very agitated, and very much mobility, been a little difficult for technician to make picture. The technician had to adjust the bed in a position which was favorable to ultrasound. Plaintiff had a very good look at the ultrasound monitor which was exactly in front of the plaintiff. Plaintiff inquired about the medical findings and requested explanations. At the end of the ultrasound exam Dr Bruce Pilate came and informed plaintiff that everything was good and was nothing abnormal. Plaintiff was informed about the baby length of 7.03 cm. Plaintiff believes testing performed in July 20,2006 provide evidence of presence of blood clots in uterus and provide sufficient information to defendants as to diagnostic plaintiff's condition and necessity of treatment; plaintiff believes DR Pilate identified the plaintiff's medical condition of thrombophilia [as Daniel Pesch acknowledged in September 2006], and the test made all information available to defendants; however defendants refused to inform plaintiff they refused to make record of adequate diagnostic and misinformed plaintiff that everything was normal, when the reality was that plaintiff's medical condition was treatable. Plaintiff believes other

10

similar situated persons, not Romanians or not involved in protected actions, had received complete information about real medical condition while plaintiff was misinformed and lied to.

Plaintiff trusted DR Pilet's words that everything was normal. Later facts proved that he lied to plaintiff, misinforming plaintiff about child, about medical condition which was not acknowledged on July 20,2006 while ultrasound provide all information to them.

Plaintiff does acknowledges that the procedure required plaintiff to acknowledge all her history and protected characteristics such as her Romanian origin and her disability as they ask all information.

43. On Aug 17, 2006 Plaintiff had an appointment at about 11:30 am withy Dr Jasenof. However in the morning of Aug 17, 2006, Plaintiff received a phone call from Jennifer requesting plaintiff to come at 10:00 am, as there was early availability and Dr Jasenof was on harry as he had other matter to do;  plaintiff responded that plaintiff could came earlier as plaintiff and the plaintiff's husband are interested to see an ultrasound of the plaintiff's baby.

44. Early in the morning plaintiff and the plaintiff's husband met Dr Jasenof. This time Dr Jasenof refused to perform an ultrasound [while plaintiff requested an ultrasound] and he limited himself only listening at the fatal hart beat with a small pocket Doppler. Plaintiff requested him to schedule the ultrasound for 20 weeks, but he refused; plaintiff requested blood work and all necessary testing and amniocentesis, but he also refused under false reasoning such as previous results from Genetics were excellent or that he had no time. At that time he refused to listen to plaintiff's concerns as he claimed being very stressed out in that day. Plaintiff claimed that there were pain in the uterus but Dr Jasenof stated that this was because of the growing of the baby. He requested plaintiff to come in one month.

45. Plaintiff believes that other pregnant people received better care and better attention from Jasenoff while plaintiff did not receive any minimal care from Jasenof. plaintiff received no guidance or no necessary treatment or care.

46. Plaintiff discussed with Jennifer that plaintiff had pain in uterus but Jennifer said that this was normal because she had a normal pregnancy and because she had pain too while she was pregnant; shortly she was not providing care to plaintiff but he was just telling her stories.

11

47. On Sept 15, 2006 (Friday morning) Plaintiff called Jennifer and reported vaginal bleeding. Jennifer told plaintiff that this is normal in pregnancy, and recommended plaintiff to see DR Jasenof on next day on Sept 16, 2006, in the morning at 9:00 am. Plaintiff agreed and plaintiff mentioned that she will came next day withy her husband, for the pregnancy and the plaintiff's baby.

48. Plaintiff believed Jennifer discriminated against plaintiff because usually with other patients Jennifer was arranging them to be seen in AMG office from Lutheran Hospital which had doctors on call Jennifer did not arrange for plaintiff to e seen immediately or arrange a phone call to doctor on call; she misinformed plaintiff that there was no doctor available while she scheduled plaintiff to see Jasenof next day. Plaintiff believes with other patients no Romanians nor no participating in protected activates, she was directing them to office from Lutheran Hospital or provided them with phone call doctor.

49. ON Sept 16, 2006 at 9:00 am plaintiff and her husband met DR Jasenof. Plintiff showed to doctor in a plastic bad the blood and the mucus which got out one day before; Jasenof said that "this is shameful" DR Jasenof performed an ultrasound. Plaintiff's baby was developed comparative to last ultrasound. The ultrasound was quite long. The ultrasound provide information to Jsenoff that plaintiff's situation was critical and plaintiff was necessary to be hospitalized; plaintiff attaches as exhibit a study and similar pictures which proves that at that time Jasenof was fully aware of plaintiff's medical condition as blood clots were visible on his ultrasound machine; However Jasenoff discriminated against plaintiff based on national origin or her protected activities and lied to plaintiff that everything "was normal".

50. Plaintiff inquired Dr Jasenof about the well being of baby and he responded that everything was normal and there was no concern. Plaintiff showed to him blood and some mucus which from Sept 15, 2006 but Jasenof said that it was normal. Plaintiff in good faith believes that Jasenof was aware of the critical medical condition as cervix was open and as blood was showing some mucus which was sign of cervix being open. However Jasenof dishonestly misinformed plaintiff and he stated that everything was normal while plaintiff was in critical condition and cervix was open. Jasenof performed also a verification of cervix and he

12

dishonestly misinformed plaintiff stating that cervix was closed but the cervix on Sept 16,2006 was open because mucus was getting out.

51. On Sept 17, 2006 about 3:00pm placenta had rupture under pressure of blood clots and pain. Plaintiff was transported immediately to Northwestern Community Hospital were plaintiff received blood transfusion and IV. The medical personnel established that there were blood clots in uterus about 400CC, while plaintiff's situation was threatened by lost of blood see medical record Plaintiff's baby died at 21 weeks.

52. Plaintiff believes that facts from Sept 17,2006 were fully preventable with simile baby aspirin and simple care; plaintiff believes defendants willfully refused medical diagnostic and treatment discriminating plaintiff based on her national origin or participation in protected activities. Plaintiff believes defendants completely denied medical services to plaintiff and the resulted was the lost of life of baby and critical condition for plaintiff.

53. Plaintiff believes that other patients, not Romanians or not participating in protected activities were treated better or were placed in hospital and care about while plaintiff was refused complete medical care.

54.    Defendants refused to inform plaintiff about "phospholipids syndrome" medical condition identified by defendants in week 10-13 of plaintiff's pregnancy; they refused to treat in any way plaintiff's medical condition; They refused to hospitalize plaintiff; on Sept 16, 2006, in week 21 of plaintiff's pregnancy, after making ultrasound which fully showed plaintiff's uterus with big blood clots [a critical condition Requiring hospitalization], Defendant Jasenof sent plaintiff at home refusing any medical services and refusing to inform plaintiff about the real critical medical condition[he let plaintiff to understand that plaintiff was all right]; plaintiff's baby died on Sept 17, 2006 and plaintiff was in critical condition of life on Sept 17, 2006, loosing huge amount of blood which threatened plaintiff's life. "Phospholipids syndrome" is a medical condition treatable [with baby aspirin 81mg] and plaintiff's baby life could have been saved with minimal expenses and effort.

55. At the time of plaintiff's pregnancy at Lutheran General Hospital there were only 4 doctors in Obstetrics and Gynecology in Park Ridge office, Jasenof, Daniel Pesch, Gomez, Galvez; the four obstetrics doctors completely refuse to treat Plaintiff's pregnancy or provide

further medical services. However only Lutheran Hospital had about 19 specialists in infertility at time of plintiff's pregnancy; each one was making about 200[4] women pregnant on year, therefore it was expected that about 3800 women were soliciting Lutheran Hospital for medical care following fertility treatments; Jasenof was complaining that he had about 20 women on day. It appears that there existed shortage of medical specialists in obstetrics at Lutheran General Hospital; the same situation is for gynecology. At time of plintiff's pregnancy there were just 4-5 specialist in high risk at Lutheran Hospital and considering that fertility treatments are in essence high risk it can be implied that Defendants has shortage of specialists in high risk pregnancy and this induced discrimination based on national origin. There is extreme low numbers of high risk pregnancy medical specialists comparative to fertility doctors, therefore defendants have bias with respect to fertility. Considering this comparative to case 04-C-3545 defendants might have seen in 04-C-3545 as mirror of their own practice, therefore motivating retaliation against plaintiff based on plaintiff's participating in federal procedure and opposition of unlawful discrimination.

56. Defendants have bias and preference for specific race, national origin. Jasenof prefers Hispanic patient. Defendants granted preferential treatment based on national origin, race, non-disability based on overwhelming imbalance between patients in defendants' practice and community.

57. medical record made by AMG did not report any blood clot, while ultrasound performed showed clear evidence; NCH record identified on Sept 17,2006 big blood clots with 400cc, which provide evidence of Jasenof's complete refusal to provide medical services to

---

[4] In one appointment with Rapisarda he declared that he is making about 200 women pregnant on year; Reproductive endocrinology appears main specialization of Lutheran General Hospital as the number of specialists in fertility [there were 19 specialist in fertility at Lutheran Hospital] was exceeding the number of specialists in obstetrics and gynecology about time of plaintiff's pregnancy; this suggest that defendants might have been afraid of a federal investigation of their affairs as there is excessive disproportion between the specialists in obstetrics and those in infertility. Defendants appear to have bias to fertility matters, as number of fertility treatments exceed the ability of defendants to serve these pregnancies. This implies that defendants bias results in scarifications of some pregnancies and associates this with minorities and lack of culture of those it can be inferred that national origin discrimination against Romanians was induced by defendants' bias to fertility, shortly plaintiff's pregnancy was scarified as plaintiff was minority based on her national origin. Plaintiff was differently treated in medical services based on her national origin. Because Hispanic appeared to be the primary race of patients of Jasenof, due to Hispanic patients preference for Jasenof's national origin/race, implies plaintiff was discriminated based on her national origin by Jasenof against Hispanic who were major class of patients of Jasenof.

14

plaintiff. Defendants had acknowledged many times they were fully aware of plaintiff's condition but they refused medical services.

58. On Sept 17,2006 after NCH stabilized plaintiff's medical condition they transferred plaintiff to Lutheran General Hospital. At all time when plaintiff was at Lutheran Hospital Jasenof refused to discuss or meet plaintiff. Plaintiff was treated by Daniel Pesch and Isabel Gomez, and residents.

59. On Sept 18,2006 defendants refused to perform a complete D&C to plaintiff and they let a small part of placenta "product of conception" in plaintiff's uterus as to prevent further pregnancy. Afterwards they dishonestly misinformed plaintiff about her medical condition. They refused to clean the uterus under various pretexts. Following Dec 17-18,2006 defendants refused to give antibiotic to plaintiff as medical standards procedure required plaintiff to have antibiotic following pregnancy lost and labor; all other women with about same conditions received antibiotic and medical care; plaintiff requested antibiotic to Jasenof and Daniel Pesch and they refused to provide antibiotic. In night of Sept 18,2006 plaintiff called Pesch on emergency as plaintiff had high temperature, and plaintiff's heath was very bad, but Pesch refused to provide any antibiotic to plaintiff. Plaintiff discussed with other people and they confirmed that all other patients in labor situation received antibiotic and medical care staing for 4-5 days in hospital after delivery while plaintiff was sent to home on Sept 19,2007, in same day with delivery.

60. Following defendants' refusal to provide medication and medical care plaintiff uterus got infected and on Sept 22,2006 plaintiff was taken to Lutheran Hospital based on excessive temperature about 102degree and very bad medical conditions. Defendants gave plaintiff diagnostic of endometritis but in essence this was willfully induced by defendants in retaliation and based on plaintiff's national origin.

61. In December 2006 plaintiff had a hysteroscopy for diagnosis and biopsy report stated that there was placenta left over in uterus from pregnancy, as defendants refused to clean plaintiff's uterus.

62. Iannucci and Pesch had conspired to have plaintiff make hysteroscopy for removal of left placenta from uterus in fall 2006, see letter in Dec 2006 from Iannucci and record statements

of Pesch; Pesch continually solicited plaintiff to have surgery with him in an effort to agrees and harm plaintiff.

63. In January 5, 2007 plaintiff accepted to have hysteroscopy of removal of placenta from uterus. While Pesch declared that procedure is a hysteroscopy and there can not be harm, plaintiff believes that Pesch performed actually two different surgeries in same time without consent of plaintiff and without given knowledge to plaintiff; on 01/05/07 Pesch performed both a D&C and a hysteroscopy as two separate procedures and he aggressed plaintiff's uterus. His actions are battery. Pesch and defendants have liable in trespass (battery) because they did not obtain consent for procedure, while they claimed to be a simile and without risk procedure.

64. In February 2007 plaintiff requested services from Charless Miller medical Group where plaintiff received medical treatment from Michel Zinger. Zinger performed an 3-D ultrasound and established that 70% of plaintiff uterus was scarred following the surgery performed by Pesch at Lutheran Hospital on 01/05/07; Zinger identified Asherman's Syndrome as induced by defendants. Plaintiff requested Zinger to make hysteroscopy for removal of scaring. Before making testing with Zinger plaintiff performed a saline ultrasound with Pesch, and Pecsh declared that uterus was normal. Comparing the two testing plaintiff realized that Pesch was dishonestly misinforming plaintiff about the real medical condition of plaintiff while he aggressed plaintiff on 01/05/07.

65. Plaintiff discussed with Pesch the testing of Zinger in Feb 2007. Pesch declared that he will discuss with Zinger about plaintiff. After a few days from Pesch discussion with Zinger, Zinger refused to perform surgery. He requested plaintiff to go to a mental heath doctor [he gave plaintiff a name] and have medical care and for that doctor to give a letter of recommendation to Michel Zinger that plaintiff was able to have surgery. Plaintiff did not satisfy the requests of Zinger therefore plaintiff left Charless Miller office without treatment. Zinger completely refused medical care to plaintiff's situation while previous to discussion to Pesch he promised plaintiff, total medical care to solve the Ashermsn's syndrome induced by Pesch surgery.

66. There is a relation between Pecsh induction of Asherman's syndrome to plaintiff and Zinger. In February 2007 Zinger was not an employee of Lutheran Hospital. Today Michel Zinger is an employee of Lutheran Hospital. It appears that Michael Zinger was compensated for

16

his refusal to treat plaintiff by being made employee of Lutheran General Hospital [plaintiff declares under oath Michel Zinger appears today on internet http://www.advocatehealth.com/system/about/overview.html as employee of Lutheran Hospital while he was not en employee in Feb 2007].

67. In February and March 2007 plaintiff received medical services from Karande (Indian), employee of Lutheran Hospital. Plaintiff requested him to make hysteroscopy for removal of scaring and plaintiff requested him to use scissors. On March 20,2007 he performed hysteroscopy for removal of scaring; however he burned plintiff's uterus with electricity while he did not use scissors; after surgery plaintiff had about one month bleedings which indicated that Karande let scaring intentionally in the uterus; on 04/17/07 plaintiff made HSG which identified that right side of uterus was left with scar see exhibits. On 05/09/07 Karande sent a letter to plaintiff asserting that no further medical services will be provided by him or his office, complete denial of medical services. In May 2007 his associate Sigal Klipstein was not an employee of Lutheran General Hospital. Today Sigal Klipstein is an employee of Lutheran General Hospital. In fall 2006 Daniel Pesch recommended to plaintiff to receive treatment for infertility from Sigal Klipstein. Today she is employee of Lutheran General Hospital and this is related to plaintiff's harm by Daniel Pesch.

68. In Summer 2007 plaintiff requested medical services from Randy Morris, in his practice office from Naperville. After a short appointment Rendy Morrison refused to provide medical services on pretexts to discrimination, but he did not refused others no Romanians or no participating in protected activities. While in summer 2007 Randy Morrison was not an employee of Lutheran Hospital, today Randy Morrison is employee of Lutheran Hospital.

69. It appears that Lutheran General Hospital hire medical specialists in Ashermen's syndrome while plaintiff received a complete refusal of medical doctors to be treated from Ashermans' syndrome. Lutheran Hospital shows tactical legal strategy of hostile environment and complete denial to plaintiff of medical services not only by completely refusal medical services, by intentionally inducing harm but also by hiring people who refused to treat plaintiff or people who were needed to treat plaintiff in local area. This motivates an inference of retaliation as it appears that plaintiff was aggressed intentionally and Pesch induced intentional

17

harm to plaintiff. Furthermore there is significant movement regarding the number of infertility specialists employed by Lutheran General Hospital. At the time of plaintiff's pregnancy there were 19 specialists in reproductive endocrinology (RE), today there are 13 specialist RE from which 3 were new hiring as they are doctors specialists in Asherman's syndrome who refused services to plaintiff.

## Count I – Discrimination Based on National Origin or Race in medical services in Violation of Title VII, Title VI ; Unlawful Discrimination Section 1981 or 42 U.S.C. § 1983;

1-69 Plaintiff repeats and realleges paragraphs 1 through 69 as paragraphs 1-69 of this Count I.

70.     Defendants refused to retain the plaintiff based on her national origin, eliminating or discriminating her.

71.     Defendants had a practice of elimination, discrimination against, minorities or Romanians; patients with same national origin to plaintiff, or minorities, were not retained by Defendants; they suffered adverse actions, depravation of rights, benefits, ended in elimination.

72.     The national origin was a motivating factor of the discriminatory practice, in medical services; Hispanic people were preferred by Jasenof instead of the plaintiff or patients with national origin or minorities, even thou the plaintiff's satisfied all requirements and was qualified to receive medical services.

73.     Defendants granted preferential treatment to groups based on race, national origin of the groups on account of the imbalance which existed with respect to the total number of persons of race, color, or national origin treated by defendants in comparison with the total number or percentage of persons of such race, color, or national origin in existent communities (in violation of Title VII, 42 USC 2000e-2(j)). This motivated the discrimination, the disfavor treatment, in medical services, against underrepresented protected national, ethic groups based solely on the race, national origin conforming to 29 CFR 1607.11.

74.     Defendants had lack of race, national origin diversity among patients. There was a racial, national origin imbalance, motivated by defendants' preferential treatment, in education and employment, based on race, national origin; the Romanians were underrepresented and

18

disfavored based on their national origin, when other national, racial groups [Hispanic] overwhelmingly overrepresented were favorably preferred based on their race or national origin.

75.    Defendants had national origin or racial preference and people of specific nationalities, or racial groups were favored based on their national origin, but other national groups were disliked and disfavored based on their national origin.

76.    plaintiff was denied the benefits of medical services, solely because of her Romanian origin. Other patient, Romanians were denied benefits of medical services, or suffered other adverse actions, while patients (non Romanians) were allowed to enjoy the benefits of medical services that were denied to Plaintiff and other similar situated. The Hispanic was preferred to the Romanians.

77.    Defendants refused or failed to even attempt to understand the Plaintiff's cultural differences and completely refused to accept the plaintiff's culture. Defendants' made fun of the plaintiff.

78.    The plaintiff's lack of American experience was an additional motivating factor of the defendants' abuse, exploitation and humiliation against plaintiff.

79.    The Romanian culture has tradition in respect to equal rights. Defendants disliked her ethnicity because it was opposite to their false interests [unrelated to issues at question] and discriminatory practice.

80.    Defendants refused or failed to make positive efforts in reaching at a level of trust, or friendship, beyond the language or cultural differences. The relation between the plaintiff and the defendants was cold, distant, and formal, therefore subject to national origin factors.

81. defendants' violation of federal or state laws as described was an actual cause to plaintiff's losses, injury.

82.    The relationship between the plaintiff and defendants was a contractual relationship..

83.    Plaintiff belongs to "Romanian ethnicity", an ethnicity traditionally subject to discrimination; the disparate treatment against the plaintiff had racial character on the grounds of the plaintiff's ethnicity. defendants had traditional discrimination against minorities, Romanians.

19

84.    The plaintiff was subject to a constructive discharge based on her ethnicity. The defendants acted with either actual knowledge of or reckless disregards for the violation of the plaintiff's federal right under Section 1981.

85.    Therefore, the plaintiff's ethnicity was a motivating factor of unlawful discrimination against plaintiff.

86.    defendants' discriminatory practice against the plaintiff's ethnicity violated her federal right under Sect 1981, as protected under Section 1983; the violation was the cause to her damages injuries.

WHEREFORE RODICA WAIVIO, respectfully requests that this court grant judgment in her favor and against Defendants, and grant Plaintiff all relief deemed appropriate under the law.

## Count II US Constitution, Legal Malpractice, Tort of Retaliation, Tort of Misrepresentation, Deceit (Varga, ETS) Section 1985; Tort of Battery, Trespass

1-86 Plaintiff repeats and realleges paragraphs 1 through 86 as paragraphs 1-86 of this Count II.

87. Defendants' adverse actions followed the plaintiff's opposition and plaintiff's protected actions, federal court activity within such a period of time to raise an inference of retaliation.

88. The plaintiff claims the following in the present count

A. Plaintiff opposed unlawful discrimination and participated in protected activities, and plaintiff had federal and state court procedure;.

B. Defendants acted adversely against plaintiff as described in this count;

C. There is a relationship between the plaintiff's involvement in protected activities, opposition and federal or state court participation and defendants' adverse actions against the plaintiff; this is proved by the short period of time between the plaintiff's protected activities and the adverse actions, or by defendants' complete refusal of medical services refusal to plaintiff's requests and specific necessities.

D. Plaintiff suffered substantial damages as a result of the actions described;

Defendants'practice was the legal and proximate cause of injury, losses, and damages to the plaintiff.

89. The plaintiff claims the following in the present count:

20

a. Defendants used false, deceptive statements material to the facts and actions against plaintiff; these were done intentionally with purpose to personal gain or to hide information;

b. Plaintiff trusted all these, she relayed on Defendants' dishonest matters, or misrepresentation, or she was affected by Defendants' misrepresentation because others relied on Defendants' misrepresentation.

c. Defendants' deceive practice or misrepresentation was the legal and proximate cause of injury, losses, and damages to the plaintiff.

d. Plaintiff suffered substantial damages as a result of the Defendants' misrepresentation was the legal and proximate cause of injury, losses, and damages to the plaintiff.

90.    The plaintiff proves the following in the present count:

a. Defendants' agents were required to obey the state and federal laws; they owed a duty of lawful and proper conduct, trustful actions;

b.  Defendants' violated the state laws as described in this count

c.  Defendants' violation was legal or proximate cause of injury losses to plaintiff,

d.  Plaintiff suffered substantial damages as a result of the Defendants 'actions

91. Defendants' intended to deprive the plaintiff of her rights, among other ways, by retaliation, discrimination based on national origin inappropriate conduct, activates of deceit, inappropriate actions designated to deprive the plaintiff of her rights.

92. The facts described in this count proved the violation of state or federal laws actionable under 45USC1985, Tort of Intent, Tort of Misrepresentation and Fraud, Tort of Deceit, Malpractice, Tort of Retaliation; these violations were the legal and proximate cause of injury to the plaintiff, and the plaintiff suffered damages as a result of the Defendants' actions; the plaintiff's depravation of legal rights or the adverse damages were therefore caused.

WHEREFORE RODICA WAIVIO, respectfully requests that this court grant judgment in her favor and against Defendants, and grant Plaintiff all relief deemed appropriate under the law.


WHEREFORE, plaintiff, in her complaint, prays that this Honorable Court grant the following relief:

21

(a)    Declare that defendants had unlawful practice against plaintiff in violation of federal and state laws and US Constitution;

(a)    Order Defendants provide full adequate medical services to Plaintiff for all her life.

(c)    Order Defendants to give two children to plaintiff and her husband as remedy to the lost of her baby and harm made to her health; defendants have means to provide medical achievement of pregnancy and life child.

(d)    Permanently enjoin the Defendants and its agents, employees, successors, and all persons in active concert or participation as appropriate, from all illegal practice;

(e)    Provide sufficient remedial relief to make Waivio whole for the loss she has suffered as a result of the actions against her as alleged in this complaint;

(f)    Provide solution to defendants practice as to secure that practice is not repeated.

(g)    Provide all remedy available under law and all damages compensations any type.

(h)    Award compensatory damages to Waivio for future pecuniary loses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and injuries incurred (direct, indirect) as a result of the discrimination against as alleged in this complaint.

(k)    Award punitive damages to Waivio as a result of malice, wrongdoing or reckless indifference to Plaintiff's rights as alleged in this complaint.

(l)    Plaintiff requests the suspension of the right of medical practice to Daniel Pesch and Ian Jasenof; or injunctive order to enjoin them from unlawful and illegal activity against plaintiff including misinformation of others, perjury, false statements, activity of deceit, conspiracy etc.

(m)    Provide sanctions and punishment for defendants' agents as appropriate to Laws.

(n)    Enforce defendants pursuant to 42USC300, 42USC300(e)(b) to provide full and adequate medical services and correct past matters.

Plaintiff prays for such additional relief as this Honorable Court deems just and proper.

The plaintiff prays for such additional relief as this Honorable Court deems just and proper.

22

## JURY DEMAND

The plaintiff hereby demands a trial by jury of all triable issues pursuant to Rule 38 of FRCP and Sect 102 of the Civil Rights Act of 1991, 42 U.S.C. Sec 1981a. Plaintiff hereby demands a jury determination of damages, and damages about $15000000.

Date of submission
Jan 16, 2008

*Rodica Waivio*

1325 Baldwin Court, Apt 2A,
Palatine, IL, 60074 Phone: 847-963-0231      Respectfully, Submitted by Dr. Rodica Waivio


Defendants
Ian Jasenof and Jennifer Torres
1255 N Milwakee
Glenview IL 60025
Or
1875 Dempster Suite 340
ParkRidge IL 60068

Acknowledgement

Present complaint includes pursuant to Rule 10(c) exhibits which are submitted separately