

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2005819 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 2005819)

Page 1

**C**
Easley v. Verizon Wireless
N.D.Ill.,2004.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern
Division.
Latonya EASLEY, Plaintiff,
v.
VERIZON WIRELESS, SBC Communications
Inc., Mario Crawford, Leon Banks, City of Chica-
go, United States of America, Federal Bureau of In-
vestigation, and Drug Enforcement Administration,
Defendants.
**No. 03 C 2969.**

Aug. 25, 2004.

Latonya Easley, Chicago, IL, pro se.
AUSA, United States Attorney's Office, Chicago,
IL, for Defendants.

*MEMORANDUM OPINION AND ORDER*

COAR, J.
*1 Before the court are the four motions to dismiss
filed by defendant Verizon Wireless, defendant
SBC/Ameritech Corp., defendant City of Chicago
(whose motion was adopted by defendants Craw-
ford and Banks), and defendants United States of
America, Federal Bureau of Investigation, and Drug
Enforcement Administration. For the reasons set
forth below, defendants' motions are granted, and
plaintiff LaTonya Easley's second amended com-
plaint is dismissed in its entirety, with prejudice.

I. Background

On May 2, 2003, plaintiff (proceeding *pro se* ) filed
her original complaint in this matter. It numbered
79 pages. Plaintiff subsequently moved for the ap-
pointment of counsel and applied to proceed *in
forma pauperis.*By an order dated May 21, 2003,
this court granted plaintiff's application to proceed
*in forma pauperis* but dismissed her complaint for

failure to state a coherent claim.

Subsequently, on May 29, 2003, plaintiff moved to
vacate the dismissal of her case. The court treated
her motion as one for leave to file an amended
complaint and, on June 4, 2003, granted the motion.
In so doing, the court instructed plaintiff that the al-
legations in her complaint were impossible to fol-
low and explicitly warned her that if her amended
complaint was "equally incomprehensible," it
would be dismissed and the court would not "grant
leave the next time" (*i.e.,* to file another amended
complaint).

On June 13, 2003, plaintiff filed a 31-paged
amended complaint, along with 26 pages of attach-
ments. During a July 9, 2003 status hearing, the
court informed plaintiff that the first amended com-
plaint would be dismissed for her failure to comply
with Federal Rules of Civil Procedure Rule 8(a)'s
"short plain statement" requirement. In so ruling,
the court outlined for plaintiff the pleading require-
ments established by Rule 8 and specifically ex-
plained how her complaint failed to meet those re-
quirements. The court also identified specific ex-
amples of the defects in plaintiff's pleading, focus-
ing particularly upon plaintiff's confusing and ex-
tensive recitation of numerous conversations and
interactions with and between defendants and other
parties. The court explained that plaintiff was re-
quired "to state in a short, concise form what the
defendants did that gives [her] a right to re-
lief."Finally, the court warned plaintiff, "this is the
last time [the court is] going to allow an amend-
ment to this complaint."In other words, the court
instructed plaintiff, "You need to get ... an amended
complaint on file that sets forth in some compre-
hensible fashion what your claims are. Otherwise,
I'm going to dismiss the case with preju-
dice."Accordingly, the court issued an order dis-
missing the first amended complaint and granting
plaintiff leave to file a second amended complaint.

On July 17, 2003, plaintiff filed her second

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2005819 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 2005819)

Page 2

amended complaint, which consists of 28 pages of text, plus 31 pages of attachments.[FN1]On August 19, 2003, plaintiff again moved for the appointment of counsel. On August 26, 2003, the court denied said motion.

> FN1. One of the attachments is an eight-paged document titled "Facts Stated to Claims," which does not differ in any meaningful way from the text of the complaint, itself. It contains various purported general statements of law and vague allusions to plaintiff's claims. Consistent with Rule 10(c) of the Federal Rules of Civil Procedure, in ruling upon defendants' motions, the court treats the attachments as part of the second amended complaint.

*2 Over the next several months, the numerous defendants in this action were served with and/or received copies of the second amended complaint and summons.[FN2]Thereafter, defendants filed their respective motions to dismiss pursuant to Rules 8 and 12(b)(6) of the Federal Rules of Civil Procedure. In June 2004, this court granted the City's motion to intervene on behalf of Banks and Crawford and to vacate the clerk's default judgments previously entered against them. It also granted leave to defendants Banks and Crawford to adopt the City's motion to dismiss.

> FN2. Some of the parties have indicated in their motions to dismiss that service may not have been proper, but they do not contest service for the purposes of their motions. Relatedly, who plaintiff has intended to make defendants in this case has been something of a moving target since the filing of the original complaint and remains unclear. It is not necessary for the court to address or resolve either of these issues due to its other findings, as set forth below.

Defendants' motions are now fully briefed and ripe for decision.[FN3]

> FN3. At various times, plaintiff filed numerous other motions, almost all of which were denied by this court. However, the court granted plaintiff's motion to dismiss two defendants pursuant to Rule 17(a). On July 22, 2004, it also granted her motion to file a response brief directed at Banks and Crawford (each of whom adopted the City's motion to dismiss). To date, plaintiff has not filed any such response brief(s).

II. Analysis

A. The Pleading Requirements Established by Fed.R.Civ.P. Rule 8

Defendants have moved to dismiss plaintiff's second amended complaint, first and foremost, on the grounds that the complaint is incomprehensible, unintelligible, and inscrutable. In other words, they all essentially contend that plaintiff has failed to comply with Rule 8(a)'s requirement that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief."Fed.R.Civ.P. 8(a)(2). *See also*Fed.R.Civ.P. 8(e) (requiring that allegations in a complaint be "simple, concise, and direct").

Under Rule 8, a complaint "must be presented with intelligibility sufficient for a court or opposing party to understand whether a valid claim is alleged and if so what it is."*Vicom, Inc. v. Harbridge Merchant Servs. Inc.,* 20 F.3d 771, 776 (7th Cir.1994) (internal quotations and citations omitted). The purpose behind Rule 8 is to ensure that both the defendant and the court have fair notice of the claims alleged. *See Wade v. Hopper,* 993 F.2d 1246, 1249 (7th Cir.1993)."A complaint that is prolix and/or confusing makes it difficult for the defendant to file a responsive pleading and makes it difficult for the trial court to conduct orderly litigation."*Vicom,* 20 F.3d at 775-76. Thus, a complaint "must be presented with clarity sufficient to avoid requiring a district court or opposing party to forever sift through its pages in search" of what it is that the plaintiff is claiming. *Jennings v. Emry,* 910 F.2d 1434, 1436

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2005819 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 2005819)

Page 3

th Cir.1990).

B. Plaintiff's Second Amended Complaint

Here, plaintiff has had three opportunities to set forth her claims in a comprehensible fashion. On this, her third try, she has once again fallen far short of doing so.

Although the second amended complaint is shorter than the two previous versions, it duplicates its predecessors in substantial respects and, as such, suffers from the same patent deficiencies. Indeed, many paragraphs contained within the first amended complaint are repeated verbatim or nearly verbatim in the second amended complaint. Moreover, much of the second amended complaint consists of precisely the type of allegations that the court instructed plaintiff *not* to include in amending her complaint (*i.e.,* her extensive and profoundly confusing allegations regarding numerous incidents, conversations, *etc.,* virtually none of which aids the court in discerning the nature or contours of plaintiff's claims). Finally, notwithstanding the court's clear and specific instructions to plaintiff, the narrative set forth in her second amended complaint is generally rambling and confusing, rather than "concise" or "comprehensible." It contains sentences that range from grammatically improper to utterly nonsensical.[FN4]As a whole, the second amended complaint is prolix and fatally incoherent.

> FN4.*See, e.g.,* 2nd Am. Cmplt ¶ 1 ("The plaintiff states she was never told by defendants, Marsha Thomas and Mario Crawford and Frank Tucci and Leon Banks and Barry (last name unknown) in civil litigation at any time by them or any of their family and friends and work associates"); *Id.,* ¶ 28 ("The defendant Mario was able to conspire with allegedly Marsha Thomas and Leon and S/A Frank Tucci and other unknown DEA Agents and Phillip Edwards and intentionally and knowingly intercept the plaintiff's telephone line with

reckless regard to the plaintiff's feeling to injure and cause harm by negligence of an intimate relationship"); *Id.,* ¶ 29 ("The plaintiff was unable to report alleged corrupt actions without knowledge of defendants based on the on-going illegal wiretapping, which led to continued harassment"); *Id.,* ¶ 31 ("The defendants knowingly and intentionally with willful and wanton conduct obtained authorized wire interception by use and abuse of power and authority with Ameritech Agents whom may not have always check for a valid warrant based on the established relationship with the DEA and FBI and Ameritech/SBC and Ameritech/Verizon"); *Id.,* ¶ 33 ("The plaintiff states the defendants knowingly and intentionally from 3/1994 to 4/1996 by means of illegal wire tapping the known user and bill to Tonya [ ] violated the Thirteen Amendment and Force Labor violation of FCRP 18 USC 1589 at time Kenji Pace was under investigation for Drugs and Taxes in which plaintiff had not seen since 5/1999 in a public place 'Chicago Customer Wheels' by ownership of Norvice Landon"); and *Id.,* ¶ 56 ("The defendants S/A Frank Tucci and Unknown DEA Agents and Leon and Mario and Marsha Thomas (Municipal Corporation) and The Chicago Office of The FBI for Malicious investigation based on misrepresentations of facts about the plaintiff person's to the FEDS/DEA from the alleged defendants, police informants and undercover narcotic officers, and informants and snitches").

*3 Based upon those deficiencies, the court can only guess that plaintiff intended to allege some kind of vague wiretap "conspiracy" involving many individuals, organizations, and agencies and taking place from roughly 1994 to 1997. She makes what can only be described as a hodgepodge of repetitive references to: (1) an alleged wire tap, telephone call

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2005819 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 2005819)**

interceptions, and other surveillance and investigation of her (in connection with "the 1988 case of Kenji Pace and Latonya Easley" and otherwise) (*see* 2nd Am. Cmplt, ¶¶ 7-9, 13-18, 21-23, 25-26, 28-35, 37, 39, 51-52, 64-65, 68, 70, 71, 89); FN5 (2) her belief that she was improperly identified as a law enforcement "snitch" and corresponding defamation of her character (*see Id.*, ¶¶ 12, 41-55, 57, 59); (3) alleged forced labor on her part (premised upon the notion that plaintiff unwittingly and unwillingly aided the government through her comments in recorded conversations) (*see Id .,* ¶¶ 33-35); (4) her dating of an undercover narcotics officer (identified as Mario Crawford) (*see Id.*, ¶¶ 35, 41-45, 58); (5) defendants' alleged conspiracy to force the termination of plaintiff's employment with SBC and/or Verizon (where one was the corporate predecessor of the other) (*see Id.*, ¶¶ 69-71, 74, 76, 82); (6) efforts to "exonerate" Crawford that led to the violation of plaintiff's constitutional rights (*see Id.*, ¶¶ 69, 73); (7) endangerment of plaintiff's life through the illegal manufacture of a controlled substance and/or her association with illegal drug manufacturers (*see Id.*, ¶¶ 41-45, 50, 54-55); and (8) defendants' alleged harassment of plaintiff through their "watching nice cars parked in front of the home of the plaintiff," displaying vanity license plates that contained "code name and language," driving recklessly in front of her one day in August 1998, and sending Ameritech employees to drive around her house and harass her (*see Id.*, ¶¶ 11, 65-66, 84-85).FN6 None of these jumbled allegations or beliefs, taken either separately or in the aggregate, tells a coherent story. Instead, with respect to the factual bases for plaintiff's claims, the second amended complaint is-like its predecessors-impenetrable and insufficient.

> FN5. In this vein, plaintiff repeatedly contends that the alleged interception of her oral and telephone communications and other investigation of her was effected "by obtaining an authorized wire tap" through the provision of misleading and false information to the judge who subsequently

issued a search warrant. *Id.,* ¶ 8.*See also Id.,* ¶¶ 22, 31, 90.

> FN6. Based upon these alleged wrongs, plaintiff seeks damages in excess of $600 million.

Relatedly, the second amended complaint also fails to make clear the nature, let alone the contours, of plaintiff's purported legal theories/claims. Instead, her "legal" allegations are jumbled, internally inconsistent, and vague. Plaintiff cites as the legal bases for her claims a handful of statutes (including 42 U.S.C. § 1983 (creating a cause of action against those acting under color of state law who cause a deprivation of any rights, privileges, or immunities secured by the United States Constitution and the laws of the United States), 41 U.S.C. § 601 (governing the resolution of contract disputes involving the federal government); 18 U.S.C. § 1589 (criminalizing forced labor); 18 U.S.C. § 2510, *et seq.* (*i.e.,* the Federal Wiretapping Act) (authorizing recovery of civil damages for illegal electronic surveillance, while expressly stating that this remedy is available against persons or entities "other than the United States"); FN721 U.S.C. § 858 (criminalizing the endangerment of human life in connection with the illegal manufacture of controlled substances); and 28 U.S.C. §§ 1346(b), 2671, *et seq.* (*i.e.,* the Federal Tort Claims Act) (providing a waiver of sovereign immunity and creating federal jurisdiction to decide cases against the federal government for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the government under certain circumstances)) *and* the First, Fourth, Fifth, Tenth, Thirteenth, and Fourteenth Amendments to the Constitution. Then, conversely, in her responses to defendants' motions to dismiss, plaintiff states that she is asserting six claims in this lawsuit and that five are based upon alleged constitutional violations, while the sixth is based upon an alleged "endangerment" of her life. *See Swofford v. Mandrell,* 969 F.2d 547, 549 (7th Cir.1992) (courts should consider allegations con-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2005819 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 2005819)

Page 5

tained in *pro se* plaintiffs' other filings in ruling upon motions to dismiss).

> FN7. The Seventh Circuit has held that this statute likewise does not allow for suits against municipalities. *See Amati v. City of Woodstock,* 176 F.3d 952, 956 (7ᵗʰ Cir.1999) (citing 18 U.S.C. § 2510(6)).

\*4 Based on the foregoing, it is clear that plaintiff has failed, for the third time, to abide by the requirements of Rule 8(a). Reading the complaint as a whole, it is impossible to ascertain what plaintiff alleges was done to her and by whom, let alone how defendants' actions formed or manifested a conspiracy and/or violated the law. As such, the second amended complaint shall be dismissed.

C. Dismissal With Prejudice

Rule 15(a) provides that a court should "freely" grant leave to amend a pleading "when justice so requires." Fed.R.Civ.P. Rule 15(a). However, a party's repeated failure to cure deficiencies through previously-allowed amendments justifies the denial of leave to amend a complaint. *See Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) ("In the absence of any apparent or declared reason-such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.-the leave sought should, as the rules require, be 'freely given' ").*See, e.g., Midwest Grinding Co. v. Spitz,* 976 F.2d 1016, 1021 (7ᵗʰ Cir.1992) (upholding denial of leave to correct pleading deficiency by filing third amended complaint where plaintiff "had fair notice of its pleading deficiencies from the defendants' motion to dismiss, but it chose to ignore that warning").

Here, the court provided plaintiff with ample warning of the consequences of her repeated failure to comply with the pleading requirements established

by Rule 8. Subsequently, when faced with her third opportunity to draft a compliant complaint, plaintiff nonetheless failed to do so. Under these circumstances, dismissal with prejudice is appropriate. That is, plaintiff will *not* be permitted to file another amended complaint in this action. *See Bennett v. Schmidt,* 153 F.3d 516, 518 (7ᵗʰ Cir.1998) ("It is even possible to justify dismissal with prejudice if the complaint remains incomprehensible after opportunity to amend").

Plaintiff's *pro se* status does not excuse her failure to comply with the pleading requirements established by the rules or require imposition of a less severe consequence. As a general matter, a *pro se* litigant's pleadings are held to a less stringent standard than those of litigants who are represented by counsel. *See Antonelli v. Sheahan,* 81 F.3d 1422, 1427 (7ᵗʰ Cir.1996).*See also Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972). Yet, a *pro se* litigant nonetheless must act in accordance with court rules and directives. *See Downs v. Westphal,* 78 F.3d 1252, 1257 (7ᵗʰ Cir.1996) ("being a *pro se* litigant does not give a party unbridled license to disregard clearly communicated court orders" or to "choose which of the court's rules and orders it will follow, and which it will wilfully disregard"); *Jones v. Phipps,* 39 F.3d 158, 163 (7ᵗʰ Cir.1994) (*"pro se* litigants are not entitled to a general dispensation from the rules of procedure or court imposed deadlines") (citations omitted). Plaintiff failed to follow the applicable rules and this court's specific directives when, for the third time, she filed a complaint that utterly fails to comply with Rule 8. Notwithstanding her *pro se* status, this failure justifies dismissal with prejudice of the second amended complaint. *See, e.g., Lyon v. Brown,* No. 97-1698, 1998 U.S.App. LEXIS 9786, at \*5-6(7ᵗʰ Cir. May 12, 1998) (upholding dismissal with prejudice of *pro se* plaintiff's third amended complaint for failure to state a claim upon which relief may be granted; plaintiff had "repeatedly failed to remedy the same deficiencies," as he merely "realleged the same claims that the district court previously dismissed"

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2005819 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 2005819)

and "did not cure the deficiencies of the earlier complaints," despite the district court's "highlight[ing] the specific problems" therein.[FN8]

> FN8. Defendants have argued in the alternative that, to the extent any comprehensible claim can be discerned from the complaint, the complaint nonetheless fails to state a claim upon which relief may be granted and, thus, must be dismissed pursuant to Rule 12(b)(6).*See*Fed.R.Civ.P. 12(b)(6). Dismissal under this provision "is warranted if the plaintiff can prove no set of facts in support of [her] claims that would entitle [her] to relief."*GE Capital Corp. v. lease Resolution Corp.,* 128 F.3d 1074, 1080 (7th Cir.1997). Thus, the court's task is to "examine[ ] the allegations in the complaint to determine whether they pass muster."*GE Capital,* 128 F.3d at 1080. In so doing, the court assumes the truth of all well-pleaded factual allegations and draws all reasonable inferences in the plaintiff's favor. *See Antonelli,* 81 F.3d at 1427;*Prince v. Rescorp Realty,* 940 F.2d 1104, 1106 (7th Cir.1991). As set forth above, plaintiff's allegations are not well pled and, in fact, are inscrutable. Thus, the second amended complaint would not be amenable to the analysis required by Rule 12(b)(6). In any event, in light of the court's ruling that the second amended complaint should be dismissed with prejudice for plaintiff's repeated failure to draft a pleading that complies with Rule 8's requirements, it is simply not necessary to address defendants' numerous arguments for dismissal pursuant to Rule 12(b)(6).

III. Conclusion

*5 For the foregoing reasons, defendants' motions to dismiss are granted, and plaintiff's second amended complaint is dismissed in its entirety, with prejudice.

N.D.Ill.,2004.
Easley v. Verizon Wireless
Not Reported in F.Supp.2d, 2004 WL 2005819 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy                                                          Page 1
Slip Copy, 2006 WL 2536688 (N.D.Ill.)
**(Cite as: Slip Copy, 2006 WL 2536688)**

Waivio v. Board of Trustees, University of Illinois
at Chicago
N.D.Ill.,2006.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern
Division.
Rodica WAIVIO, Plaintiff,
v.
BOARD OF TRUSTEES, UNIVERSITY OF
ILLINOIS AT CHICAGO, Peter Nelson, Sol Shatz,
Amy Levant, Clark Hulse, Sylvia Manning, Educa-
tional Testing Services, Defendants.
No. 04 C 3545, 04 C 2314, 04 C 6263, 05 C 2316.

Aug. 31, 2006.

Rodica Waivio, Palatine, IL, pro se.
Richard Quentin Holloway, Andrews & Holloway,
PC, Homewood, IL, for Plaintiff.
Norman P. Jeddeloh, Richard Keith Hellerman,
Arnstein & Lehr, Craig Allen Varga, Julie Felicia
Grosch, Varga, Berger, Ledsky, Hayes & Casey,
Chicago, IL, for Defendants.

OPINION AND ORDER

NORGLE, J.
**\*1** Before the court are Defendants' Motions to Dis-
miss pursuant to Federal Rule of Civil Procedure
12(b)(6) and 8(b). For the following reasons, De-
fendants' Motions to Dismiss are granted and the
case is terminated with prejudice.

I. BACKGROUND [FN1]

> FN1. The court takes the facts from
> Plaintiffs' Complaint, and the parties briefs
> in the Motion to Dismiss.

A. Facts

The widely accepted proposition that the courts
must "treat pro se litigants gently," see*Lockhart v.*

*Sullivan,* 925 F.2d 214, 216 (7th Cir.1991), must
have been created for the case of Rodica Waivio
("Waivio"), a Romanian born student living in the
United States. The voluminous record in this action
stems from Waivio's failure pass a competency ex-
am, and her eventual removal from Defendant Uni-
versity of Illinois at Chicago's ("UIC") Graduate
School. The long history of Waivio's claim began in
2001, when she was admitted to UIC's Ph.D. pro-
gram in computer science. In 2001 and through
2002, Waivio worked as a graduate research assist-
ant. Her advisor at the time was Clement Yu
("Yu"). Then, starting in January 2002, Baskar
Dasgupta ("Dasgupta") served as Waivio's advisor
through September 25, 2002. On that day, Dr.
Dasgupta informed Waivio that he would no longer
serve as her advisor, and that her research assistant
position would not be renewed. Defendants allege
that Dr. Dasgupta told Waivio that he could not un-
derstand her work, and he concluded that Waivio's
work was "weird" and not up to the University's ac-
cepted standard for graduate level work.

Waivio alleges that Dr. Dasgupta denied her future
employment because of her national origin, and
also that "defendant's agents did not like mathemat-
ics which is a Romanian tradition."Waivio further
claims to suffer from bipolar depression, and that
she notified the Defendants of this condition in
December 2001. However, Waivio did not register
for disability services with UIC until May 28, 2003,
one and a half years after she claims she first noti-
fied Defendants of her problem. As a result of Wai-
vio's registration for disability services, UIC re-
quested that Defendant Educational Testing Ser-
vices ("ETS") provide Waivio with certain accom-
modations to take the Graduate Record Examina-
tion ("GRE"). ETS is not controlled by the Uni-
versity, and therefore UIC would not have the final
say as to any accommodations that ETS provided to
Waivio.

On May 30, 2003, Waivio filed her first grievance
with UIC relating to her failure of the GRE. De-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2536688 (N.D.Ill.)
(Cite as: Slip Copy, 2006 WL 2536688)

fendant Peter Nelson ("Nelson") denied Waivio's grievance on June 10, 2003. In his denial, Nelson explained that Waivio elected to take the GRE as a substitute for the competency exam that is required for all students. Nelson also noted that Waivio had the lowest score of all the students who took the test. Waivio claims that she was denied the benefits of being a graduate student because nobody was willing to serve as her advisor, after Dr. Dasgupta resigned his position. Waivio does not allege any efforts taken on her behalf to secure another advisor, after Dr. Dasgupta withdrew. Moreover, Waivio claims that UIC raised the passing level required on the GRE in 2004, in an effort to cause her to fail the exam, and eventually be removed from the program.

*2 Waivio failed the GRE twice. The first time was in 2003, as mentioned in Nelson's denial of Waivio's first grievance. On her first exam, Waivio scored in the 27th percentile; the minimum passing grade was in the 67th percentile. In 2004, Waivio failed the GRE for the second time. She scored in the 58th percentile, the minimum passing grade was in the 70th percentile. Defendants claim that the minimum passing score changes each year based on the individual scores of each student sitting for the test. Put another way, the exam is graded on a curve.

Lastly, Waivio alleges that she encountered problems in a class taught by Thomas Moher ("Moher"). Specifically, Waivio alleges that she was treated differently than her classmates because she received a failing grade, while another student received an A. Furthermore, Waivio claims that from 2002 through 2004, UIC refused to give her financial support and employment with the university. Finally, in May 2003, Waivio received a warning of academic deficiency, based on her low grade point average, and on March 10, 2004, Waivio was terminated for failure to pass the Ph.D. competency exam on her second try.

B. Procedural History

On May 21, 2004, Waivio filed her initial complaint in the Northern District of Illinois. In addition to the case filed under the current docket number, Waivio has flied four other complaints, all in the Northern District of Illinois.[FN2] She has also filed two separate cases in the Illinois State Court. The court had given Waivio leave to amend her complaint eight different times, and finally held that the "Corrected Second Short Amended Complaint" filed on August 10, 2005, was the final and operative complaint in this case. On September 16, 2005, UIC filed its Motion to Dismiss, and on September 23, 2005, ETS filed its Motion to Dismiss. On June 28, 2006, Waivio filed her Responses to UIC's and ETS's Motions to Dismiss, and on January 16, 2006, UIC filed its Reply. Then, on August 4, 2006, ETS filed its Reply. The Motions to Dismiss are fully briefed and before the court.

> FN2. See Case Nos. 04-C-6263, 04-C-2314, 05-C-2316, 06-C-1938

## II. DISCUSSION

A. Standard of Review

Pursuant to Federal Rule of Civil Procedure 8, "[A] pleading which sets forth a claim for relief, whether an original claim ... shall contain ... a short and plaint statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Furthermore, federal courts have "the inherent power to sanction for conduct which abuses the judicial process." *Barnhill v. United States,* 11 F.3d 1360, 1367 (7th Cir.1993) (citing *Chambers v. NASCO, Inc.,* 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991)). Such power is "governed not by rule or statute, but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Id.* (quoting *Link v. Wabash R. Co.,* 370 U.S. 626, 630-31, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962)). The court's use of its inherent power "should be employed sparingly and only when there is a record

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2536688 (N.D.Ill.)
(Cite as: Slip Copy, 2006 WL 2536688)

Page 3

of delay, contumacious conduct, or when other, less drastic sanctions prove unavailing."*Dotson v. Bravo*, 321 F.3d 663, 667 (7th Cir.2003). When deciding the type of sanction to employ, "the court should consider 'the egregiousness of the conduct in question *in relation to all aspects of the judicial process.*"*Id.* (emphasis included). The court has a wide discretion to dismiss a case with prejudice as a sanction. *See id.*

## B. Waivio's Complaint Abuses the Legal Process

### *1. Waivio has used the court system to harass Defendants*

**\*3** "There are species of misconduct that place too high a burden ... for a court to allow a case to continue."*Dotson*, 321 F.3d at 663 (quoting *Barnhill*, 11 F.3d at 1368). This is such a case. Waivio's Complaint stems from her dismissal from UIC's Ph.D. program for her academic deficiency, including her failure to pass a competency exam. When Waivio was dismissed from the program, she turned her anger and frustration not only on UIC and its Board of Directors, but on ETS, the company that administers the GRE, as well as Defense counsel. She has filed seven total complaints in this case, each time accompanied by a blunderbuss of exhibits. Each of these complaints are in excess of the fifteen page limit, single spaced, and contain hundreds of paragraphs, all in less than the standard twelve-point font. After each Complaint, Waivio filed a motion to amend parts of the complaint, either a paragraph in one count, or a sentence on a page, buried deep within her pleading.

Waivio has filed five separate cases in the Northern District of Illinois within the past two years. Most recently, she has filed a Complaint which was assigned to Judge Castillo, while this Motion to Dismiss was currently pending.[FN3] All of Waivio's complaints have been in excess of the fifteen page limit mandated in the local rules. *See* Local Rule 7.1. The court, understanding th pro se litigants must be treated gently, granted Waivio's request to

file a brief in excess of the fifteen page limit. *See* Minute Order of September 7, 2005. Additionally, on January 12, 2006, when Waivio filed her two hundred and fifty-eight page Response to UIC's Motion to Dismiss, the court granted Waivio leave to file a shortened Response, in order to comply with the local rules. *See* Minute Order of January 12, 2006. Even after the court had granted Waivio leave to file a brief of 50 pages, she still moved the court to grant her leave to supplement her pleadings to include even more pages and exhibits. *See* Minute Order of February 16, 2006.

FN3.Case No. 06-C-1938

Waivio's actions became so egregious, that UIC eventually sought an order of protection and sanctions against her. Specifically, it its Motion for Sanction and for a Protective Order, UIC states that during a conversation with Waivio, she said that "if I lose this case, I will kill you."*See* Minute Order of March 2, 2006. Additionally, counsel informed the court that Waivio had attempted to physically restrain him, and yelled obscenities in the hallway at the courthouse after court calls. Defendants further allege that Waivio has also made unsolicited visits to defense counsel's office in an effort to discuss the case. *See id.*

In September 2005, Waivio filed a Motion to Strike. After Defendants' filed their Response, Waivio wrote defense counsel three emails within the span of four hours. Waivio's initial e-mail stated that defense counsel was "crazy" and should seek help for a mental disorder. *See id.*Within two hours, Waivio sent a second e-mail, apologizing for her behavior. The third e-mail strangely asks if defense counsel wants plaintiff to "lie in bed." *See id.*

**\*4** Furthermore, defense counsel cites several instances where Waivio abused court procedure. In June and July 2005 Waivio issued a litany of discovery requests, and failed to give notice to defense counsel of any of these requests. Additionally, Defendants inform the court that Waivio has filed two state court cases in the Circuit Court of Cook

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

County, alleging the same cause of action as her federal claim. In the course of the state court action, Waivio has verbally harassed counsel outside of the courtroom.

Waivio admitted to several of the instances alleged in Defendants' Motion for Protective Order. In regards to her purported verbal harassment, Waivio states that "maybe the words 'liar' or 'crook' were used ...." and that she used "the Romanian word 'frac,' and also the word 'escroc,'" Pl.'s Resp. to Mot., ¶ 12. Waivio further explains that her "reckless behavior" was motived "by the plaintiff's disability which means plaintiff is a person with emotional disability and the present situation is very stressful, therefore most probable plaintiff was a little careless to the words or expressions used...." *Id.,* at 8. Waivio further acknowledges that she is "a subject of misinterpretations and misunderstandings." *Id.* Moreover, implicit in Waivio's denial of her threat to kill defense counsel, is her acknowledgment that she has used harsh words with Defendants attorneys.

Undaunted by the Protective Order, or the court's many warnings, Waivio has continued to file countless pleadings styled either "Motions" or "Requests" under various Federal Rules of Civil Procedure. A majority of these pleadings are drafted in such a manner as to make it extremely difficult to decipher exactly what relief Waivio requests. For example, on January 11, 2006, Waivio filed a pleading styled "Motion Pursuant to Rule 8 or Rule 42; Denying UIC's Motion to Dismiss; Motion Supporting Order from 11/03/04."*See* Doc. No. 244. In her Motion, Waivio alleges the following:

On April 25, 2005, UIC Defendants filed two motions of reassignment and consolidations of case 05-C-2314 and case 05-C-2316 to the case 04-C-3545. These motions from Documents [54] and [56], on the case record, are UIC's defense in support of consolidation. However, the main UIC's statement which is at the core of these motions is "[case 04-C-3545 is] action involving a [federal] question of law or fact and [is] pending before the

court," which means the UIC's hypothesis is: "[case 04-C-3545 is] properly before this court since raise federal questions" as seen in Document [212]. Plaintiff names this UIC's defense as STATEMENT A IN DEFENSE for UIC.

On September 16, 2005, UIC defendants filed a motion of dismissal in case 04-C-3545. The motion and memorandum, from Documents 191, and 193-2, are UIC's defense in support of dismissal. However, the main statement made by UIC defendants which is at the core of this motion is "[Plaintiff failed case 04-C-3545, and the case should be dismissed under Rule 8 and Rule 12 FRCP]"; UIC defendants claimed case 04-C-3545 was not a proper federal question conforming to federal laws and regulations. Plaintiff names this UIC's defense as STATEMENT B IN DEFENSE for UIC.

*5 This above STATEMENT A and STATEMENT B are related, because they are based on the status of the case 04-C-3545, but they are in alternative, which means when STATEMENT A is sufficient, STATEMENT B is insufficient; and when STATEMENT B is sufficient, STATEMENT A is insufficient."

Def.'s Mot. Pursuant to Rule 8 or Rule 42, ¶¶ 5-7.

This motion is more akin to a mathematical formula than a legal brief. It is difficult to understand the purpose for the motion, or what is the request for relief. The court construed this pleading as a Response to the pending Motion to Dismiss. However, Waivio filed this motion two months after she filed her initial two hundred and fifty-eight page Response to UIC's Motion to Dismiss. On January 12, 2006, the court struck Waivio's Response, and granted her leave to file an amended response that conformed to the local rule. The logic of filing two separate Responses to a Motion to Dismiss, two months apart, where one brief is in excess of two hundred and fifty pages, and the latter only four pages in length, strains common sense.

Lastly, in perhaps the most egregious action of her

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2536688 (N.D.Ill.)
(Cite as: Slip Copy, 2006 WL 2536688)

continued misconduct, Waivio filed a rambling, fourteen page pleading styled "Short Amendment to [379]." FN4 Upon review of the docket, document number 379 is a "Motion pursuant to Rule 8(e)(2), 60(b), and 8(b), as well as 28 U.S.C. § 2072 or U.S. Constitution." In her "Short Amendment" Waivio alleges the following.

> FN4. This is Waivio's standard operating procedure. She files a motion under a Federal Rule, and then a few days later, files a pleading styled "Amendment" to her previously filed motion.

Plaintiff brings [379] and present document also pursuant to Rule 60(b)(5) because order [309] or [369] "it is no longer equitable that the order should have prospective applicability." In [339] this court made a series of citation of matters from defendants' motion [151] and [292] however this court inappropriately incriminated plaintiff by inappropriate interpretations. In [309] Court failed to point out that court did not look at the credibility of defendants' statements listed in [309]. Court's list of facts from [309] are disrespectful, indecent and raises a few questions while they create ground for sex harassment against plaintiff. Furthermore plaintiff would like to report plaintiff believes that [309] is a matter of sex harassment against plaintiff which resulted in plaintiff being subjected to sex harassment. Shortly court's order [309] resulted in sex harassment against plaintiff. Shortly it is ashamed for a District court to publish statements as those shown in [309], while evidently they are just misinterpretations of a Pro Se litigant....

Norman Jeddeloh and Richard Hellerman are dishonest persons designated to make actions and statements, and try desperately almost anything. The statements from [292] and [151] are dishonest and disrespectful matters and they lack respect and good decency and this court is not allowed to inappropriately make favor. In [334] plaintiff showed that they killed the plaintiff's baby, and they proved that they can do anything unless appropriately controlled by this court; plaintiff proved in [334] that

defendants' statements were false.

*6 Def.'s Mot., at 5. Waivio cites to no evidence in the record to justify the allegations that defense counsel are responsible for the death of her baby. Such allegations are beyond the scope of any claim in any of Waivio's complaints, and are not grounded in any good faith basis. If any party must be controlled by the court, it surely must be Waivio.

Then, on August 18, 2006, while this Motion to Dismiss was under advisement, Waivio filed yet another rambling, fourty-four page pleading styled "Plaintiff's Reply to Defendants' Response to Plaintiff's Motion [379, 395]." In it, Waivio makes the following claims.

In [379] plaintiff alleged that defendants continued their inappropriate conduct and that they was [sic] endangering the plaintiff baby life. Plaintiff under oath affirmed that Norman Jeddeloh [C]ontinued his practice of inappropriate behavior against plaintiff by scramming, terrifying plaintiff by inappropriate gesture and sever hostility on March 16, 2006 [two weeks from the order [309]] in State Court; furthermore Grosch continued to solicits plaintiff "at the message center from [her] building" which was interpreted by plaintiff as "sex solicitation" or "solicitation to harm plaintiff." Plaintiff alleged that the present conditions, as plaintiff alleges defendants unlawfully discriminate against plaintiff are inappropriate for a child and endanger the baby's life....

In [400] Julie Grosch affirms that Jeddeloh and Grosch were "on a date" on March 16, 2006; she affirms love involvement with Norman Jeddeloh, and affirms Jeddeloh might ave been jealous as vehement discussions and loud voiced were proving Jeddeloh' love involvement with Julie Grosch; Plaintiff believes the vehement discussion was related with a "special relationship" between Hellerman and Grosch [see 269]; on March 16, 2006 as well as in other opportunities Jeddeloh exhibit a high interest in special endowed women, in particular Julie Grosch; from beginning of May 2005,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2536688 (N.D.Ill.)
(Cite as: Slip Copy, 2006 WL 2536688)

Page 6

Grosch witnessed an authentic interest of Norman Jeddeloh for sex; Jeddeloh's interest for sex exploded on March 16, 2006 through a vehement jealousy behavior, proving incontestability that sex was a high interest of Jeddeloh, while wearing extravagant closes [sic] confirming his sex interest; Grosch entertained UIC agents' sex interest ... by placing herself very closely to UIC agents, through solicitations, reciprocal visits ... phone calls ... and some time wearing extravagant closes [sic] as well as she let herself being called "she is my girlfriend" or matters very much related to this.

Pl.'s Mot, at 16. Doc. No. 405.

Once again, this motion has no relation to Waivio's federal claims, and serves merely to burden the court with frivolous arguments and baseless accusations. The personal lives of the attorneys in this case is of no concern to the court, let alone to Waivio. Furthermore, Waivio includes a plethora of exhibits, all of which bear absolutely no relationship to this case. She includes a report titled "Endocrine FunctionTumor Markers," Ex. 1; as well as various pleadings from her ongoing state action. *See* Ex.2. Motions such as these support the court's conclusion that the only acceptable sanction at this point in the litigation is to dismiss the case with preju- dice.

*2. Dismissal with Prejudice is the only feasible sanction for this cause of action*

\*7 Waivio has continued to ignore court orders relating to page limits and the filing of extraneous motions. Instead, she has inundated this court with a deluge of pleadings, ranging from requests to stay discovery, to motions for protective orders based on pleadings filed by UIC and ETS's attorneys. This case, filed in 2004, has over 400 docket entries. Comparable cases, dealing with similar claims such as Title VII and the ADA, filed around the same time as Waivio's, typically have between 50-75 entries in the docket A majority of these pleadings lack any type of good faith basis for presentment.

Yet, time and again, the court granted Waivio several extensions, and warned her about page limitations, and the possibility of sanctions. In fact, the court allowed Waivio ten months to file a Response to the Motions to Dismiss.

The court also notes that in that ten month time span, Waivio filed countless motions with the court that had little if anything to do with the pending Motion to Dismiss. In each of her pleadings, Waivio references other motions she has filed by docket number alone. In virtually all of her pleadings, she includes a string of four, five, or six docket numbers in a row, and uses these numbers as if the court could tell from the face of her motion what she references. The court reminds Waivio that her pleadings must make all arguments accessible to the court, least she forces us to "play archaeologists with the record." *Chicago Bd. of Educ. v. Substance, Inc.,* 354 F.3d 624, 630 (7th Cir.2003). Moreover, the court reiterates that "judges are not like pigs, hunting for truffles buried within the record."*Roger Whitmore Auto. Services, Inc. v. Lake County, Il.,* 424 F.3d 659, 664 n. 2 (7th Cir.2005) (quoting *United States v. Dunkel,* 927 F.2d 955, 965 (7th Cir.1991)).

By filing several complaints in both the federal and state courts, Waivio runs the risk of creating piecemeal litigation. "Piecemeal litigation occurs when different tribunals consider the same issue, thereby duplicating efforts and possibly reaching different results."*Tyrer v. City of South Beloit,*-F.3d-, 456 F.3d 744, 2006 WL 2136641, \*10 (7th Cir. Aug.2, 2006) (quoting *LaDuke v. Burlington N.R. Co.,* 879 F.2d 1556, 1560 (7th Cir.1989)). If Waivio pursues both her state court action along with her federal claims, "substantially similar issues will be litigated simultaneously in different forums."*Id.* Waivio has proven a less than candid party with the court, filing several other complaints in the Northern District, without informing this court of her actions, while this case is currently pending. As a result, "the possibility exists that one court, unaware that the other court has already ruled, will resolve an is-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2536688 (N.D.Ill.)
**(Cite as: Slip Copy, 2006 WL 2536688)**

sue differently and create a conflict between the two forums."*Id.*

Furthermore, there is no evidence that any other type of sanction, except for dismissal with prejudice would be effective. Based on Waivio's propensity for protracted litigation, any imposition of monetary sanctions would be met with further briefing, and ensuing motions to add "Amendments" to those briefs. Moreover, there is no assurance that a monetary sanction would deter Waivio from filing countless other frivolous motions with the court. Her behavior over the past two years has demonstrated that nothing short of the abrupt dismissal of this case will cease the constant onslaught of motions she creates."[O]ther, less drastic sanctions [would] prove unavailing."*Dotson,* 321 F.3d at 667. The court has given Waivio considerable leeway and a significant amount of time to prosecute her case. After two years, Waivio's case is the "species of misconduct that place too high a burden ... for a court to allow a case to continue."*Dotson,* 321 F.3d at 663 (quoting *Barnhill,* 11 F.3d at 1368). The court recognizes that "dismissal is a harsh sanction, but 'the most severe in the spectrum of sanctions proved by statute or rule must be available ... not merely to penalize those whose conduct may be deemed to warrant a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterent." ' *Dotson,* 321 F.3d at 667 (quoting *Nat'l Hockey League v. Metro. Hockey Club, Inc.,* 427 U.S. 639, 642, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976)). Therefore, the court will exercise its discretion and dismiss Waivio's Complaint, with prejudice.

### III. CONCLUSION

*8 For the reasons stated above, Defendant's Motion to Dismiss is granted. Plaintiff's Complaint is Dismissed, with prejudice.

IT IS SO ORDERED.

N.D.Ill.,2006.

Waivio v. Board of Trustees, University of Illinois at Chicago
Slip Copy, 2006 WL 2536688 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy                                                                                    Page 1
Slip Copy, 2007 WL 3087197 (N.D.Ill.)
(Cite as: Slip Copy, 2007 WL 3087197)

**C**
Waivio v. Board of Trustees University of Illinois
at Chicago
N.D.Ill.,2007.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois,Eastern
Division.
Rodica WAIVIO, Plaintiff
v.
BOARD OF TRUSTEES UNIVERSITY OF
ILLINOIS AT CHICAGO, Sol Shatz, individual
and director, Peter Nelson, individual and Head
Dep., and Arnstein & Lehr LLP, Defendants.
**No. 06 C 7189.**

Oct. 18, 2007.

Rodica Waivio, Palatine, IL, pro se.
Norman P. Jeddeloh, Arnstein & Lehr, LLP, Chica-
go, IL, for Defendant.

### MEMORANDUM OPINION AND ORDER

VIRGINIA M. KENDALL, United States District
Judge.
*1 Plaintiff Rodica Waivio ("Waivio" or
"Plaintiff"), proceeding pro se, brings this action
against the Board of Trustees University of Illinois
at Chicago (the "Board" or "UIC"), Sol Shatz
("Shatz"), Peter Nelson ("Nelson"), and Arnstein &
Lehr LLP ("Arnstein" and together with Shatz and
Nelson, "Defendants"). Before the Court is Defend-
ants' Motion to Strike and Dismiss pursuant to
Rules 11 and 12(b) of the Federal Rules of Civil
Procedure. For the reasons set forth below, Defend-
ants' Motion under Rule 11 is Denied and Defend-
ants' Motion to Dismiss under Rule 12(b) is Gran-
ted and the Amended Complaint is dismissed with
prejudice.

### Background

On December 29, 2006, Waivio filed her initial
complaint in this action. Less than four months

earlier, Judge Norgle entered an order dismissing
with prejudice several consolidated cases between
Waivio, UIC and various other parties (including
Shatz, Nelson and Arnstein) for Waivio's abuse of
the legal process. Seemingly unsatisfied with the
result she obtained from Judge Norgle, Waivio then
brought this action, which seeks to resurrect the
same disputes Waivio has already raised-or could
have raised-in previous cases.

Waivio's Amended Complaint in this case-like her
"Corrected Second Short Amended Complaint" in
Case No. 04 C 3545 before Judge Norgle-comprises
a rambling, disjointed, and almost entirely incom-
prehensible 203 paragraphs related to UIC's de-
cisions to dismiss her from its graduate program
and to deny her financial support and employment
with the university. Waivio claims that UIC and its
agents discriminated against her based on her disab-
ility, national origin and gender. Specifically, Wai-
vio alleges that in early 2004, UIC improperly
denied her requests for financial support, denied her
requests for employment, and denied her requests
for letters of recommendation. Strangely, Waivio
also alleges that Arnstein-UIC's *counsel*-retaliated
against her for "plaintiff's protected actions and op-
position of UIC [sic] unlawful practice" by threat-
ening Waivio with "dismissal of cases." (Am. Cplt.
at ¶ 41.) Waivio appears further to allege that UIC's
counsel, in the person of Richard Hellerman,
caused the death of her unborn child:

[Hellerman] screamed vehemently at plaintiff, in-
flicted emotional distress, threatened plaintiff with
adverse actions, psychologically coercing intimidat-
ing her to file response to UIC.motion. dismiss. Ju-
ly8-12,2005. He misinformed, deceived plaintiff.
He was full of anger, bitterness, and hostility to-
ward plaintiff. Plaintiff asked him to stop intimidat-
ing and threatening her. He instigated plaintiff and
created hostile environment against plaintiff by in-
flicting emotional pain, sufferings. 15-20 days later
plaintiffs' baby died.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 2

*Id.* at ¶ 47.

Waivio seems to be particularly troubled by the manner in which UIC and its counsel treated Julie Grosch ("Grosch"), one of the lawyers representing defendant Educational Testing Services in Case No. 04 C 3545.Essentially, Waivio complains that UIC and its counsel treated Grosch more favorably than they treated Waivio, which Waivio characterizes as "Defendants' discriminatory practice." *Id.* at ¶ 58-59.Waivio alleges that UIC's counsel, in the persons of Hellerman and Norman Jeddeloh ("Jeddeloh") "proved interested and vehemently interacted with Julie Grosch, (woman, American, non-disabled)" while "[Waivio] was treated very severely as defendant."*Id.* at ¶ 51, 54.In what the Court can only interpret as an allegation related to the motive for the disparate treatment as between herself and Grosch (because it is almost completely unintelligible), Waivio further alleges that:

*2 Plaintiff's female characteristics are opposite to Grosch; Grosch has long blond hear [sic], Waivio has short brown hear [sic], Grosch is tall, thin, Waivio is short, not thin; Grosch dressed "extravagant cloths," [sic] Waivio dressed uninteresting cloths; [sic] Grosch is beautiful, Waivio is uninteresting; Pursuant Rule 8(e)(2), Defendants misclassified plaintiff as opposite alternative Grosch, inappropriately related plaintiff's actions with their sexual interests.... Defendants have specific sexual interest, national origin, no disability, retaliation interests and plaintiff is [or plaintiff was wrongly classified as] related and opposite [regarded as impairment] to their sexual interest national origin, non disability retaliation e[sic] interests, therefore plaintiff was discriminated, refused and suffered adverse actions and effects based on her sexuality or other protected characteristics and protected actions.

*Id.* at ¶ 61-62.In addition to her allegations related to Defendants' "discriminatory practices," Waivio also includes similarly incomprehensible allegations related to "Plaintiff's Severe Treatment." Specifically, Waivio alleges that:
Defendants refused to treat gently plaintiff. Plaintiff

was inappropriately treated as criminal "kill you", unwelcome, unwanted ("physically restrain"), refused, rejected ("yelled obscenity"), defendants regarded plaintiff's protected characteristics as "impairment". Defendants regarded plaintiff's disability as threat, as impairment; Defendants harassed plaintiff based on her sexual characteristics, hostile environment against plaintiff. "Lie in bed", "attempted physically restrain" is insulting, "ashamed court publish". Intimidations are harsh words "kill", "obscenity", "admitted[false]", "abused court proceudre" or "fail to give notice", verbally harassed" "give harsh words", "crazy". Plaintiff's Romanian language is regarded as "obscenity", while plaintiff's disability is regarded as threats, or harsh words, while matters were evident misunderstandings. Plaintiff's genter is regarded as "uncommon" "unsolicited visits or wants plaintiff lie in bed or restrain him". Retaliation is related to plaintiff's state actions or discovery, opposition of unlawful discrimination, when defendants regarded Waivio's protected actions as "impairment", harassing, falsely claiming "abuse process", while barring her actions. All these negatively affected plaintiff's performances or opportunities; plaintiff suffered substantive losses, state actions were dismissed.

*Id.* at ¶ 64-65.

Waivio's previous case-No. 04 C 3545 before Judge Norgle-sought relief from a variety of defendants for a large range of allegedly discriminatory practices related to Waivio's status as a student and an employee at UIC. Indeed, in her "Corrected Second Short Amended Complaint," filed in August 2005 in that case, Waivio alleged that *"plaintiff was almost never evaluated based on her individual merit: she was almost never free from discrimination;* the plaintiff was unlawfully discriminated against almost all the time in education and employment."(Exh. A to Mtn. to Dismiss at ¶ 57) (emphasis in original). Judge Norgle's Opinion dismissing that case also reflects that Waivio raised, in the course of litigating that case, her concerns about

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 3087197 (N.D.Ill.)
(Cite as: Slip Copy, 2007 WL 3087197)

Page 3

Grosch and the loss of her unborn child-allegedly as a result of the conduct of Jeddeloh and Hellerman. *Waivio v. Bd. of Trs.,* No. 04 C 3545, 04 C 2314, 04 C 6263, 05 C 2316, 2006 U.S. Dist. LEXIS 62126, *14-16 (N.D.Ill. Aug. 31, 2006).

## Discussion

### I. Defendants' Motion Under Rule 11 is Denied.

*3 Fed.R.Civ.P. 11(c)(1)(A) requires that a "motion for sanctions under this rule shall be made separately from other motions or requests ..." In filing a combined motion under Rules 11 and 12(b), Defendants have failed to comply with the procedural requirements of Rule 11(c)(1)(A). Moreover, the Court cannot ascertain from Defendants' papers whether they have complied with the "safe harbor" provision of Rule 11(c)(1)(A). That provision prohibits the filing of a motion for sanctions under Rule 11"unless, within 21 days after service of the motion (or such other period as the court may prescribe), the challenged paper, claim, defense, contention, allegation, or denial is not withdrawn or appropriately corrected."The plain language of Rule 11 requires the party filing a motion for sanctions under the rule to serve the motion upon the opposing party and allow 21 days before filing the motion with the court so that the party upon which the motion is served might have an opportunity to avoid sanctions by withdrawing the offending paper or allegation. In this case, the Defendants have not advised the Court whether they have provided Waivio with an opportunity to withdraw the Amended Complaint before bringing their Motion under Rule 11. Accordingly, because the Court cannot ascertain whether the Defendants have complied with the "safe harbor" provision set forth in Rule 11(c)(1)(A) and for their failure to comply with the requirement, under that same rule, that Rule 11 motions be brought separately from other motions, Defendants' Motion under Rule 11 is denied.

### II. Waivio's Claims are Barred by the Doctrine

of *Res Judicata.*

Defendants also move to dismiss the Amended Complaint, arguing that Waivio's claims are barred by the doctrine of *res judicata.*"A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of a complaint for failure to state a claim upon which relief may be granted."*Johnson v. Rivera,* 272 F.3d 519, 520-21 (7th Cir.2001). In reviewing a motion to dismiss, the court must accept all well-pleaded factual allegations in the complaint and must draw reasonable inferences from those facts in favor of the Plaintiff. *Richards v. Kiernan,* 461 F.3d 880, 882 (7th Cir.2006). Moreover, the courts must "treat pro se litigants gently." *Lockhart v. Sullivan,* 925 F.2d 214, 216 (7th Cir.1991). However, to survive a motion to dismiss, a complaint-even one filed by a pro se litigant-must set forth "enough facts to state a claim to relief that is plausible on its face."*Bell Atlantic Corp. v. Twombly,* --- U.S. ----, ----, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007).*Res judicata* is an affirmative defense, and the plaintiff need not plead around affirmative defenses.*United States Gypsum Co. v. Indiana Gas Co.,* 350 F.3d 623, 626 (7th Cir.2003); Fed.R.Civ.P. 8(c). Still, a plaintiff "may plead himself out of court by alleging (and thus admitting) the ingredients of a defense."*United States Gypsum,* 350 F.3d at 626.

*4 "Under the doctrine of res judicata, 'a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.'"*Highway J Citizens Group v. United States DOT,* 456 F.3d 734, 741 (7th Cir.2006) (quoting *Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980)).*Res judicata* applies to bar a subsequent action when the following three requirements are met: (1) there is an identity of causes of action; (2) there is an identity of parties or their privies; and (3) a final judgment on the merits. *Id.* (citing *Cent. States, S.E. & S.W. Areas Pension Fund v. Hunt Truck Lines, Inc.,* 296 F.3d 624, 628 (7th Cir.2002))."[T]he doctrine of res judicata

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

provides that, when a final judgment has been entered on the merits of a case, it is a finality as to the claim or demand in controversy, concluding parties and those in privity with them, not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose."*Nevada v. United States,* 463 U.S. 110, 129-30, 103 S.Ct. 2906, 77 L.Ed.2d 509 (1983) (internal quotation marks omitted).

A. *As Between this Case and Waivio's Previous Lawsuit, there is an Identity of Causes of Action.*

"A claim has 'identity' with a previously litigated matter if it emerges from the same 'core of operative facts' as that earlier action."*Brzostowski v. Laidlaw Waste Sys.,* 49 f.3d 337, 338-39 (7th Cir.1995) (citing *Colonial Penn Life Ins. Co. v. Hallmark Ins. Admin., Inc.,* 31 F.3d 445, 447 (7th Cir.1994)). That is to say, "[t]wo claims are one for the purposes of res judicata if they are based on the same, or nearly the same, factual allegations."*Id.* (citing *Colonial Penn,* 31 F.3d at 447). Accordingly, "the question is not [just] whether the legal issues now presented were raised previously; rather, it is whether these matters *'could have been raised* in [the prior] action.'"*Highway J,* 456 F.3d at 743 (quoting *Brzostowski,* 49 F.3d at 338 (emphasis added by *Highway J* court)).

"To determine 'whether the plaintiff could have raised the [current] issue[s] in the first suit,' we employ a 'same transaction' test."*Id.* (quoting *Doe v. Allied-Signal, Inc.,* 985 F.2d 908, 913 (7th Cir.1993))."Under the 'same transaction' test, 'a cause of action consists of a single core of operative facts giving rise to a remedy.... Once a transaction has caused injury, all claims arising from that transaction must be brought in one suit or lost. A plaintiff may not avoid an earlier judgment on the merits by merely concocting a new legal theory.'"*Id.* (quoting *Allied-Signal,* 985 F.2d at 913).

In this case, Waivio argues that *res judicata* is no bar to her claims because she has presented new facts regarding her interactions with UIC and because, she claims, her current Complaint focuses on events that occurred from 2004 until the present, as opposed to her previous suit which, she argues, sought recovery for events occurring between 2001 and 2004. (Am.Cplt.17-19.) Despite the fact that Waivio focuses on different facets of her experience at UIC in the two complaints, the discrimination she alleges in the operative complaint in this case-discrimination based on her national origin, gender, and disability-arises from the same "core of operative facts" discussed in the first complaint-the events and interactions that led to her eventual termination from UIC's graduate program. Waivio reviews her time at UIC in detail in both complaints. In both complaints she alleges that UIC denied her requests for accommodations for her disability; alleges that her dismissal stems from her Romanian heritage and her gender; and alleges that UIC discriminated against her by not offering her employment or funding-presumably on the same impermissible bases. That Waivio may have failed to raise certain facts or legal theories in her previous action is of no moment; she could have and should have raised all claims relating to her student status and employment with UIC in her previous action.

B. *There Exists an Identity of the Parties or their Privies as between this Case and Waivio's Previous Lawsuit.*

*5 In order for the doctrine of *res judicata* to apply as a bar to this action, there must be-as between this suit and Waivio's earlier lawsuit-an identity of the parties or their privies. While the parties to this suit are not nominally identical to the parties in Waivio's previous lawsuit (Arnstein was not a party to Judge Norgle's case), *res judicata* may still bar this action to the extent that the parties to this suit share a sufficiently close identity of interests with the parties to the earlier suit-and they do. *See People Who Care v. Rockford Bd. of Educ.,* 68 F.3d 172, 177 (7th Cir.1995) (concluding that privity "is gen-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

erally applied to those with a sufficiently close identity of interests"). Here, there can be no question that the defendants in this case share an identity of interest with the defendants in Waivio's previous lawsuit. UIC, Shatz and Nelson are parties to both suits. And Arnstein's interest in this suit is sufficiently identical to the individual lawyers who faced allegations in the previous suit. Jeddeloh and Hellerman-who practice law with the Arnstein firm-faced allegations in Waivio's previous suit that they caused the death of Waivio's unborn child; those allegations have been resurrected in this suit, but are now levied against the firm and not the individual lawyers.

### C. *Waivio's Previous Action Proceeded to a Final Judgment on the Merits.*

It is beyond question that Waivio's previous case proceeded to a final judgment on the merits. As a sanction for her abuse of the legal system, Judge Norgle dismissed that case with prejudice. *Waivio v. Bd. of Trs.,* No. 04 C 3545, 04 C 2314, 04 C 6263, 05 C 2316, 2006 U.S. Dist. LEXIS 62126 (N.D.Ill. Aug. 31, 2006). A dismissal with prejudice is a final judgment on the merits for the purposes of *res judicata. Phillips v. Shannon,* 445 F.2d 460, 462 (7th Cir.1971). Accordingly, Waivio's previous action-which was dismissed with prejudice as a sanction for abuse of the legal system-was disposed of via a final judgment on the merits; Waivio's arguments to the contrary are without merit.

**III. Even if Not Barred by *Res Judicata,* This Court Would Nevertheless Decline to Exercise Supplemental Jurisdiction Over Plaintiff's Claims Against Arnstein.**

Even if Waivio had not already raised her claims against Arnstein in her previous lawsuit-which she did-this Court would still decline to exercise supplemental jurisdiction over those allegations which, if they amount to anything at all, are tort claims under Illinois law between non-diverse parties. Al-

though Waivio appears to couch her allegations against Arnstein in terms of discrimination and retaliation, the Court fails to comprehend how Arnstein could be liable for any discrimination against Waivio in employment or education since Waivio does not allege that Arnstein is an educational institution nor does she allege that Arnstein ever employed Waivio or considered any application for employment submitted by Waivio. That is to say, taking Waivio's allegation that Arnstein treated Grosch favorably while treating Waivio poorly as true, that allegation does not state a claim for discrimination in employment or in education under federal law. As such, even if Waivio's allegations against Arnstein were new and could not have been addressed in the earlier litigation, they would still amount to nothing more than tort claims under state law over which this Court would decline to exercise its supplemental jurisdiction. *Baker v. Kingsley,* 387 F.3d 649, 654, n. 1 ("28 U.S.C. § 1367... expressly authoriz[es] district courts to decline to exercise supplemental jurisdiction over a state-law claim if all claims within the court's original jurisdiction [have] been dismissed.").[FN1]

> FN1. Because Waivio's claims against Arnstein appear to arise almost exclusively from the alleged "severe treatment" Waivio received from Hellerman and Jeddeloh during the course of the previous litigation, it is possible-if not probable-that those claims would also be barred by the litigation privilege under Illinois law. *See Steffes v. Stepan Co.,* 144 F.3d 1070, 1074 (7th Cir.1998) (quoting from the underlying district court opinion) ("Illinois law recognizes an absolute litigation privilege which protects anything said or written in the course of a legal proceeding. The only qualification to this privilege is that the communication pertain to the litigation. This requirement is not applied strictly, and the communication need not be confined to the specific issues involved in the litigation ... The absolute privilege is af-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 3087197 (N.D.Ill.)
**(Cite as: Slip Copy, 2007 WL 3087197)**

forded even when malice is assumed to
have motivated the attorney. All doubts are
to be resolved in favor of finding that the
privilege applies.")

### *Conclusion*

*6 For the reasons stated herein, Defendants' Mo-
tion to Dismiss is granted and Plaintiff's complaint
is dismissed with prejudice.

So ordered.

N.D.Ill.,2007.
Waivio v. Board of Trustees University of Illinois
at Chicago
Slip Copy, 2007 WL 3087197 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.